# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff*,<br>v.<br><br>DAVID M. SCANLAN in his official capacity as Secretary of State for the State of New Hampshire, and the STATE OF NEW HAMPSHIRE,<br><br>    *Defendants*. | Case No. 1:25-cv-00371-AJ<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE** |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 3

    I.    Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers. ....................................................................... 3

    II.    The Department of Justice has embarked on an unprecedented nationwide campaign to amass personal voter registration data held by the states. ................................................. 4

    III.    The Department of Justice sues New Hampshire to obtain its voter registration list. ........ 5

    IV.    Proposed Intervenors' personal information is placed in jeopardy by DOJ's demands. ..... 6

LEGAL STANDARD ................................................................................................................. 9

ARGUMENT ............................................................................................................................. 10

    I.    Proposed Intervenors are entitled to intervene as of right under Rule 24(a)(2). ............... 10

        A.    The motion is timely. ................................................................................................ 10

        B.    Proposed Intervenors have an interest in protecting their sensitive and personal information from improper disclosure to DOJ. ................................................... 10

        C.    The existing parties do not adequately represent Proposed Intervenors. ....................... 11

    II.    Alternatively, Proposed Intervenors should be granted permissive intervention. ............ 14

CONCLUSION .......................................................................................................................... 15

**INTRODUCTION**

The Department of Justice ("DOJ") recently embarked on an unprecedented nationwide campaign to amass a wide array of highly sensitive personal information on voters in a centralized database. In connection with this effort, DOJ sued New Hampshire and Secretary of State Scanlan on September 25, seeking to compel production of New Hampshire's complete and unredacted voter registration list, which contains sensitive and private information about every voter in New Hampshire. This assault intrudes not only on New Hampshire's constitutional prerogative to maintain and protect its own voter registration list and the explicit guarantees that New Hampshire has made to voters that their private information will not be shared; but also on the privacy rights of individual New Hampshire voters who have good reason to fear their personal information being handed over to the federal government. This includes Neal Kurk, Robert "Bob" Perry, Louise Spencer, and Christopher Cole ("Proposed Intervenors")—four civically engaged New Hampshire voters—who now move to intervene in this litigation to defend their privacy rights and prevent the improper disclosure of their sensitive and personal information to DOJ.

New Hampshire has exceptionally strong protections for precisely the kind of information that DOJ demands. Two of the Proposed Intervenors are former legislators with deep familiarity with these laws—one, Mr. Kurk, was directly involved in drafting and enacting these protections, including the New Hampshire Constitution's unique guarantee that "[a]n individual's right to live free from governmental intrusion in private or personal information is natural, essential, and inherent." N.H. Const. pt. 1, art. 2-b; *see also* RSA § 654:45(VI) (explicitly promising that the "voter database shall be private and confidential"). These protections are essential not only to Proposed Intervenors but to voters across New Hampshire, a state whose commitment to personal liberty is deeply grounded in its motto to "live free or die." DOJ's demands not only run roughshod over federalism principles and New Hampshire law—they spurn Proposed Intervenors' privacy

1

rights. Proposed Intervenors should be allowed to directly defend those interests.

Proposed Intervenors readily satisfy the standard for intervention as of right. *See* Fed. R. Civ. P. 24(a). They have a clear interest in ensuring the continued privacy of their personal information and that interest is directly threatened and could be severely impaired by this suit. The existing parties do not adequately represent that interest. While Defendants have thus far resisted disclosure, Secretary Scanlan has publicly stated that he "really [doesn't] have strong feelings about where this goes" and that his office would only oppose DOJ's request "for the time being."[1] Further still, the existing Defendants—as governmental defendants—must consider the "broader public-policy implications" of the issues presented in this suit, unlike Proposed Intervenors, who are solely concerned with protecting their privacy, "full stop." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 195–96 (2022) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538–39 (1972)). The fact that the State's chief election officer has already indicated that he does not perceive these rights as being as essential raises a strong risk that the existing Defendants will not litigate the case as vigorously as Proposed Intervenors. And once Proposed Intervenors' privacy rights are violated, such harm cannot be undone. Federal courts routinely grant intervention as of right to intervenors like these to ensure that their rights are zealously defended. This Court should do the same.

Alternatively, Proposed Intervenors should be granted permissive intervention under Rule 24(b) to ensure that New Hampshire voters have a voice in this case, the core subject of which is the disclosure of *their* personal information. At a minimum, Proposed Intervenors—who include the author of New Hampshire's unique state constitutional right to privacy and many prominent

---

[1] *See* Jonathan Shorman, *Some Republican states resist DOJ demand for private voter data*, Stateline (Sep. 18, 2025) ("Stateline Article"), https://stateline.org/2025/09/18/some-republican-states-resist-doj-demand-for-private-voter-data/.

members of New Hampshire's civil society—will help to develop the issues in this case and ensure vigorous presentation of arguments that the existing Defendants may be limited in presenting. Those considerations weigh strongly in favor of permissive intervention.

## BACKGROUND

**I.　　Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers.**

The U.S. Constitution "invests the States with responsibility for the mechanics" of elections, subject to any decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* U.S. Const. art. I, § 4, cl. 1. Accordingly, as a default matter, the Constitution assigns states the responsibility for determining voter eligibility and maintaining lists of eligible voters. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013).

While Congress has enacted certain laws governing voter registration, these laws augment existing "state voter-registration systems," *id.* at 5, and confirm that states are the custodians of voter registration data. Congress in 1993 enacted the National Voter Registration Act ("NVRA") to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501(b). New Hampshire is presently exempt from the NVRA, but even where it applies, the NVRA tellingly charges *states*—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including as to maintaining voter lists (subject to strict procedural safeguards), *id.* § 20507(c)–(g). It similarly makes *states* the custodians of voter lists, *see Husted*, 584 U.S. at 761.

In the wake of the 2000 elections, Congress enacted the Help America Vote Act ("HAVA") "to improve voting systems and voter access." *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Like the NVRA, HAVA regulates how *states* maintain voter lists, requiring

they create a "computerized statewide voter registration list" and "perform list maintenance." 52 U.S.C. § 21083(a)(1)(A), (2)(A). HAVA is abundantly clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A).

II. **The Department of Justice has embarked on an unprecedented nationwide campaign to amass personal voter registration data held by the states.**

This Spring, DOJ launched a campaign to demand broad and unprecedented access to state voter files, including personal information about each registered voter that New Hampshire law designates as "private and confidential." *See* RSA § 654:45(VI). DOJ has reportedly sent demands to well over thirty states, with plans to make similar demands on all fifty states.[2] It seeks to use the data to create a national voter database that will, in turn, be used to seek to substantiate President Trump's unfounded accusations that millions of non-citizens have voted illegally in recent elections.[3] The vast majority of states have refused to comply, appropriately declining to turn over sensitive personal information that is typically protected by state law.[4]

The pressure campaign against New Hampshire began on June 25, 2025, when DOJ sent Secretary Scanlan a letter demanding, among other things, New Hampshire's "statewide voter registration list." Ex. F at 2. Secretary Scanlan responded on July 25 by explaining that New Hampshire prohibited the Secretary from releasing the voter list except "in limited circumstances not applicable here." Ex. G at 8. DOJ then sent another letter on August 18 in which it claimed that the information was necessary to "ascertain New Hampshire's compliance with the list maintenance requirements of HAVA." Ex. H at 1. DOJ made clear it expected New Hampshire to supply information disclosing "all identifiers [of each voter], including the registrant's full name,

---

[2] *See* Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://perma.cc/8VP4-WRXD.
[3] *Id.*
[4] *See* Stateline Article, *supra* note 1 (noting only Indiana has acquiesced so far).

4

date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number." *Id.* at 1.

Secretary Scanlan declined again to produce a copy of New Hampshire's voter registration list on August 28.[5] But publicly, he has indicated an openness to complying with the DOJ's request. In an interview about the issue, he candidly said, "I really don't have strong feelings about where this goes."[6] He made clear that his refusal to turn over the voter list stood only "for the time being."[7]

**III.     The Department of Justice sues New Hampshire to obtain its voter registration list.**

DOJ filed this suit on September 25, seeking to compel New Hampshire to provide its full statewide voter registration list. *See generally* Dkt. 1. DOJ frames its suit chiefly as seeking to ensure that New Hampshire is complying with its obligations under HAVA. *Id.* ¶ 7. But HAVA does not require states to disclose voter registration materials to the federal government, and DOJ's complaint and letter correspondence cite no case law or other authority for the radical proposition that DOJ's authority to enforce HAVA's "uniform and nondiscriminatory" requirements entitles it to unfettered access to state voter registration lists upon demand. 52 U.S.C. § 21111.

Because HAVA plainly does not authorize DOJ's demands, the agency also invokes Section 303 of the Civil Rights Act of 1960, a long dormant Civil Rights era law that permits DOJ to review certain voting records to investigate "question[s] concerning infringement or denial of [] constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962). Congress enacted the law to preserve "the right of all qualified citizens to vote without discrimination on

---

[5] *See* Todd Bookman, *Trump Administration and NH officials continue fight over access to state's voter data*, N.H. Pub. Radio (Aug. 28, 2025, 4:48 PM), https://www.nhpr.org/nh-news/2025-08-28/trump-administration-and-nh-officials-continue-fight-over-access-to-states-voter-data.
[6] *See generally* Stateline Article, *supra* note 1.
[7] *Id.*

5

account of race," and specifically to facilitate "investigation[s]" authorized under the Civil Rights Act of 1957. H.R. Rep. No. 86-956, at 1944 (1959). But DOJ admits it is not seeking to enforce these laws or investigate the unconstitutional denial of the right to vote. Instead, DOJ claims to be evaluating New Hampshire's list maintenance efforts under HAVA. *See, e.g.*, Compl. ¶¶ 2, 7, 53.[8] The Civil Rights Act thus has no application here.

### IV. Proposed Intervenors' personal information is placed in jeopardy by DOJ's demands.

Proposed Intervenors are each civically-engaged, registered voters in New Hampshire whose confidential personal information—driver's license numbers, partial social security numbers, and full dates of birth—will be disclosed to DOJ if it prevails in its suit. That is notwithstanding New Hampshire's own strict protections for such data, including a constitutionally-enshrined right to privacy. N.H. Const. pt. 1, art. 2-b; *see also* RSA § 654:45(VI).

***Neal Kurk.*** Mr. Kurk is a Weare resident and voter who served for over three decades in the New Hampshire House of Representatives as a Republican member from the Hillsborough 2 District. *See* Ex. B ("Kurk Decl.") ¶ 3. Mr. Kurk has long been a leading advocate for privacy rights in New Hampshire and, in 2018, was the primary sponsor of an amendment to the State Constitution to enshrine an express right to privacy for personal information. *Id.* ¶ 4. The amendment proved overwhelmingly popular with New Hampshire voters, passing with roughly 80% support. *Id.* It states: "An individual's right to live free from governmental intrusion in private or personal information is natural, essential, and inherent." N.H. Const. pt., 1, art. 2-b. Mr. Kurk was also involved in drafting New Hampshire's laws promising that the voter registration database "shall be private and confidential." Kurk Decl. ¶ 6. And he previously served as a plaintiff in state

---

[8] Even if Section 303 did apply, it does not prohibit states from redacting confidential and sensitive voter information that has nothing to do with investigating the denial of the right to vote, just as they may under the NVRA. *See PILF v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024).

court litigation challenging an earlier effort by President Trump's Presidential Advisory Commission on Election Integrity to collect similar voter registration data. *Id.* ¶ 7. Mr. Kurk's work championing privacy rights is driven by a strong belief that ensuring personal privacy helps build trust in elections, encouraging private citizens to turn over personal information to local officials who can be counted upon to protect that data. *See id.* ¶ 12. He is deeply concerned that if DOJ is successful it will trample the privacy rights of New Hampshire voters and discourage participation in the electoral system. *Id.* ¶¶ 9–12. He does not want to see the protections he helped build into New Hampshire law erased by DOJ's top-down efforts. *Id.* He also cares deeply about his own privacy and does not want his own personal information turned over to the DOJ. *Id.* ¶ 10.

**Robert "Bob" Perry.** Mr. Perry is a Strafford resident and voter. *See* Ex. C ("Perry Decl.") ¶ 2. He served in the New Hampshire House of Representatives as a Democratic member from 2006 to 2010 and again from 2011 to 2014. *Id.* ¶ 3. During his time in the legislature he served on the House Committee on Election Law. *Id.* Since leaving the legislature, Mr. Perry has been an active volunteer with Open Democracy, an organization committed to preserving a government accountable to the people and with political equality for all. *Id.* ¶ 4. He is currently the Vice Chair of Open Democracy Action. His work at Open Democracy focuses on preserving voting rights, bolstering government transparency, and ensuring fair redistricting in New Hampshire. *Id.* Mr. Perry's personal experience as an electoral candidate and on the election law committee taught him that New Hampshire voters have a strong expectation that their personal information will be kept private when shared with state and local election officials. *Id.* ¶ 5. Mr. Perry strongly believes that DOJ's effort in this suit will undermine faith in New Hampshire's electoral system across voters of all stripes. *Id.* ¶ 8. If DOJ is successful in compelling the disclosure of voters' personal information, he fears that it will discourage voter registration and participation in the state's

7

elections. *Id.* ¶¶ 8–9, 11. He also does not have faith that DOJ will properly use or protect voters' personal data, particularly given widespread reporting of data misuse by the current administration. *Id.* ¶ 10. Mr. Perry also strongly opposes his own personal data being surrendered to DOJ. *Id.* ¶ 8.

***Louise Spencer.*** Ms. Spencer is a Concord resident and voter who does not want her personal voter registration data turned over to the federal government. *See* Ex. D ("Spencer Decl.") ¶ 2, 11. She strongly supports and relies on New Hampshire's extensive protections for such information and appreciates the security they give her as a politically active citizen, particularly in a political climate where the federal government routinely retaliates against its opponents. *Id.* ¶¶ 8–9. Ms. Spencer is also the co-founder of Kent Street Coalition ("Kent Street"), an all-volunteer grassroots community organization focused on, among other things, helping to ensure that all New Hampshire voters are able to engage in politics in a meaningful way at the local level. *Id.* ¶¶ 3–4. The organization's work relies upon motivating volunteers to speak publicly and forcefully on matters of public concern, including in the press and before the legislature. *Id.* ¶ 10. In recent months, volunteers have increasingly expressed unease about publicly opposing legislation supported by the current administration, out of fear that it will expose them to scrutiny or retaliation. *Id.* ¶ 5. These are not concerns that Ms. Spencer has heard before and she fears that DOJ's suit, if successful, will exacerbate this problem. *Id.* 9. Thus, DOJ's suit adds to a climate of intimidation and retaliation that Mr. Spencer fears will discourage the public volunteering and civic engagement work that Kent Street relies upon. *Id.* ¶¶ 9–10. It will also make it more difficult for Kent Street volunteers to motivate ordinary voters to participate in the electoral process. *Id.* ¶ 10. Finally, Ms. Spencer has also frequently volunteered as a poll observer, which has given her firsthand appreciation for the importance of New Hampshire's privacy protections. *Id.* ¶ 6. She herself relies upon those protections and places faith in her state and local election officials to

protect her personal political information. *Id.*

***Christopher Cole.*** Mr. Cole is a resident and voter in Portsmouth. *See* Ex. E ("Cole Decl.") ¶ 2. Mr. Cole moved to New Hampshire in 1991 and practiced law here for over three decades while also raising a family. *Id.* ¶ 2–3. He has consistently been civically engaged, including through service on the Board of an organization dedicated to educating young people about voting and has repeatedly served as a volunteer poll observer. *Id.* ¶¶ 4–5. These experiences have underscored for him the importance of New Hampshire's strong privacy protections for voters and contributed to his strong belief that New Hampshire's privacy laws help encourage voter participation. *Id.*¶ 6. He also deeply values these protections for his own data and opposes having his personal data turned over to DOJ, both out of a concern for his own privacy and because he is worried that turning over the data will facilitate retaliation and result in its improper use, including potentially against individuals like him who frequently speak out against the current political administration, particularly on issues around elections and voting. *Id.* ¶¶ 7, 9–12.

## LEGAL STANDARD

A movant has a right to intervene where "(i) its motion is timely; (ii) it has an interest relating to the property or transaction that forms the foundation of the ongoing action; (iii) the disposition of the action threatens to impair or impede its ability to protect this interest; and (iv) no existing party adequately represents its interest." *Ungar v. Arafat*, 634 F.3d 46, 50 (1st Cir. 2011) (citing Fed. R. Civ. P. 24(a)(2)). Courts also have discretion to grant intervention if the movant has "a claim or defense that shares with the main action a common question of law or fact," if doing so will not "unduly delay or prejudice the adjudication of the original parties'

rights," Fed. R. Civ. P. 24(b).[9] There is a strong "policy favoring liberal intervention under Rule 24." *In re Thompson*, 965 F.2d 1136, 1143 n.11 (1st Cir. 1992).

**ARGUMENT**

**I.  Proposed Intervenors are entitled to intervene as of right under Rule 24(a)(2).**

**A.  The motion is timely.**

Proposed Intervenors' motion—filed a mere five days after DOJ brought suit and before any case schedule has been set—is plainly timely. *See Fiandaca v. Cunningham*, 827 F.2d 825, 834 (1st Cir. 1987) (motion timely where filed "days" after "learning that their interests may be affected"); *see also Old Orchard Provisions, LLC v. Town of Old Orchard Beach*, No. 2:23-CV-00272-NT, 2023 WL 8540917, at *3 (D. Me. Dec. 11, 2023) (similar). Moreover, because no case schedule has yet been set and no substantive events have yet occurred in the case, there is no risk of prejudice to the existing parties. *See Garrity v. Gallen*, 697 F.2d 452, 455 (1st Cir. 1983). Proposed Intervenors further agree to abide by any schedule set by the Court or the existing parties.

**B.  Proposed Intervenors have an interest in protecting their sensitive and personal information from improper disclosure to DOJ.**

Proposed Intervenors also satisfy Rule 24(a)(2)'s interest factors, because each has "interests, [which] as a practical matter, may be impaired by this litigation." *B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.*, 440 F.3d 541, 545 (1st Cir. 2006). Each is a registered New Hampshire voter who strongly opposes the disclosure of their sensitive personal information to the federal government. *See supra* Background Section IV. "[T]hat is all Rule 24 demands." *Sakab Saudi Holding Co. v. Aljabri*, No. CV 21-10529-NMG, 2021 WL 8999588, at *2 (D. Mass. Oct. 26,

---

[9] In compliance with Rule 24(c), Proposed Intervenors attach a proposed "pleading" to their motion. *See* Ex. A. Proposed Intervenors reserve the right to file a Rule 12 motion ahead of any deadline set by the Court or the Federal Rules.

2021) (finding Rule 24(a)(2) satisfied where the "plaintiff's claims 'could result' in the disclosure of privileged information" (quoting *Fernandez*, 440 F.3d at 545)).

Beyond their individual privacy concerns, each Proposed Intervenor has discrete interests tied to their participation in New Hampshire's civic life. Mr. Kurk has a strong interest in preserving the privacy protections he helped build into New Hampshire law, including the constitutional amendment he sponsored and which passed with overwhelming public support. *See* Kurk Decl. ¶ 4. Ms. Spencer has a strong interest in ensuring she can continue to effectively conduct her work on behalf of Kent Street, including by motivating volunteers to speak out on issues of public concern. *See* Spencer Decl. ¶¶ 4–5, 9. Mr. Perry fears DOJ's efforts will undermine public confidence in the electoral system; confidence he worked hard to build and sustain in the legislature. *See* Perry Decl. ¶¶ 5, 8. Mr. Cole worries about his ability to criticize members of the current presidential administration, particularly given the administration's recent efforts to retaliate against lawyers opposed to its efforts. *See* Cole Decl. ¶¶ 10–11. As a "practical matter," these interests each "may be impaired by this litigation." *Fernandez*, 440 F.3d at 545.

### C. The existing parties do not adequately represent Proposed Intervenors.

Proposed Intervenors readily make the "minimal showing that the representation afforded by existing parties likely will prove inadequate." *Pub. Serv. Co. of N.H. v. Patch*, 136 F.3d 197, 207 (1st Cir. 1998); *accord Trbovich*, 404 U.S. at 538 n.10.[10]

DOJ plainly does not represent Proposed Intervenors' interests—it seeks to forcibly compel production of their sensitive personal information against their wishes and in violation of privacy

---

[10] *See also McDonough v. City of Portland*, No. 2:15-CV-00153-JDL, 2015 WL 3755289, at *3 (D. Me. June 16, 2015) (confirming burden to show inadequate representation "is not onerous" even when an existing governmental party intends to defend the action: "the intervenor need only show that the government's representation *may* be inadequate, not that it *is* inadequate" (citing *Conservation L. Found. of New Eng., Inc. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992)).

11

laws. The existing Defendants also do not adequately represent Proposed Intervenors' interests. Secretary Scanlan has already expressed disconcerting ambivalence about the issue, publicly commenting that he "really [doesn't] have strong feelings about where this goes" and that his office is only opposing DOJ's request "for the time being."[11] Those concessions readily illustrate that the existing Defendants "*may*" supply inadequate representation here—all that is required to satisfy this factor. *McDonough*, 2015 WL 3755289, at *3 (citing *Mosbacher*, 966 F.2d at 44). Proposed Intervenors do not share Secretary Scanlan's ambivalence—they are *categorically* opposed to DOJ's efforts and care *strongly* about where this case goes. *See, e.g.*, Kurk Decl. ¶¶ 9– 12; Perry Decl. ¶¶ 7–11; Spencer Decl. ¶¶ 7–11; Cole Decl. ¶¶ 8–12. Their interests are accordingly self-evidently "different in kind [and] degree from those" of the existing Defendants, readily satisfying the inadequacy of representation inquiry. *Fernandez*, 440 F.3d at 546 (citation omitted).

Moreover, the risk that the existing Defendants may resolve the case weighs strongly in favor of granting intervention. *E.g.*, *City of Chicago v. FEMA*, 660 F.3d 980, 986 (7th Cir. 2011) (explaining that a possible "conflict of interest . . . when it comes to settlement possibilities" favors intervention); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 974 (3d Cir. 1998) (similar). Representation is not adequate where existing parties may seek to "negotiate[] a settlement that would [be] contrary to the interest of the prospective intervenors." *Fiandaca*, 827 F.2d at 833.[12]

Even absent Secretary Scanlan's concessions, good reason exists to find that Defendants are not likely to represent the interests of Proposed Intervenors. As governmental defendants, they

---

[11] *See* Stateline Article, *supra* note 1.

[12] The existing defendants may also face unique pressure in seeking to settle this suit. Unlike the other seven states sued to date by DOJ for refusing to turn over voter rolls, New Hampshire is unique as the only state led by officials of President Trump's own political party. These Defendants therefore are likely to face acute pressure to settle this suit on terms that Proposed Intervenors—a bipartisan collection of New Hampshire voters—are unlikely to find satisfactory.

12

must balance their own personal views with their public duties, including under federal and state laws governing voter registration. *See Kleissler*, 157 F.3d at 972 (recognizing that a government official's interests are "necessarily colored by [their] view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it"); *cf. Bellitto v. Snipes*, 935 F.3d 1192, 1201 (11th Cir. 2019). As a result, "a governmental entity charged by law with representing the public interest of its citizens" will not necessarily "advance the narrower interest of a private entity." *Mosbacher*, 966 F.2d at 44. Courts have thus "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003).

The Supreme Court itself recently emphasized this point, noting that public officials must "bear in mind broader public-policy implications," whereas private litigants—like Proposed Intervenors—seek to vindicate their own rights "full stop." *Berger*, 597 U.S. at 195–96 (citing *Trbovich*, 404 U.S. at 538–39). Because state officials do not share "identical" interests with private parties, private parties bear only a "minimal" burden in showing inadequate representation. *Id.* (citation omitted). And courts in general are typically "liberal in finding" this requirement satisfied; recognizing that, ultimately, "there is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests." 7C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1909 (3d ed. 2024). Here, Proposed Intervenors are not "constrained" by competing public duties, *Mosbacher*, 966 F.2d at 44, and are vehemently opposed to the exposure of their personal and private information. In order to ensure that their interests are adequately represented, they must be allowed to intervene to defend them.

**II. Alternatively, Proposed Intervenors should be granted permissive intervention.**

This Court should alternatively exercise its discretion to grant permissive intervention. Rule 24(b) "should be construed liberally" in favor of intervention, *Animal Prot. Inst. v. Martin*, 241 F.R.D. 66, 68 (D. Me. 2007) (citation omitted), and it is readily satisfied here—Proposed Intervenors assert a "claim or defense that shares with the main action a common question of law or fact," *see* Ex. A, and granting intervention would not "unduly delay or prejudice the adjudication" of the matter, Fed. R. Civ. P. 24(b). Indeed, Proposed Intervenors agree to abide by any schedule entered by the Court or agreed to by the existing parties.

Courts regularly grant permissive intervention to ensure actual voters (or organizations representing them) have a say in litigation concerning their rights.[13] That rationale applies with particular force here. Proposed Intervenors indisputably have "confidentiality and/or privacy interest[s]" at stake in this case, which alone "warrants an opportunity to permissively intervene to protect that interest." *In re Exch. Union Co.*, No. 24-MC-91645-ADB, 2025 WL 894652, at *3 (D. Mass. Mar. 24, 2025). Further, Proposed Intervenors are a bipartisan collection of New Hampshire voters that include the drafter of the state's constitutional right to privacy, another former elected official familiar with election law issues, and members of New Hampshire's civil society who are actively engaged in New Hampshire elections. *See supra* Background Section IV. These individuals will add a unique—and critically important—voter perspective that will be "helpful in fully developing the case." *Daggett v. Comm'n on Governmental Ethics & Election Pracs.*, 172 F.3d 104, 113 (1st Cir. 1999). Their familiarity with New Hampshire's privacy protections will also provide "expertise and personal experience" that aid the Court's resolution of

---

[13] *See, e.g.*, *RNC v. Aguilar*, No. 2:24-CV-00518-CDS-MDC, 2024 WL 3409860, at *3 (D. Nev. July 12, 2024); *Ariz. All. for Retired Ams. v. Hobbs*, No. CV-22-01374, 2022 WL 4448320, at *2 (D. Ariz. Sep. 23, 2022); *PILF v. Winfrey*, 463 F. Supp. 3d 795, 802 (E.D. Mich. 2020).

this important matter. *Id.* These considerations, in addition to the clear satisfaction of Rule 24(b), strongly weigh in favor of permissive intervention.

## CONCLUSION

For all of the foregoing reasons, Proposed Intervenors respectfully request that the Court grant them intervention as of right—or in the alternative grant permissive intervention—to allow them to protect the significant interests they have at stake in this case.

Dated: September 30, 2025

Respectfully submitted,

*/s/ Steven J. Dutton*
Steven J. Dutton, NH Bar No. 17101
**McLANE MIDDLETON, P.A.**
900 Elm Street
Manchester, New Hampshire 03101
Telephone: (603) 625-6464
steven.dutton@mclane.com

Paul Twomey, NH Bar No. 2589
**TWOMEY LAW OFFICE**
PO Box 623
Epsom, New Hampshire 03234
Telephone: (603) 568-3254
polotuama7@gmail.com

Elisabeth C. Frost*
David R. Fox*
Christopher D. Dodge*
Marcos Mocine-McQueen*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
efrost@elias.law
dfox@elias.law
cdodge@elias.law
mmcqueen@elias.law

Walker McKusick*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(206) 656-0177
wmckusick@elias.law

*Counsel for Plaintiff*

*\* Pro Hac Vice Applications Forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2025, the foregoing document was served via e-mail on all counsel of record.

/s/ Steven J. Dutton