# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

United States of America,　　　　*

　　　　　　　　　　　　　　　　*

　　　　　Plaintiff,　　　　　　*

　　　　v.　　　　　　　　　　　*　　　Civil No. 1:25-cv-00371-AJ

　　　　　　　　　　　　　　　　*

David M. Scanlan, in his official capacity　*

as Secretary of State for the　　*

State of New Hampshire,　　　　*

and the State of New Hampshire.　*

　　　　　　　　　　　　　　　　*

　　　　　Defendants.　　　　　*

　　　　　　　　　　　　　　　　*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

The Federal Government brought this action to try to compel or coerce the New

Hampshire Secretary of State and the State of New Hampshire to provide it with a complete,

unredacted copy of New Hampshire's statewide voter registration list (SVRL).[1]  The SVRL is an

interactive computer database created and maintained by the State to allow it to more efficiently

and effectively administer elections.  The SVRL contains massive quantities of confidential

information—including names, social security numbers, dates of birth, residential addresses,

party registrations, and voting histories—on all active and inactive registered voters in New

Hampshire.

This case should be dismissed because the Federal Government has no statutory authority

to compel the State of New Hampshire to comply with its unprecedented demand.  *See generally*

*United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at \*5 (C.D. Cal. Jan.

---

[1] The Federal Government filed this civil action as part of a larger, coordinated effort to acquire from each state the personal identifying information of virtually all their citizens, paired with historic voter participation and in some cases party affiliation information. *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at \*13-14 (C.D. Cal. Jan. 15, 2026) (noting demands have been made to at least 43 states and D.C. and that US DOJ has filed suit against at least 23 states and D.C.).

15, 2026) (finding in a nearly identical lawsuit that the request being made by the Federal Government was both "unprecedented and illegal."). The demand is neither authorized by the Help America Vote Act nor by the Civil Rights Act of 1960. In fact, quite the opposite is true. Providing the SVRL to the Executive Branch of the Federal Government would violate both state and federal law. As such, this Court should grant New Hampshire's motion to dismiss upon a finding that the Federal Government's complaint fails to state a legal claim for relief.

**Statement of Facts**[2]

In late June 2025, the Federal Government, through the U.S. Department of Justice, sent New Hampshire Secretary of State, David Scanlan, a two-page letter. Exhibit 1: June 25 Letter. The letter noted that federal law, specifically the Help America Vote Act (HAVA), contained minimum standards for states with relation to "several key aspects of administration of federal elections[.]" *Id.* The letter asked Secretary Scanlan to provide "information regarding the State's HAVA compliance" to the U.S. Department of Justice within thirty days in the form of answers to fifteen separate questions/requests for information. *Id.* For example, the letter requested that Secretary Scanlan:

> Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.

---

[2] Despite this case being at the Motion to Dismiss stage, the court may consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment. *See Torréns v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994); 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34[2] (3d ed. 1999). Certain written instruments attached to pleadings may be considered part of the pleading. *See* Fed. R. Civ. P. 10(c). Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim. *See Van Buskirk*, 284 F.3d at 980; *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Venture Assoc. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). The defendant may offer such a document, and the district court may treat such a document as part of the complaint and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).

*Id.* Additionally, the letter demanded Secretary Scanlan "send" the Federal Government a "current statewide voter registration list" including both active and inactive voters. *Id.*

Secretary Scanlan largely complied with the demands put forth in the Federal Government's letter, answering the majority of the questions in full. *See* Exhibit 2: July 25 Letter. For example, as to the duplicate voter registration question, Secretary Scanlan provided a summary of the process adopted by New Hampshire and contained within its statutes for identifying and removing duplicate voter registrations. *Id.* However, Secretary Scanlan also explained to the Federal Government that he would be unable to give full answers to some questions because he had legal obligations to protect information that would pose a cybersecurity risk if disclosed. *Id.* As to the Federal Government's demand that Secretary Scanlan send a current statewide voter registration list, Secretary Scanlan explained that he was only permitted by law to provide the statewide list in limited circumstances not applicable here. *Id.*; *see also* N.H. RSA 654:31, IV (authorizing the Secretary of State to provide a statewide list with limited voter information to candidates, political parties, and political committees). Secretary Scanlan noted, however, that the Federal Government could obtain a copy of the public checklist from each municipality and provided a link to a list of all municipalities. *Id.* N.H. RSA 654:31, II (requiring each municipality to provide a copy of the most recent public checklist to any person who requests it). Finally, Secretary Scanlan's letter made clear that the Federal Government should let him know if it needed any follow-up information in addition to what was being provided. *Id.*

The Federal Government responded back a few weeks later with a new letter discussing only their request for a copy of the statewide voter registration list. *See* Exhibit 3: August 18 Letter. No mention whatsoever was made to any perceived deficiencies in the answers provided

by Secretary Scanlan to the other fourteen questions and requests for information/documentation. *Id.* Instead, the Federal Government's second letter made a new claim that the U.S. Department of Justice had "independent authority … to seek the State's [voter registration list]" under 52 U.S.C. § 21111. That statute provides that the U.S. Attorney General "may bring a civil action against any State" to seek declaratory or injunctive relief "as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements" of HAVA. 52 U.S.C. § 21111. *Id.* The Federal Government also claimed to have authority to a copy of the statewide voter registration list under the Civil Rights Act of 1960. Exhibit 3: August 18 Letter. The letter claimed that the Federal Government's "purpose" for making its request for the statewide voter registration list was "to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA[.]" *Id.* Notably absent was any assertion that the Federal Government had reason to believe New Hampshire was out of compliance with federal law.

Finally, the letter expanded the prior request, now demanding that it be provided not just a "current statewide voter registration list," Exhibit 1: June 25 Letter, but instead a full, unredacted version of the SVRL, including "all fields" and "all identifiers, including the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number," Exhibit 3: August 18 Letter. The Federal Government demanded that this information to be provided within seven days and made clear that the Federal Government, while not intending to make the information public, would consider itself free to share the provided unredacted list with other "governmental agencies[.]" *Id.*

Secretary Scanlan responded by letter ten days later. Exhibit 4: August 28 Letter. He once again explained that production of an unredacted copy of New Hampshire's SVRL was

prohibited by state law and that, having reviewed the purported authorities offered by the Federal Government, found no "provision under federal law that compels the production of voter registration data" that would supersede the prohibition put in place by state law. *Id.* Secretary Scanlan once again reminded the Federal Government that it could get copies of the municipal level voter lists and even offered to provide copies of all the marked checklists from the 2024 general and primary elections should the Federal Government wish to see them. *Id.*

Secretary Scanlan received no further communication from the Federal Government on these topics and, about a month later, the Federal Government filed its complaint initiating this legal proceeding. The Federal Government's complaint contains two counts. Count I claims that the State of New Hampshire violated the Civil Rights Act, 52 U.S.C. §§ 20701-20706, when it refused to provide the Federal Government with an electronic copy of its computerized statewide voter registration list (SVRL). Compl. ¶¶55-59. Count II claims that the State of New Hampshire violated The Help America Vote Act (HAVA), 52 U.S.C. § 21083, by: (1) failing to provide sufficient information to the Federal Government upon request; (2) failing to conduct list maintenance as required; (3) refusing to provide the Federal Government a complete computerized copy of its SVRL; and (4) failing to provide the Federal Government information about the process it uses to validate driver's license numbers and social security numbers submitted with voter registration applications. Compl. ¶¶60-61.

Based upon these two claims of statutory violations, the Federal Government's prayer for relief is in four parts. Compl. (Prayer for Relief) ¶¶1-4. The Federal Government seeks to have this Court issue three declarations: that the State of New Hampshire is out of compliance with Title III of the Civil Rights Act; that the State of New Hampshire is out of compliance with HAVA section 303; and that the State of New Hampshire law prohibiting disclosure of the

SVRL except in limited circumstances is preempted by federal law. Finally, the Federal Government seeks an order compelling the State of New Hampshire to provide the Federal Government a current, unredacted copy of its SVRL.

### Argument

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts that, if accepted as true, are sufficient to "raise a right to relief above the speculative level" and to state a "claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Courts should grant Rule 12(b)(6) motions when there is no cognizable legal theory to support the claim. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). At the motion to dismiss stage, courts must accept all material facts alleged in the complaint as true and construe them in the light most favorable to the non-moving party. *Tomkins v. United Health Care of New England, Inc.*, 203 F.3d 90, 93 (1st Cir. 2000).

The Federal Government's complaint is not sufficient to survive this motion to dismiss as it fails to state a claim of relief that is plausible on its face. The complaint is neither supported by any viable legal theory nor by well plead facts. Specifically, the Civil Rights Act does not compel the State of New Hampshire to comply with the Federal Government's demands for a complete, unredacted copy of the SVRL. Neither does HAVA compel such compliance and, to the contrary, compliance with the Federal Government's demand would directly violate both federal and state law. As to the Federal Government's allegations that New Hampshire is out of compliance with its obligations under HAVA, the Complaint contains no well plead facts supporting any allegation that New Hampshire is substantively out of compliance with its legal obligations under federal law. New Hampshire has provided information on its procedures and processes whenever it has been asked, and the complaint contains no well plead facts to support

a legal conclusion that New Hampshire is out of compliance with its list maintenance obligations under HAVA.

For all these reasons, the State of New Hampshire is entitled to have this motion to dismiss granted and the case against it dismissed for failure to state a claim upon which relief may be granted.

**I.  The State of New Hampshire is not compelled by the Civil Rights Act to provide the Federal Government with an unredacted copy of its SVRL.**

52 U.S.C. § 20701 requires state election officials to "retain and preserve, for a period of twenty-two months … all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]"  52 U.S.C. § 20703 then requires that the records so retained and preserved "shall, upon demand in writing by the Attorney General or his representative …, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative."  When making such a demand the Federal Government must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The Federal Government's demand for the SVRL was not a valid demand pursuant to 52 U.S.C. § 20703 for two reasons.  First, an electronic copy of New Hampshire's SVRL is not a record which must be retained and preserved under 52 U.S.C. § 20701 (and therefore not a record that must be produced under 52 U.S.C. § 20703).  Second, the Federal Government's demand did not contain a sufficiently stated basis and purpose to be validly made under the law.

### a. The SVRL is not a record or paper covered by 52 U.S.C. § 20701's retention and preservation requirements.

The Civil Rights Act requires state officials to "retain and preserve … all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]" 52 U.S.C. § 20701.  It is only these records and papers which must be produced upon demand by the executive branch of the federal government through the Attorney General. 52 U.S.C. § 20703.  New Hampshire's SVRS is not such a record or paper.

Passed in 1960, Title III of the Civil Rights Act was intended to ensure states preserved, and the federal government could access, "public records which ought ordinarily to be open to legitimate reasonable inspection." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962).  It was not intended by Congress to provide the executive branch of the federal government unrestricted access to "confidential, private papers and effects" of all voting citizens within the United States. *Id.*  The SVRL, a centralized statewide database full of highly sensitive information, did not exist until more than forty years after the passage of the Civil Rights Act, when HAVA was passed in the early 2000s.  It is inconsistent with precedent, and frankly illogical, to think that Congress intended the Civil Rights Act record retention and production requirement passed to ensure the federal government could inspect voter registration paperwork to prevent disenfranchisement of minorities to apply in such a way as to require wholesale production to the federal government of all states' unredacted SVRLs.

When interpreting the Civil Rights Act over the last half century, courts have not reached a consistent conclusion as to what constitutes a record or paper which must be retained and produced because it relates to applications, registrations, payment of a poll tax,

or "other act requisite to voting" as the phrases are used within the Civil Rights Act. *See Liebert v. Millis*, 733 F. Supp. 3d 698, 711-12 (W.D. Wis. 2024) (collecting cases interpretating meaning of phrase "any record or paper relating to any application, registration, or other act requisite to voting" as used within another section of the Civil Rights Act). However, even courts which interpret this phrase most broadly extend it only to "voting-related paperwork." *Id.* Covered documents have, in some circumstances, been found to include things such as voter registration forms and applications for absentee ballots. *Id.* However, even the inclusion of paper ballots themselves is in question as ballots do not appear to be a record or paper "requisite to voting in an election." *Id.*; *see generally Ritter v. Migliori*, 142 S. Ct. 1824, 1826 n.2 (Alito, J., dissenting) ("It is therefore awkward to describe the act of voting as 'requisite to the act of voting.'"). Under all the case law, the SVRL is far outside the kinds of papers and records which are implicated by the retention and production requirements of the Civil Rights Act.

      **b.** **The Federal Government's demand for the SVRL did not comply with the Civil Rights Act's statutory requirement that written production demands contain a statement of the basis and the purpose therefor.**

The Civil Rights Act requires that the Federal Government's demand for election records "contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The plain language of the statute—in particular the use of the definite article "the" before both "basis" and "purpose"—creates a bipartite requirement. *See Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.,* 963 F.3d 982, 990 (9th Cir. 2020) ("[W]hen 'and' is used to join two concepts, it is usually interpreted to require 'not one or the other, but both.'"). Accordingly, when seeking records under the Civil Rights Act, the Federal Government must state both the basis and the purpose, *i.e.* both the objective or goal of the request and the underlying fact or condition giving rise to the request. *See Black's Law Dictionary* (12th ed. 2024) (defining purpose as the

"objective, goal, or end" and the basis as the "underlying fact or condition"). *See also Kennedy v. Lynd,* 306 F.2d 222, 229 n.6 (5th Cir. 1962) (finding the United States Attorney General to have articulated a sufficient statement of the basis and purpose of a request for documents when he explained that the demand was "based upon information" tending to show race based discrimination in voting and voter registration was occurring and that the "purpose of this demand" was to ascertain whether a violation of federal law was occurring); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *24 (C.D. Cal. Jan. 15, 2026) ("The DOJ is required to offer a written statement of *both* the purpose and basis for its demands to California.").

### i. No basis for the Federal Government's demand was offered within its letter to New Hampshire.

As outlined in the fact section above, the Federal Government's demand pursuant to 52 U.S.C. § 20703 purported to articulate a purpose (the insufficiency of which will be discussed in the following section). Exhibit 3: August 18 Letter. However, it made no statement whatsoever as to the basis for its request. *Id.* The Federal Government does not contest this fact herein, describing their demand as follows:

> The August 18 Letter also included a written demand to Defendants for the production of specific election records pursuant to the CRA, as authorized by 52 U.S.C. § 20703. The letter explained that the purpose of the request is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA.

*See* Compl. ¶46 (internal citations omitted).

Given this failure to offer any basis, the Federal Government's demand is, on its face, an invalid record request under 52 U.S.C. § 20703 and the State of New Hampshire had no obligation to comply. As such, count I of the Federal Government's complaint, which claims

that by failing to comply New Hampshire was in violation of the Civil Rights Act, must be dismissed on this basis alone.

### ii. The purpose offered for the Federal Government's demand was not factually nor legally valid.

The Federal Government's stated purpose for its demand was "to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)." Exhibit 3: August 18 Letter.  This is neither a valid nor a credible purpose for making a request under the Civil Rights Act.

In enacting the Civil Rights Act, Congress did not intend to give the executive branch through the Attorney General in Washington roving and unbounded authority to request states' election records. *See generally United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 201–02 (1979) ("It is a 'familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers.'").  Instead, it was intended to give the Attorney General the tools necessary to protect American's civil rights.

When enacted in 1960, the Civil Rights Act sought to protect the "constitutional right of every American … to vote without discrimination on account of race or color." "Statement by the President Upon Signing the Civil Rights Act of 1960," May 6, 1960, https://tinyurl.com/3ses36xe.  To ensure this purpose could be realized, the law provided the Attorney General the "power to require the production of election records during any investigation of complaints that qualified persons have been denied the right to vote in violation of federal law," without which "assembl[ing] the necessary proof of discrimination [was] impracticable, if not impossible." Proposed Civil Rights Legislation: Hearing Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary, 86th Cong. 13-14

(Mar. 20, 1959), https://tinyurl.com/2caa3m27.[3] *See also* H.R. Doc. No. 75 (1st Sess. 1959),

*reprinted in* 105 Cong. Rec. 1922 (Feb. 5, 1959); H.R. Rep. No. 86-956 (Aug. 20, 1959),

*reprinted in* 1960 U.S.C.C.A.N. 1925, 1944; *Lynd*, 306 F.2d at 228 (explaining that purpose

of Title III is to allow for gathering of records "relating to all persons as to whom there is a

question concerning infringement or denial of their constitutional voting rights" in order to

allow Attorney General to fulfill "duties imposed upon him by the Civil Rights Act of 1957

and 1960").

       When viewed in this context, the inclusion of "the basis and the purpose" requirement

in 52 U.S.C. § 20703 is properly understood as a requirement that the Attorney General

disclose "the basis" it has to believe there has been a violation of an American's civil rights

and "the purpose" for which the records will be used. *See generally Lynd,* 306 F.2d at  229

n.6 (finding sufficient a statement of the basis and purpose which explained the demand was

based upon information tending to show race based discrimination in voting and voter

registration was occurring and that the purpose of this demand was to ascertain whether a

violation of federal law was occurring); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss.

1962) (finding valid statement of basis and purpose where it was explained that the Attorney

General had information "tending to show that discriminations on the basis of race and color

have been made with respect to registration and voting"); *Kennedy v. Bruce*, 298 F.2d 860,

863 & n.2 (5th Cir. 1962) (noting that statistical evidence in a CRA records-production

---

[3] *See also* Proposed Civil Rights Legislation: Hearing Before the S. Comm. on the Judiciary, 86th
Cong. 8 (Mar. 28, 1960) ("March 28, 1960 AG Statement") (statement of William P. Rogers, Att'y
Gen. of the U.S.) at 8, https://tinyurl.com/ydx2y9wd (reiterating the Election Records Provision was
"essential to the effective enforcement of the Civil Rights Act of 1957"); U.S. Comm'n on Civil
Rights, *Report of the U.S. Commission on Civil Rights, 1959*, at 137–38 (Sept. 9, 1959),
https://tinyurl.com/24mddz2z (recommending Congress require states and localities to retain records
and permit inspection to facilitate investigation of alleged voter discrimination).

proceeding indicating a failure to remove voters who moved away or died was "a matter which does not bear any particular importance to the present inquiry").

Understanding "the basis and the purpose" requirement as delineating a boundary on the statutorily conferred authority is vital because, without it, the Executive Branch of the Federal Government, through the appointed Attorney General in Washington, would have limitless authority to demand that states turn over sensitive voter data for any reason, including a patently improper one. It would be illogical to read the statutory language requiring the Attorney General to state in writing the basis and the purpose for her request as not to also require that this basis and purpose be factually valid and legally proper.

Applying the appropriate interpretation of the statute to this case, the purpose offered by the Federal Government here is neither factually valid nor legally proper. As to legal propriety, the Federal Government's stated purpose—"to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)[,]" Exhibit 3: August 18 Letter—is improper as it is wholly unrelated to the voting-related discrimination targeted by the Civil Rights Act. The Federal Government is not seeking these documents in connection with any investigation of nor allegations about New Hampshire's compliance with federal civil rights laws. As such, the Federal Government can no more assert the record demand provisions of the Civil Rights Act to compel the State to disclose information based on this stated purpose than it could demand such records in order to, for example, create a list of active voters affiliated with one particular party in order to initiate targeted tax audits.

Furthermore, the Federal Government's stated purpose is legally insufficient because, even in circumstances where checking compliance with a federal law provides a legally valid purpose, it must be accompanied by a factually valid basis to believe some violation is occurring.

*See generally Lynd,* 306 F.2d at 229 n.6 (finding sufficient a statement of the basis and purpose of a request for documents which explained the demand was based upon information tending to show race based discrimination in voting and voter registration was occurring and that the purpose of this demand was to ascertain whether a violation of federal law was occurring); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962) (finding valid statement of basis and purpose where it was explained that the Attorney General had information "tending to show that discriminations on the basis of race and color have been made with respect to registration and voting"). As discussed above, no such basis was provided by the Federal Government's letters.

As to the factual validity of the Federal Government's stated purpose, the Federal Government's behavior forecloses its ability to credibly claim its records request is based upon information and belief of an ongoing violation of the law and for the purpose of conducting a reasonable, targeted investigation into that alleged violation (if such a claim had even been made). *See generally United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *29-33 (C.D. Cal. Jan. 15, 2026). The Department of Justice has made requests for full unredacted versions of SVRLs from nearly all 50 states and has commenced litigation against 23 states and the District of Columbia to date. *Id.* at *13-14. Various federal officials have also made public statements indicating the Federal Government's purported purpose offered within this litigation is pretextual. *Id.* at *29-33. Federal courts are "not required to accept pretextual, formalistic explanations untethered to the reality of which the government has said outside the courtroom." *Id.* at *29-30 (citing *Dep't of Commerce v. New York*, 588 U.S. 752, 756 (2019)).

## II.  HAVA does not compel states to produce their SVRL upon demand of the Federal Government.

### a.  HAVA does not compel production by any of its express terms.

In 2002, Congress passed the Help America Vote Act, Pub. L. 107-252. Title III, § 302, 116 Stat. 1706 (codified at 42 U.S.C. § 15301 et seq.) ("HAVA").  Among its provisions is a requirement that states implement a computerized statewide voter registration list. 52. U.S.C. § 21083(a).  This SVRL must be an interactive computerized list designed, maintained, and administered at a statewide level. 52 U.S.C. § 21083(a)(1)(A).  State officials are required by federal law to engage in various list-maintenance activities. 52 U.S.C. § 21083(a)(2)&(4).  They are also required to "provide adequate technological security measures to prevent that unauthorized access to the" SVRL, although the federal statute does not provide any further directions or requirements as to the security measures a state is allowed to choose. 52 U.S.C. § 21083(a)(3).  Finally, states are required to "shar[e] information" from the SVRL with not only appropriate election officials but also with officials responsible for the state's department of motor vehicles in order to allow such officials to check the accuracy of the information. 52 U.S.C. § 21083(a)(5)(B).

The statutory text is notably devoid of any requirement that states make their SVRLs accessible to or otherwise available for inspection by the United States Attorney General or any other federal agency or official. *See United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *42 (C.D. Cal. Jan. 15, 2026) (noting that, unlike the NVRA or the Civil Rights Act, HAVA includes no disclosure provision). This is not surprising because, both historically and constitutionally, the running of elections is a power conferred to the states and not to the federal government. *See generally Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 568 (6th Cir. 2004) ("The States long have been primarily responsible for regulating

federal, state, and local elections."); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *8 (C.D. Cal. Jan. 15, 2026) ("State run elections mean that voters recognize their neighbors who staff polling stations, trust their Secretaries of State—whom they voted for—to keep their personally identifying information safe, and believe that they will not be targeted because of what they look like or who they vote for.").

The only authority granted to the Attorney General through HAVA is:

> The Attorney General may bring a civil action against any State … for such declaratory and injunctive relief (including a temporary restraining order, a permanent or temporary injunction, or other order) as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under [HAVA].

52 U.S.C. § 21111.

While this creates a mechanism for enforcement of the terms of HAVA should there be credible claims to support the filing of such a lawsuit, it does not compel States to provide unredacted electronic copies of their SVRL to the Attorney General at any time upon demand. *See generally Colón-Marrero v. Vélez*, 813 F.3d 1, 15 (1st Cir. 2016) (noting that HAVA has two mechanisms for remedying grievances: an action by the Attorney General or an administrative grievance).  The refusal to turn over information prior to litigation "does not create an independent violation of HAVA[,]" not even if it is possible USDOJ might get some or all of this information were there ongoing litigation discovery if a civil lawsuit was properly plead and proceeded beyond the motion to dismiss stage. *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *43-44 (C.D. Cal. Jan. 15, 2026).

**b.  HAVA expressly authorizes states to design and set rules for their voter files and New Hampshire's rules preclude production.**

When enacting HAVA, Congress was clear: "The specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State." 52 U.S.C. § 21085. *See also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1172 (11th Cir. 2008) (explaining that HAVA grants significant discretion to the States in determining how to implement its tenets).  New Hampshire followed this directive and passed N.H. RSA 654:45 which directs the Secretary of State to "plan, develop, equip, establish, site, and maintain a statewide centralized voter registration database and communications system[.]" RSA 654:45, I(a).  While leaving many of the specific details to the Secretary of State, the Legislature specifically provided:

> The voter database shall be private and confidential and shall not be subject to RSA 91-A and RSA 654:31, nor shall it or any of the information contained therein be disclosed pursuant to a subpoena or civil litigation discovery request.  The secretary of state is authorized to provider voter database record data to the administrative office of the courts to assist in the preparation of master jury lists … and to the clerk of the [federal district court] to assist in the preparation of federal court jury lists.  The voter checklist for a town or city shall be available pursuant to RSA 654:31.  Any person who discloses information from the voter database in any manner not authorized by this section shall be guilty of a misdemeanor.

RSA 654:45, V.

This state law clearly precludes the New Hampshire Secretary of State from complying with the Federal Government's demands to produce a full unredacted list of the SVRL and, in fact, would put him at risk of criminal liability were he to do so.  Recognizing this fact, the Federal Government asks this Court to declare New Hampshire's state law precluding disclosure to be "preempted by federal law." Compl. (Prayer for Relief) ¶15.

When a state law "interferes with or is contrary to federal law," the state law must yield to the federal law. *Free v. Bland*, 369 U.S. 663, 666 (1962). However, as has been explained above, neither HAVA nor the Civil Rights Act compels production of the SVRL to the Federal Government on demand. Therefore, New Hampshire's state law does not interfere with any federal law. Because the two "can coexist" there is no preemption. *See United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *39 (C.D. Cal. Jan. 15, 2026).

RSA 654:45, V is not only able to coexist with HAVA but is authorized by HAVA. As discussed above, the methods of complying with HAVA have been left to the states. 52 U.S.C. § 21085. New Hampshire's chosen method of adoption—of complying with federal requirements such as providing adequate security of our system as required by 52 U.S.C. § 21083(a)(3)—is (among other things) to significantly limit access to the SVRL. Providing the federal government a complete electronic copy of all information contained within our SVRL would violate a state law that is not only consistent with federal law but that was passed in order to articulate how New Hampshire would comply with federal law.

### III.    The Federal Government's demand directly violates federal law.

The Federal Government's demand that New Hampshire provide it a full, unredacted version of the SVRL is not only without grounding in any legal authority, it is also made in violation of at least two federal laws: the Privacy Act and the E-Government Act.[4]

---

[4] This Court can consider this affirmative defense at the motion to dismiss stage because "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." *Rodi v. S. New England Sch. of Law.*, 389 F.3d 5, 12 (1st Cir. 2004).

### a. The Federal Government's demand was made in violation of the Privacy Act of 1974.

"The Privacy Act of 1974 serves to safeguard the public interest in informational privacy by delineating the duties and responsibilities of federal agencies that collect, store, and disseminate personal information about many individuals." *Doe v. U.S. Civ. Serv. Comm'n*, 483 F. Supp. 539, 555 (S.D.N.Y. 1980). It is designed, among other things, to prevent "the creation of secret information systems or data banks on Americans by employees of the departments and agencies of the executive branch." S. Rep. No. 93-1183 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6916, 6917.

The Federal Government's demand for New Hampshire's SVRL violates the Privacy Act because the demand seeks to collect data on citizen's First Amendment protected activity and, even if it did not, it fails to comply with the Privacy Act's procedural requirements.

### i. The Federal Government is seeking to collect data on citizens' First Amendment protected activity without an authorized purpose in violation of federal law.

Though many of the Privacy Act's provisions are procedural in nature, it flatly forbids federal agencies from maintaining any "record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C.A. § 552a(e)(7). This prohibition reflects "Congress' own special concern for the protection of First Amendment rights." *Albright v. United States*, 631 F.2d 915, 919 (D.C. Cir. 1980).

Each individual entry in New Hampshire's voter file is clearly a "record" under the Privacy Act of 1974. 5 U.S.C.A. § 552a(a)(4) (defining "record" as "any item, collection, or

grouping of information about an individual that is maintained by an agency . . . that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual . . . .").  And each record indicates how the voter exercises rights guaranteed by the First Amendment in several ways.  It identifies the political party, if any, in which the voter has chosen to enroll, and in which prior party primaries a voter has chosen to participate; political party affiliation and participation are an "integral part" of associational freedom under the First Amendment.  *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973).  It allows the holder of the information to determine which citizens have chosen to register to vote, a choice that "implicates political thought and expression."  *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999).  And the SVRL shows which New Hampshire citizens actually voted in which elections, acts in which voters "express their political preferences."  *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *see Turner v. D.C. Bd. of Elections & Ethics*, 77 F. Supp. 2d 25, 31 (D.D.C. 1999) ("When a citizen steps into the voting booth to cast a vote on a matter properly on the ballot, he or she intends to send a message in support of or in opposition to the candidate or ballot measure at issue").  A federal database of such information is flatly prohibited by the Privacy Act as it is ripe for the very types of abuses—such as targeting voters based on their party affiliation—that the Privacy Act was enacted to prevent.

None of the three narrow statutory exceptions contained in 5 U.S.C. § 552a(e)(7) apply to authorize the collection of the SVRL and its information related to citizens exercise of their First Amendment rights.  As explained in the first two sections of this Memorandum, the collection is not "expressly authorized" by any statute and there is no way to see it as having been authorized by the voters' themselves.

As to the third exception, the information the Federal Government seeks to compile is not "pertinent to and within the scope of an authorized law enforcement activity[.]" *Id.* The Federal Government's role in HAVA enforcement is limited to filing a civil lawsuit as may be necessary to "carry out the uniform and nondiscriminatory election technology and administration requirements under" HAVA. 52 U.S.C. § 21111. Of relevance here, HAVA's election technology and administrative requirements include that states have an SVRL, have various procedures in place for administering the system, and make reasonable efforts to remove non-eligible voters from the SVRL. *See* 52 U.S.C. § 21083(a). The Federal Government has offered no explanation as to why it needs the SVRL and all of its sensitive and First Amendment protected information related to New Hampshire voters to ensure New Hampshire has reasonable procedures and is making reasonable efforts to maintain its list, and it is implausible that it does. To satisfy federal requirements, a state's list-maintenance program need only be "a serious attempt that is rational and sensible; the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Benson*, 136 F.4th at 625. Determining whether a state meets this standard requires review of its methodology and procedures, not a static compilation of all its voters' personal information. As such, the Federal Government's demand is not within the scope of "authorized" law enforcement activity.

### ii. The Federal Government has not complied with the statutory requirement that it notify the public and Congress of its data-collection efforts.

The Federal Government's demand for the SVRL also violates the Privacy Act because the United States Department of Justice has not properly notified the public and Congress of its intentions to compile a massive database of voter's protected, confidential information.

The Privacy Act requires federal agencies to publish public notices, called Systems of Records Notices (SORNs), with nine categories of information describing each "system of records" held by the agency that contains records about individual Americans. 5 U.S.C.A. § 552a(e)(4). The SORN must include categories of records maintained, categories of individuals contained in the records, expected "routine uses" of the records, categories of users, and policies governing access, storage, disposal. *Id.* The agency must provide notice in the Federal Register 30 days before "any new use or intended use of the information in the system" and allow the public to submit comments on the proposed use. *Id.* § 552a(e)(11). Notice must also be provided to the Office of Management and Budget and Congress. *Id.* § 552a(r).

The United States Department of Justice's Civil Rights Division has an existing SORN, the "Central Civil Rights Division Index File and Associated Records" SORN, as amended. *See* 68 Fed. Reg. 47610–01 (Aug. 11, 2003). This existing SORN, however, is inadequate in a number of respects. Its identified "categories of individuals on whom records are maintained in the system[,]" 5 U.S.C.A. § 552a(e)(4)(B), are insufficiently narrow, including such individuals as "subjects of investigations," "victims," and "potential witnesses." 68 Fed. Reg. 47610–01 at 47611. Likewise, its identified "categories of records maintained in the system[,]" 5 U.S.C.A. § 552a(e)(4)(C), are insufficiently narrow covering only documents such as "case files," "memoranda," and "reports." Fed. Reg. 47610–01 at 47611. Finally, its list of the "the categories of sources of records in the system[,]" 5 U.S.C.A. § 552a(e)(4)(I), is limited to "an agency or person who has or offers information related to the law enforcement responsibilities and/or other statutorily-mandated duties of CRT." *See Shearson v. U.S. Dept. of Homeland Security*, 638 F.3d 498, 502 (6th Cir. 2011).

No reasonable reader of the SORN would come away with the impression that Civil Rights Division of the United States Department of Justice intended to maintain files listing every registered voter in the country, extensive personal identifying information, their party affiliation, their voting history, etc.

Furthermore, federal executive agencies are required to publish a new SORN whenever there is a "revision" to its system of records.  5 U.S.C.A. § 552a(e)(4).  The Office of Management and Budget interprets this provision to require a revised SORN if there is "[a] substantial increase in the number, type, or category of individuals about whom records are maintained in the system" or "[a] change that expands the types or categories of records maintained in the system."  OMB Circular A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act, at 5, https://tinyurl.com/3hkzbyr2.  The Federal Government's decision to begin collecting complete voter files from multiple states, containing personal identifying information on millions of voters as well as information on their First Amendment–protected activities, easily satisfies these standards.

### b.  The Federal Government's demand was made in violation of the E-Government Act.

This Motion to Dismiss should also be granted because the Federal Government failed to conduct the privacy impact assessment required by the E-Government Act.

Under the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, federal agencies are required to conduct a "privacy impact assessment" prior to taking various actions that impact personal privacy, including any initiation of a new collection of information that will be collected, maintained, or disseminated using information technology and that "includes any information in an identifiable form permitting the physical or online

contacting of a specific individual, if identical questions have been posed to, or identical

reporting requirements imposed on, 10 or more persons, other than agencies,

instrumentalities, or employees of the Federal Government." *Id.* § 208(b)(1)(A)–(B).

New Hampshire's SVRL, which includes names and mailing addresses and consists

largely of voters' answers to standardized questions on the voter registration application,

falls within the strictures of the privacy impact assessment requirement.  Neither the

Complaint nor the correspondence from the United States Department of Justice to New

Hampshire leading up to this litigation cited any privacy impact assessment. Absent citation

to an applicable assessment, the Complaint should be dismissed for a failure to comply with

the E-Government Act.

IV. **The Federal Government fails to support their cursory allegations regarding New Hampshire's lack of compliance with HAVA with any well plead facts leaving New Hampshire entitled to judgement as a matter of law.**

HAVA confers upon the Attorney General of the United States authority to:

> bring a civil action against any State … for such declaratory and injunctive relief (including a temporary restraining order, a permanent or temporary injunction, or other order) as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under [HAVA].

52 U.S.C. § 21111.  In Count II of the Federal Government's Complaint may be seen as

attempting to bring such a civil action when it alleges that New Hampshire is in violation of

HAVA by: (1) failing to provide sufficient information to the Federal Government upon

request; (2) failing to conduct list maintenance as required; … and (4) failing to provide the

Federal Government information about the process it uses to validate driver's license

numbers and social security numbers submitted with voter registration applications. Compl.

¶¶60-61.  These allegations should be dismissed as they are insufficiently pled, being
unsupported by any well-pled facts.

While a complaint "does not need detailed factual allegations," *Bell Atl. Corp. v.
Twombly,* 550 U.S. 544, 555 (2007), a complaint that "tenders 'naked assertion[s]' devoid of
'further factual enhancement'" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)
(quoting *Twombly*, 555 U.S. at 557). This Court must reject "unsupported conclusions or
interpretations of law," *Estate of Bennett v. Wainwright*, 548 F.3d 155, 162 (2008) (quotations
omitted), and the allegations "must be enough to raise a right to relief above the speculative
level." *Bell Atl. Corp.,* 550 U.S. at 555.  The Court must "carefully balance the rule of simplified
civil proceeding pleadings against our need for more than conclusory allegations." *Aybar v.
Crispin-Reyes,* 118 F.3d 10, 13 (1st Cir. 1997) (quotation omitted).

The Federal Government's allegations that New Hampshire failed to provide sufficient
information upon request and failed to conduct list maintenance as required by HAVA are
nothing more than naked assertions devoid of sufficient factual allegations to raise a right to
relief above a level of mere speculation.  As outlined in the fact section above, Secretary Scanlan
answered all the questions put to him by the Federal Government. *See* Exhibit 2: July 25 Letter.
The Federal Government's follow-up letter did not ask any clarifying questions, identify any
perceived deficiencies in Secretary Scanlan's answers, or otherwise request any additional
information or explanation. *See* Exhibit 3: August 18 Letter.  The Federal Government's
complaint contains no factual allegations that New Hampshire has ever refused to answer
questions put to it by the Federal Government regarding its HAVA compliance efforts.  Nor did
the Federal Government identify any perceived deficiencies in the New Hampshire statutes that
require municipalities to regularly maintain voter lists. *See* N.H. RSA Chapter 654.

The Federal Government does assert that it is concerned because of the level of duplicate voter registrations New Hampshire reported as compared to the national average. Compl. ¶36. However, this does not raise the right to relief above a speculative level, particularly when the Federal Government failed to engage with the realities of New Hampshire's election system which, unlike many other states, has systems in place to ensure that voter registrations are not completed and submitted in the first place if they are going to be duplicates.

Finally, the Federal Government alleges several of New Hampshire's offered answers in its July 25 letter were insufficient. Compl. ¶¶41-43. As stated above, Secretary Scanlan provided good faith answers to the questions put to him by the Federal Government and he offered to provide additional information if needed. *See* Exhibit 2: July 25 Letter. The Federal Government did not ask any follow up questions or request additional information. But, even if this Court would need to proceed to the summary judgement phase to resolve the factual question as to the sufficiency of New Hampshire's answers, the Federal Government's claims fail as a matter of law as the Federal Government offers no legal authority by which it is entitled to compel New Hampshire to provide information upon request to the Attorney General about New Hampshire's list maintenance procedures. The statute allows the Attorney General to file suit if it can plead facts as to New Hampshire's failure to comply with HAVA's procedures, but it cannot bring a lawsuit alleging only that New Hampshire failed to write a detailed explanation of how it complies with HAVA.

As a similarly situated federal district court wrote when faced with nearly identical litigation:

> Even the federal government is not permitted to sue first, obtain discovery, and finalize its allegations later. This appears to be a telltale "fishing expedition." District courts do not "condone the use

of discovery to engage in 'fishing expeditions'" when the Plaintiff
has no basis other than "gross speculation" to support their claims.

*United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *44 (C.D. Cal. Jan.

15, 2026).

**Conclusion**

The Federal Government has hauled the State of New Hampshire into federal court

claiming that it is attempting to "remedy the State of New Hampshire's violations of federal

voting laws[,]" without even making an assertion, plausible or otherwise, that there is reason to

believe New Hampshire is out of compliance with federal law. Compl. P.2.  As has been detailed

above, it is not the State of New Hampshire's actions which are out of compliance with the law.

It is the Federal Government's actions which are out of compliance with the law.  The Federal

Government comes before this Court, and courts across this country, attempting to convince the

federal judiciary to compel sovereign states to comply with their unprecedented and illegal

demands.  This Court should follow the lead of at least one other federal district court[5] and grant

the State's motion to dismiss, finding the Federal Government's complaint to be wholly without

grounding in this Country's laws.

> Respectfully submitted,
>
> DAVID M. SCANLAN, IN HIS OFFICIAL
> CAPACITY AS SECRETARY OF STATE FOR
> THE STATE OF NEW HAMPSHIRE, AND THE
> STATE OF NEW HAMPSHIRE
>
> By their attorney,
>
> THE OFFICE OF THE ATTORNEY GENERAL
>
> JOHN M. FORMELLA
> ATTORNEY GENERAL

---

[5] *See United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897 (C.D. Cal. Jan. 15, 2026).

Dated: February 6, 2026

*/s/ Mary A. Triick*
Mary A. Triick, Bar #277277
Senior Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place South
Concord, NH 03301
Mary.A.Triick@doj.nh.gov
603-271-0447

*/s/ James H. Holl*
James H. Holl, Bar #279633
Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place South
Concord, NH 03301
James.H.Holl@doj.nh.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent by ECF on February 6, 2026, to counsel of record.

*/s/ James H. Holl*
James H. Holl, Bar #279633