## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-00371 (AJ) |
| DAVID M. SCANLAN in his official capacity as Secretary of State for the State of New Hampshire, and the STATE OF NEW HAMPSHIRE, | |
| *Defendants*. | |

### BRIEF OF AMICUS CURIAE THE DEMOCRATIC NATIONAL COMMITTEE

Federal law authorizes the Attorney General to demand voter registration records, but she cannot do so based on a misrepresentation. Rather than disclosing "the basis and the purpose" for its demand for the complete, unredacted New Hampshire voter file—as Title III of the Civil Rights Act of 1960 (Title III), 52 U.S.C. §§ 20703, requires—the Department of Justice suggests it is engaged in routine enforcement of the federal civil rights laws. To the contrary, the Justice Department intends to transfer the personally identifying information and party affiliation of every registered voter in New Hampshire to the Department of Homeland Security and is reportedly consolidating state databases into a national voter file. This deception invalidates the Title III demand. Invocation of the Help America Vote Act (HAVA), 52 U.S.C. §§ 20901-21145 fares no better, as that law does not authorize data demands. A Department of Justice that cannot be forthright with state officials cannot be trusted with the personal information of every registered voter in New Hampshire, including nearly 270,000 registered Democrats. The Democratic National Committee submits this amicus brief to protect the privacy interests of its members and the interests of its candidates and campaigns in free and fair elections and respectfully requests

that this Court deny the United States' "Motion for Order to Compel" and grant Defendants' Motion to Dismiss.

## I.      INTEREST OF AMICUS CURIAE

The Democratic National Committee (DNC) is the oldest continuing party committee in the United States. Its purposes and functions are to communicate the Democratic Party's position on issues, protect voters' rights, and aid the election of Democratic candidates nationwide, including by organizing citizens to register to vote and to cast ballots in favor of Democratic candidates. The DNC represents millions of voters, including nearly 270,000 registered Democrats in New Hampshire.

The U.S. Department of Justice (DOJ) has demanded a copy of the State of New Hampshire's complete, unredacted voter registration list. This demand forces Democrats to choose between participating in elections and the privacy and security of their personal information. Conditioning the right to vote on the release of private information "creates an intolerable burden on that right." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). The concerns of ordinary Democrats are amplified by uncertainty as to the intended use of their data. In turn, the DNC has a significant protectable interest in the success of Democratic candidates, and pressure on Democrats to avoid registration or even remove themselves from the voter rolls would impose an intolerable burden on that interest. *See, e.g.*, *Paher v. Cegavske*, No. 3:20-cv-243, 2020 WL 2042365, at *2-3 (D. Nev. Apr. 28, 2020); *cf. Bost v. Ill. State Bd. of Elections*, No. 24-568, 2026 WL 96707, at *3 (U.S. Jan. 14, 2026).

## II.      BACKGROUND

In June 2025, DOJ began sending letters to officials around the country demanding complete, unredacted copies of state voter files, and a senior DOJ official eventually acknowledged

that DOJ intends to send demands to all 50 states. *See* Jonathan Shorman, *DOJ Plans to Ask All States for Detailed Voting Info*, Stateline (Aug. 1, 2025), https://perma.cc/526V-97C3. Early letters indicated that the files would be used to oversee "HAVA compliance" or "full compliance with the NVRA," the National Voter Registration Act, 52 U.S.C. §§ 20501-11. *E.g.*, Ltr. from Maureen Riordan, U.S. Dep't of Justice, to Steve Simon, Minn. Sec'y of State (June 25, 2025), https://perma.cc/NZ9N-FCDC; Ltr. from Michael E. Gates, U.S. Dep't of Justice, to Deirdre Henderson, Lt. Gov. of Utah (July 15, 2025), https://perma.cc/FV8G-W965. DOJ has since confirmed that it is sharing lists it receives with the Department of Homeland Security (DHS) and developing a national voter file. *See* Tr. 120:6-121:2, *United States v. Weber*, No. 2:25-cv-9149 (C.D. Cal. Dec. 12, 2025), ECF No. 92; *Harmeet Dhillon | Trump DOJ: Ensuring Election Integrity and Fixing Immigration*, The Independent Institute, (Dec. 9, 2025), https://www.youtube.com/watch?v=FLtqQqt2FwA (at 1:59) (describing data comparison between states); Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, Stateline (Sept. 12, 2025), https://perma.cc/C6RQ-6ATP (quoting DOJ and DHS statements); Devlin Barrett and Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/9PM4-2A6R. Collectively, these admissions and recent DOJ actions cast "serious doubt as to the true purposes for which [DOJ] is seeking voter registration lists." *United States v. Oregon*, No. 6:25-cv-1666, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026).

On June 25, DOJ sent a letter to New Hampshire Secretary of State David Scanlan demanding an unredacted copy of New Hampshire's statewide voter registration list, in relation to the State's compliance with the database design and voter identification requirements in Section 303 of HAVA, 52 U.S.C. § 21083. *See* June 25 Ltr., ECF No. 31-2. On July 25, Secretary Scanlan

provided extensive responses to DOJ's specific questions about HAVA compliance but declined to provide the statewide voter registration list. *See* July 25 Ltr., ECF No. 31-3. On August 18, DOJ sent a second letter, reiterating its request for the complete, unredacted New Hampshire voter file. Aug. 18 Ltr., ECF No. 6-9. This second letter newly invoked Title III authority and stated, "[t]he purpose of this request is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)." *Id.* at 1. The letter also asserted that Section 401 of HAVA, 52 U.S.C. § 41111, provides authority to demand unredacted voter files. *See id*. On August 28, Secretary Scanlan once again informed DOJ that New Hampshire would not produce its unredacted voter file. *See* Aug. 28 Ltr., ECF No. 31-5.

On September 25, the United States filed suit against Secretary Scanlan and the State of New Hampshire, demanding production of the complete, unredacted New Hampshire voter file. *See* Compl., ECF No. 1. Months later, DOJ filed a "Motion for Order to Compel," demanding immediate production of the voter file. *See* U.S. Mot., ECF No. 31; U.S. Mem. ECF No. 31-1. On February 6, Defendants moved to dismiss. N.H. Mot., ECF No. 32.[1]

### III.    LEGAL STANDARD

Title III of the Civil Rights Act of 1960 dictates that "every officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal election], all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" or transfer such materials to another

---

[1] DOJ has thus far sued 24 states and the District of Columbia for unredacted voter files. *See* U.S. Dep't of Justice, *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/6NET-8BNG. DOJ has also obtained or is obtaining roughly 18 states' complete, unredacted voter files through voluntary disclosures. *See Unmasking Election Corruption*, Just the News Not the Noise (Dec. 9, 2025), https://justthenews.com/podcasts/john-solomon-reports/unmasking-election-corruption-insights-harmeet-dhillon-and-j (at 20:55).

officer of election or designated custodian.  52 U.S.C. § 20701.  In turn, "[a]ny record or paper required by [Title III] to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative." *Id.* § 20703.  "This demand shall contain a statement of the basis and the purpose therefor." *Id.*  "The United States district court for the district in which a demand is made pursuant to [Title III], or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." *Id.* § 20705.

The Help America Vote Act imposes additional requirements on the administration of federal elections.  The Attorney General may enforce only "the uniform and nondiscriminatory election technology and administration requirements" in Sections 301 to 304 of the Act.  52 U.S.C. § 21111.  HAVA does not contain express subpoena authority or public disclosure requirements.

## IV.    ARGUMENT

DOJ has no legal basis to obtain the complete, unredacted New Hampshire voter file.  By refusing to offer an honest statement of "the basis and the purpose" for the demand, the Attorney General loses the cover of Title III authority.  52 U.S.C. § 20703.  And HAVA contains no subpoena authority at all.  *See* 52 U.S.C. § 21111; *see also, e.g.*, *United States v. Iannone*, 610 F.2d 943, 945-46 (D.C. Cir. 1979) (rejecting claim of implied subpoena authority).  Because the United States' complaint does not state a claim upon which relief can be granted, this Court should deny the United States' Motion for Order to Compel and grant Defendants' motion to dismiss.

## A.    DOJ Has Forfeited Its Authority Under Title III.

DOJ cannot obtain the complete, unredacted New Hampshire voter file—including voters' dates of birth, Social Security numbers, driver's license numbers, and partisan affiliations—based on a facially deficient Title III demand.  By offering mere pretext rather than an honest statement of "the basis and the purpose" for the demand, the Attorney General has forfeited Title III authority.  52 U.S.C. § 20703.  Title III requests are subject to "appropriate process," *id.* § 20705, scrutiny the instant request cannot bear.

### 1.    DOJ Has Obscured the True Basis and Purpose for Its Title III Demand.

DOJ's Title III claim seeking the complete, unredacted New Hampshire voter file should be dismissed because the demand did not state "the basis and the purpose therefor."  52 U.S.C. § 20703; *see also* N.H. Mem. at 9-14, ECF No. 32-1.  Title III requires candor between federal officials and state and local election administrators who safeguard voters' sensitive personal information.  Thus, DOJ cannot use Title III to obtain records "under the guise of a pretextual investigative purpose."  *United States v. Weber*, No. 2:25-cv-9149, 2026 WL 118807, at *12 (C.D. Cal. Jan. 15, 2026); *see also CFPB v. Accrediting Council for Indep. Colls. & Secondary Schs. (ACICS)*, 854 F.3d 683, 690 (D.C. Cir. 2017) (emphasizing that the validity of a civil investigation demand "is measured by the stated purpose," making notification of purpose "an important statutory requirement").  Yet DOJ has provided New Hampshire and its citizens less than a half-truth.  DOJ told Secretary Scanlan that the "purpose of this request is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)."  Aug. 18 Ltr. at 1.  "Behind this screening, there appears to be a different purpose." *Weber*, 2026 WL 118807, at *11 (addressing California request).  DOJ has publicly confirmed that it is sharing voter files with DHS and compiling a national voter file for its own use.  *See, e.g.*,

*DOJ Is Sharing State Voter Roll Lists*, *supra*; *see also Weber*, 2026 WL 118807, at *11. As explained below, neither action is related to HAVA enforcement. *See Oregon*, 2026 WL 18402, at *10 n.4 & n.5, *13 (addressing parallel litigation).[2]

Title III demands a statement of "*the* basis and *the* purpose" for the demand, not merely *a* basis and *a* purpose. 52 U.S.C. § 20703 (emphasis added). By twice using the definite article, Title III requires the Attorney General to offer "a discrete thing": the complete basis and purpose of the request and not merely one basis and purpose among many. *Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors*, 603 U.S. 799, 817 (2024) (emphasizing distinction between definite and indefinite article). Without a complete statement of the basis and the purpose of the demand, state officials and reviewing courts "cannot accurately determine whether the inquiry is within the authority of the [Justice Department] and whether the information sought is reasonably relevant." *ACICS*, 854 F.3d at 691; *see also In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) (indicating that Title III requests cannot be "used without restraint"). "[H]alf-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be . . . misrepresentations." *Universal Health Servs. v. United States ex. rel. Escobar*, 579 U.S. 176, 188 (2016); *cf. Dep't of Commerce v. New York*, 588 U.S. 752, 781-85 (2019) (setting aside agency action due to pretextual invocation of the Voting Rights Act). Thus, DOJ's refusal to be forthright about the intended use of sensitive personal information is fatal to the demand. *Cf. United States v. Raffensperger*, No. 5:25-cv-548, 2026 WL 184233, at *2-4 (M.D. Ga. Jan. 23, 2026), ECF No. 49 (dismissing Title III request for failure to comply with statutory requirements).

---

[2] DOJ similarly invoked HAVA when requesting 2020 election records, even while asserting an interest in "transparency." Oct. 30 Ltr., https://perma.cc/WCM3-FVTW. Repeat demands for records based on pretextual invocation of HAVA undercut purported reliance on that statute here.

DHS has broad authority over counterterrorism, emergency management, immigration, and border protection, but its powers do not extend to HAVA enforcement. *See* 6 U.S.C. § 111(b); *cf.* 52 U.S.C. § 21111 (DOJ authority). Even if DOJ were only interested in comparing the New Hampshire voter file with DHS data to identify voters who may not meet state eligibility requirements—which might not require transferring the voter file to DHS custody—such database matching would not advance HAVA enforcement. HAVA specifies that appropriate officials must remove voters from statewide voter registration lists using a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters . . . consistent with the" NVRA. 52 U.S.C. § 21083(a)(4)(A). Courts have repeatedly held that this provision does not "broaden[] the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019); *see also Am. Civ. Rights Union v. Phila. City Comm'rs*, 872 F.3d 175, 184-85 (3d Cir. 2017). New Hampshire is exempt from NVRA requirements, *see* 52 U.S.C. § 20503(b)(2), and HAVA does not supersede the NVRA, including New Hampshire's statutory NVRA exemption, *see id.* § 21085. Thus, DHS data are not relevant to HAVA enforcement in New Hampshire.[3]

Adding the complete, unredacted New Hampshire voter file to a DOJ national voter database also does not advance even the pretextual purpose of investigating New Hampshire's HAVA compliance. As noted above, HAVA merely reiterates the NVRA's list maintenance requirements, *see, e.g.*, *Bellitto*, 935 F.3d at 1202; *Am. Civ. Rights Union*, 872 F.3d at 184-85, from which New Hampshire is exempt. Moreover, comparison to another state's database has no

---

[3] Even in states subject to the NVRA, DHS data are not relevant to federal list maintenance requirements. The NVRA's list maintenance mandates concern only deceased registrants and movers. *See* 52 U.S.C. § 20507(a)(4). Federal data concerning deaths and changes of address are held by the Social Security Administration and the Postal Service respectively, not DHS. *See* 42 U.S.C. § 1306c(d); 52 U.S.C. § 20507(c)(1); 39 C.F.R. § 122.2(b).

bearing on HAVA database-design mandates, such as consolidation of duplicate registration records.  *See* 52 U.S.C. § 21083(a)(2)(B)(iii).  Joining the New Hampshire voter file to another state's voter file—a file New Hampshire does not possess and is not legally required to obtain— does not help determine whether New Hampshire maintains duplicate records on its own voter file.  *Cf. id.* § 21083(a)(2)(A)(ii) (requiring coordination with in-state databases).[4]

Even  if Title III required the Attorney General's representative to provide only "a purpose" and not "the purpose" of a demand—and it does not—DOJ's demand for the complete, unredacted New Hampshire voter file is unrelated to ascertaining "New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)."[5]  52 U.S.C. § 21083(b)(4)(A) and (B) do not contain any list maintenance requirements at all; they provide

---

[4] Through the Electronic Registration Information Center, 24 states and the District of Columbia obtain cross-state mover reports based on voter registration and motor vehicle data.  *See* Electronic Registration Information Center, *FAQ's*, https://perma.cc/AY53-TF3Z; *see also* Electronic Registration Information Center, *Technology & Security Overview*, https://perma.cc/CY4E-85VL.  However, New Hampshire and 24 other states that register voters do not participate in this exchange, and federal law does not mandate interstate comparison of voter registration records.  The United States suggests that states participate in interstate data exchanges to help identify and remove "duplicate voter registrations."  U.S. Mem. at 10.  This makes little sense, as HAVA addresses only the presence of duplicates within a single statewide database, not double registration or double voting.

[5] In other states, DOJ asserted that the purpose of obtaining the unredacted voter file is to ascertain compliance the NVRA, HAVA, or both provisions.  *See, e.g.*, Aug. 21 Ltr., *United States v. Weber*, No. 2:25-cv-9149 (C.D. Cal. Nov. 7, 2025), ECF 37-2, at 24 (NVRA only).  DOJ has also incorporated a demand for the unredacted voter file as a purported oversight measure in a recent consent decree.  *See* Consent Decree ¶ 11, *United States v. N.C. State Bd. of Elections*, No. 5:25-cv-283 (E.D.N.C. Sept. 8, 2025), ECF No. 72.  The Attorney General's assertion of varying purposes for identical voter file demands suggests that the claimed enforcement aim here is mere pretext.  *Cf. Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 478 U.S. 252, 267 (1977) (deeming departures from substantive and procedural norms to be evidence of pretext).  Shockingly, immediately after the shooting of Alex Pretti, the Attorney General tied the handover of Minnesota's unredacted voter file to the "chaos in Minnesota."  Ltr. from Att'y Gen. Bondi to Gov. Walz (Jan. 24, 2026), https://perma.cc/9WT4-HQF4; *see also* U.S. Notice of Corrections to the Record, *AFSCME v. Social Security Admin.*, No. 1:25-cv-596 (D.D.C. Jan. 16, 2026), ECF No. 197 (disclosing "Voter Data Agreement" under which Social Security Administration agreed to "analyze state voter rolls" with the aim of "overturn[ing] election results in certain States").

requirements for mail-in voter registration applications.  That alone is fatal to the Title III request.

Should this Court overlook the error and turn instead to 52 U.S.C. § 21083(a)(4)(A) and (B), the

demand would still fall short.  Although Section 303(a)(4) of HAVA imposes a "[m]inimum

standard for accuracy of State voter registration records," that provision merely applies NVRA

requirements to statewide voter registration databases mandated by HAVA, *see Bellitto*, 935 F.3d

at 1202 (11th Cir. 2019); *Am. Civ. Rights Union*, 872 F.3d at 184-85, and NVRA requirements do

not apply in New Hampshire, *see* 52 U.S.C. § 20503(b)(2).

Even if this Court were to rewrite the Attorney General's August 18 Title III request

entirely by adding Section 303(a)(2) database design mandates referenced in the June 25 letter,

such as the elimination of duplicate entries for a single registered voter, this would still not provide

a bona fide basis or purpose for the database demand.  Across the first two decades of HAVA

enforcement, DOJ neither demanded nor required a complete, unredacted voter file to investigate

HAVA violations or oversee compliance with a remedy, and DOJ recognized that HAVA

requirements are implemented pursuant to state discretion.  *See* 52 U.S.C. § 21085.  *See generally*

U.S. Dep't of Justice, *Cases Raising Claims under the Help America Vote Act* (last updated Sept.

20, 2024), https://perma.cc/9DDZ-2FZN.  For instance, DOJ previously entered into a consent

decree requiring only "reasonable steps" to identify possible duplicate registrations, not perfect

consolidation of duplicate records.  Consent Decree ¶¶ 4, 9, *United States v. New Jersey*, No. 06-

4889 (D.N.J. Oct. 12, 2006), https://perma.cc/TF6V-NUY4; *see also* U.S. Election Assist.

Comm'n, *Voluntary Guidance on Implementation of Statewide Voter Registration Lists* 11-14

(July 2005), https://perma.cc/KJX9-ZZ3W ("recogniz[ing] the fallibility of databases" and

prioritizing "[s]afeguards to ensure that eligible voters are not removed in error from the official

list of eligible voters").  And once a HAVA-compliant system was in place, the decree required

reporting of list maintenance statistics but did not demand copies of the complete, unredacted voter file.  *See* N.J. Consent Decree ¶ 11.  Although DOJ now claims it needs unredacted voter files to determine if voters have been registered since HAVA went into effect without submitting a driver's license or Social Security number, *see* U.S. Mem. at 10; *see also* 52 U.S.C. § 21083(a)(5), that inquiry at most requires production of voter records *lacking* these identifiers, along with associated registration dates.  Incredibly, DOJ's Title III request did not invoke this provision of HAVA, *see* Aug. 18 Ltr. at 1 (citing 52 U.S.C. § 21083(b)(4)(A)-(B)), putting a fine point on DOJ's shifting and pretextual invocations of HAVA.  Ultimately, unredacted voter files do not assist HAVA enforcement.  *Cf., e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 626-27 (6th Cir. 2025) (rejecting identification of "27,000 'potentially deceased' voters" as evidence of failure to meet NVRA "reasonable effort" requirement for identification and removal of decreased registrants), *petition for cert. pending*, No. 25-437 (filed Oct. 7, 2025).

### 2.    Title III Requests Are Subject to Ordinary Judicial Oversight.

DOJ cannot avoid scrutiny of the basis and purpose for its Title III demand by claiming that the Civil Rights Act of 1960 authorizes a "special statutory proceeding."  *See, e.g.*, U.S. Mem. at 5; *see also Ensuring Election Integrity*, *supra* (at 2:41) ("The 1960 Civil Rights Act is actually very clear.  The Attorney General doesn't have to show her homework as to what she is going to do with it, and I am her designee.  So, I get to ask for that information, and they have to give it.").  In fact, Title III requires an honest statement of "the basis and the purpose" of the request.  52 U.S.C. § 20703.  Thus, this Court's role "is not so limited."  *Oregon*, 2026 WL 318402, at *8.  The grave issues at stake require this Court to subject the Attorney General's request to exacting scrutiny under the procedures mandated by the Federal Rules and fundamental due process.

Title III does not authorize the "special statutory proceeding" that the United States demands.  DOJ relies on the 1962 decision of the U.S. Court of Appeals for the Fifth Circuit in *Kennedy v. Lynd*, 306 F.2d 222, to make this claim.  *See* U.S. Mem. 5-6, 13-14.  To be sure, *Lynd* indicated that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand is not open to judicial review or ascertainment."  306 F.2d at 226 (quoting former 42 U.S.C. § 1974b).  *Lynd* was decided in the early 1960s, an era of racist disenfranchisement and massive resistance to civil rights, even within the federal judiciary.  *See, e.g.*, *Kennedy v. Bruce*, 298 F.2d 860, 862 (5th Cir. 1962) (reversing dismissal in conflict with controlling law).  But "history did not end in 1965."  *Shelby Cnty. v. Holder*, 570 U.S. 529, 532 (2013).  In 1965, the Voting Rights Act removed the exigency that might have justified paltry process by suspending the disenfranchising tests and devices that DOJ had used Title III to investigate.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966) (describing case-by-case use of Title III); *see also id.* at 319, 333-34 (upholding suspension in covered states).  Six decades since DOJ last litigated a contested Title III action, basic principles of federal law dictate that the requisite statement of the basis and the purpose for a Title III request is subject to ordinary judicial oversight.

Rule 81(a)(5) now establishes that the Federal Rules of Civil Procedure "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings."  These rules protect the rights of recipients and guarantee that "an adversary hearing, if requested, is made available."  *Becker v. United States*, 451 U.S. 1306, 1308 (1981).  Indeed, just two years after the Fifth Circuit decided *Lynd*, the Supreme Court decided *United States v. Powell*, 379 U.S. 48 (1964), holding that the

government must establish statutory requirements before a tax subpoena may be enforced. *See id.* at 57-58. Even after the federal government has met that burden, the recipient of a summons or subpoena has an opportunity to rebut the government's prima facie case or establish an abuse of process. *See, e.g.*, *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347-50 (1st Cir. 2009). Such due process is the prerequisite to judicial enforcement of a records request issued by another branch of government. *See, e.g.*, *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862-63 (2020) (addressing whether a subpoena was "related to, and in furtherance of, a legitimate task of the Congress"). Ultimately, the "Supreme Court's holding in *Powell* squarely rejects [the United States'] contention and reliance on *Lynd*. *Oregon*, 2026 WL 318402, at *8.

The text of Title III does not insulate the demand from judicial review. 52 U.S.C. § 20703; *cf.* Fed. R. Civ. P. 81(a)(5) (allowing exclusion from the Federal Rules as "provided by statute"). Rather, Title III's jurisdictional provision authorizes only "appropriate process to compel the production" of documents. 52 U.S.C. § 20705; *see also Raffensperger*, 2026 WL 184233, at *3 (requiring strict adherence to the text of Title III). Where Congress authorizes alternative procedures to the Federal Rules of Civil Procedure, it does so explicitly and in detail. *See, e.g.*, 42 U.S.C. § 2000a-5 (procedures under Title II of the Civil Rights Act of 1964); *see also Katzenbach v. McClung*, 379 U.S. 294, 295-96 (1964) (describing these procedures as "a special statutory proceeding"). Moreover, the statutory requirement that the Attorney General must offer "the basis and the purpose" for a Title III request would serve no purpose if—as DOJ contends—federal courts may adjudicate only whether a demand has been made and the custodian of documents has received notice of the proceeding. *See Oregon*, 2026 WL 318402, at *9. It remains possible that an "assertion that the demand was made for the purpose of investigating possible violations of a Federal statute" could meet the basis and purpose

requirement, *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963), but only when the assertion is complete and accurate, *cf. SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.").  Here, DOJ has suggested that it needs the complete, unredacted New Hampshire voter file to investigate HAVA compliance, which is at best a fishing expedition and at worst simple pretext.  While DOJ might ordinarily be presumed to be acting in good faith, "appropriate process" requires an opportunity to prove otherwise.  *See In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962); *see also, e.g.*, *LULAC v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 187 n.29 (D.D.C. 2025) (describing misrepresentation in recent election litigation).  Moreover, in recent months, district courts have repeatedly "identified serious defects in the government's explanations and representations . . . prompting judges to discount government submissions, compel expedited discovery, and withhold the presumption."  Ryan Goodman et al., *The "Presumption of Regularity" in Trump Administration Litigation* (Nov. 20, 2025), https://perma.cc/PL5G-BTAN; *see also Oregon*, 2026 WL 318402, at *11 ("The presumption of regularity that has been previously extended to [the United States] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").

Thus, the U.S. District Court for the Central District of California recently determined that "Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause."  *Weber*, 2026 WL 118807, at *8; *see also id.* (confirming that "[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures" and that "appropriate process" allows courts to "determine that the DOJ has not met Title III['s] statutory requirements").  Soon thereafter,

the U.S. District Court for the District of Oregon applied "the Federal Rules of Civil Procedure" to a Title III claim and dismissed the suit for failure "to state an adequate basis and purpose." *Oregon*, 2026 WL 318402, at *8; *see also id.* at *13 (describing the request as "chilling" "overreach").  And a third court in Connecticut recently concluded that Title III "gives the district court jurisdiction to receive and adjudicate applications by the Attorney General seeking to enforce the disclosure obligations provided for therein" following full briefing and oral argument.  Order, *United States v. Thomas*, No. 3:26-cv-21 (D. Conn. Jan. 14, 2026) (as amended), ECF No. 30.  This Court should follow the emerging consensus, impose rigorous scrutiny, deny the "Motion for Order to Compel," and dismiss the Title III claim.

### B.    HAVA Does Not Provide DOJ with Subpoena Authority.

The United States' invocation of HAVA as an alternative basis for its demand is at best puzzling, as HAVA contains neither subpoena authority nor a public records provision.  *See* 52 U.S.C. §§ 20901–21145; *cf. id* § 21003(b) (requiring states to submit HAVA compliance plans to the U.S. Election Assistance Commission as a condition for federal funding); *see also* N.H. Mem. 15-18.  Although DOJ claims that HAVA "provides authority for the Justice Department to seek the State's [voter file] via Section 401," Aug. 18 Ltr. at 1, that provision merely authorizes the Attorney General to enforce four sections of the Act, *see* 52 U.S.C. § 21111.  The "authority of an administrative agency to issue subpoenas for investigatory purposes is created solely by statute." *Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988); *see also id.* (noting that courts do not "assume the existence of the power to [issue subpoenas] where Congress has not provided for them specifically, nor provided procedural safeguards"); *cf. United States v. Constr. Prods. Res.*, 73 F.3d 464, 471-73 (2d Cir. 1996) (determining whether subpoena lay within agency's statutory authority).  Thus, the mere fact that a statute contains enforcement provisions does not grant

subpoena authority to the enforcement agency.  *See, e.g.*, *Iannone*, 610 F.2d at 945-46; *Bobreski v. EPA*, 284 F. Supp. 2d 67, 75-78 (D.D.C. 2003); *see also Cuahy Packing Co. v. Holland*, 315 U.S. 357, 364-66 (1942) (rejecting implied subpoena delegation authority).  Moreover, enforcement authority does not mandate direct oversight of state election officials, which would impose substantial federalism costs.  *See, e.g.*, *Shelby Cnty*, 570 U.S. at 549; *see also* 52 U.S.C. § 21085 (codifying state discretion).  HAVA simply does not authorize records requests.  *See Weber*, 2026 WL 118807, at *15; *Oregon*, 2026 WL 318402, at *6-7.

If enforcement authority were always accompanied by the authority to demand relevant documents, express subpoena provisions throughout the United States Code would be meaningless surplusage.  *See, e.g.*, *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 476 (2019) (recognizing that courts "generally presum[e] that statutes do not contain surplusage" (internal citation and quotation marks omitted)).  Were it otherwise, Title III itself would not have been needed to ensure that DOJ could effectively enforce the Civil Rights Act of 1957.  *See* S. Rep. No. 86-1205 (1960).  These arguments do not withstand scrutiny.  Therefore, HAVA provides no basis for DOJ's request for the complete, unredacted New Hampshire voter file.

## V.    CONCLUSION

For the reasons set out above, this Court should grant Defendants' motion to dismiss.

Respectfully submitted,                              February 9, 2026

/s/ Robin D. Melone                                  /s/ Daniel J. Freeman
Robin D. Melone (NH Bar No. 16475)                   Daniel J. Freeman* (NY Bar No. 4582037)
Pastori | Krans, PLLC                                Democratic National Committee
82 North Main Street, Suite B                        430 South Capitol Street SE
Concord, NH 03301                                    Washington, DC 20003
(603) 369-4769                                       (202) 863-8000
rmelone@pastorikrans.com                             freemand@dnc.org

                                                     * Pro Hac Vice Applications Forthcoming

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this, the 9th day of February 2026, the foregoing document was submitted for filing through the ECF system.  The document will be sent electronically to the registered participants and paper copies will be served via first class mail on non-registered participants.


Dated: February 9, 2026                    */s/ Robin D. Melone*_____
                                           Robin D. Melone