## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| | Case No. 1:25-cv-00371-AJ |
| v. | |
| | **MEMORANDUM OF LAW IN** |
| DAVID M. SCANLAN in his official capacity as Secretary of State for the State of New Hampshire, and the STATE OF NEW HAMPSHIRE, | **SUPPORT OF MOTION TO DISMISS** |
| *Defendants*. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

I.      Federal law has long made voter list maintenance a State responsibility, consistent with the constitutional separation of powers. ...................................................... 3

II.     DOJ has embarked on an unprecedented campaign to amass personal voter registration data held by the States. ................................................................... 5

III.    DOJ sues Secretary Scanlan to obtain New Hampshire's voter registration list. ............... 8

LEGAL STANDARD ........................................................................................................... 9

ARGUMENT ....................................................................................................................... 9

I.      DOJ fails to state a claim under the Civil Rights Act of 1960 ......................................... 10

      A.     New Hampshire's exemption from the NVRA's list maintenance rules, and parts of HAVA, render DOJ's demand improper as a matter of law. ............ 10

      B.     Even if New Hampshire was subject to relevant federal list maintenance requirements, DOJ has failed to provide a lawful purpose for its demand. .......... 12

      C.     DOJ failed to provide any basis for requesting records in its demand. ............... 17

II.     DOJ fails to state a claim under HAVA ........................................................................ 19

III.    Title III and HAVA do not preempt New Hampshire confidentiality laws ..................... 21

IV.    DOJ fails to comply with the Privacy Act. ................................................................... 23

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*In re Admin. Subpoena No. 25-1431-019,*
    800 F. Supp. 3d 229 (D. Mass. 2025) .............................................................. 15

*Ala. ex rel. Gallion v. Rogers,*
    187 F. Supp. 848 (M.D. Ala. 1960) .................................................................. 14

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
    570 U.S. 1 (2013) ...................................................................................... 3, 22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................................ 9

*Blackstone Realty LLC v. FDIC,*
    244 F.3d 193 (1st Cir. 2001) ......................................................................... 25

*Carr v. Marietta Corp.,*
    211 F.3d 724 (2d Cir. 2000) .......................................................................... 18

*CFPB v. Accrediting Council for Indep. Colleges & Schs.,*
    854 F.3d 683 (D.C. Cir. 2017) ................................................................. 12, 17

*CFPB v. Source for Pub. Data, L.P.,*
    903 F.3d 456 (5th Cir. 2018) .................................................................... 17, 18

*In re Coleman,*
    208 F. Supp. 199 (S.D. Miss. 1962) ......................................................... 15, 18

*Douglas v. Hirshon,*
    63 F.4th 49 (1st Cir. 2023) ............................................................................ 20

*Foster v. Love,*
    522 U.S. 67 (1997) .......................................................................................... 3

*FTC v. Am. Tobacco Co.,*
    264 U.S. 298 (1924) ...................................................................................... 12

*Home Depot U.S.A., Inc. v. Jackson,*
    587 U.S. 435 (2019) ...................................................................................... 13

*Husted v. A. Philip Randolph Inst.,*
    584 U.S. 756 (2018) ........................................................................................ 4

*Kennedy v. Bruce*,
  298 F.2d 860 (5th Cir. 1962) ................................................................. 13, 18

*Kennedy v. Lynd*,
  306 F.2d 222 (5th Cir. 1962) ................................................................. *passim*

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
  No. 25-cv-3501 (SLS), 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ................. 23, 24, 25

*McCloskey v. Mueller*,
  446 F.3d 262 (1st Cir. 2006) ................................................................. 20

*Morales-Cruz v. Univ. of P.R.*,
  676 F.3d 220 (1st Cir. 2012) ................................................................. 9

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ................................................................. 11

*New England Cleaning Servs., Inc. v. Am. Arb. Assoc.*,
  199 F.3d 542 (1st Cir. 1999) ................................................................. 9

*O'Brien v. Mass. Bay Transp. Auth.*,
  162 F.3d 40 (1st Cir. 1998) ................................................................. 10

*Pejepscot Indus. Park, Inc. v. Maine Cent. R.*,
  215 F.3d 195 (1st Cir. 2000) ................................................................. 18

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984) ................................................................. 10

*Phoung Luc v. Wyndham Mgmt. Corp.*,
  496 F.3d 85 (1st Cir. 2007) ................................................................. 9

*Project Vote, Inc. v. Kemp*,
  208 F. Supp. 3d 1320 (N.D. Ga. 2016) ................................................................. 21

*Project Vote/Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012) ................................................................. 21

*Project Vote/Voting For Am., Inc. v. Long*,
  752 F. Supp. 2d 697 (E.D. Va. 2010) ................................................................. 21

*Pub. Int. Legal Found. v. N.C. State Bd. of Elections*,
  996 F.3d 257 (4th Cir. 2021) ................................................................. 21

*Pub. Int. Legal Found., Inc. v. Bellows,*
    92 F.4th 36 (1st Cir. 2024) ................................................................... 2, 21, 23

*Pub. Int. Legal Found., Inc. v. Matthews,*
    589 F. Supp. 3d 932 (C.D. Ill. 2022) ............................................................ 21

*Republican Nat'l Comm. v. N.C. State Bd. of Elections,*
    120 F.4th 390 (4th Cir. 2024) ...................................................................... 4

*Ríos-Campbell v. U.S. Dep't of Com.,*
    927 F.3d 21 (1st Cir. 2019) ........................................................................ 20

*In re Subpoena No. 25-1431-014,*
    No. MC 25-39, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025) ......................................... 15

*True the Vote v. Hosemann,*
    43 F. Supp. 3d 693 (S.D. Miss. 2014) ............................................................ 21

*United States v. Oregon,*
    No. 6:25-CV-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ...................... *passim*

*United States v. Palomar-Santiago,*
    593 U.S. 321 (2021) ............................................................................... 18

*United States v. Weber,*
    No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ......... *passim*

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ............................................................................... 13

*Voter Reference Found., LLC v. Torrez,*
    160 F.4th 1068 (10th Cir. 2025) ................................................................. 21

*Watt v. W. Nuclear, Inc.,*
    462 U.S. 36 (1983) ................................................................................ 22

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 4 ............................................................................... 2, 3, 11

N.H. Const. pt. 1, art. 2-b .......................................................................... 1, 6, 21

## STATUTES

5 U.S.C. § 552a ..................................................................................... 23, 24, 25

52 U.S.C. § 20503 ........................................................................................ 1, 3, 10

52 U.S.C. § 20507 .................................................................................................. 4

52 U.S.C. § 20703 ...................................................................................... 1, 18, 19

52 U.S.C. § 20901 ................................................................................................ 22

52 U.S.C. § 21083 .......................................................................................... *passim*

52 U.S.C. § 21111 ........................................................................................ 14, 19

RSA § 654:16 ........................................................................................................ 12

RSA § 654:31 ........................................................................................................ 21

RSA § 654:44 ........................................................................................................ 11

RSA § 654:45 ......................................................................................... 1, 6, 11, 21

**FEDERAL RULES**

Fed. R. Civ. P. 12 ................................................................................................. 9

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 86-956 (1959) ............................................................................. 8, 14

H.R. Rep. No. 107-329, pt. 1 (2001) .............................................................. 3, 4, 19

**OTHER AUTHORITIES**

AAG Harmeet Dhillon (@AAGHarmeetDhillon), X  (Dec. 18, 2025, at 9:24 AM ET),
    https://x.com/AAGDhillon/status/2001659823335616795 ................................. 5

*Basis*, Black's Law Dictionary (4th ed. 1968) ............................................................ 18

Patrick Berry, *Tracker of Justice Department Requests for Voter Information*,
    Brennan Ctr. for Just. (Feb. 9, 2026), https://perma.cc/RM4N-WWRZ ........................... 5

*Purpose*, Black's Law Dictionary (4th ed. 1968) ....................................................... 18

*The National Voter Registration Act of 1993 (NVRA)*, U.S. Dep't of Justice,
    https://perma.cc/2LYX-68UM ............................................................................... 16

## INTRODUCTION

The United States Department of Justice ("DOJ") seeks to build a nationwide voter registration list, a scheme not authorized by Congress and contrary to federal laws assigning States the responsibility for overseeing voter registration. To build this unauthorized and unprecedented federal list, DOJ has demanded that New Hampshire—along with at least forty other States—turn over its full, unredacted voter database, even though DOJ has no actual authority to make such a demand and despite the fact that New Hampshire law mandates that "the voter database shall be private and confidential." RSA § 654:45(VI); *see also* N.H. Const. pt. 1, art. 2-b.

Nothing in federal law authorizes the relief that DOJ seeks. DOJ chiefly relies on Title III of the Civil Rights Act of 1960 ("CRA"), which it claims authorizes it to investigate New Hampshire's compliance with voter list maintenance obligations under the Help America Vote Act ("HAVA"). But this theory has a major problem—New Hampshire is exempt from certain federal list maintenance obligations under HAVA as a result of its broader exemption from the National Voter Registration Act ("NVRA"). *See* 52 U.S.C. §§ 20503(b)(2), 21083(a)(2)(A)(iii). While DOJ tries to identify *other* HAVA obligations that might justify its intrusion into New Hampshire's voter registration activities, those HAVA provisions are principally committed to State discretion. DOJ therefore has failed to identify any federal obligation that New Hampshire could possibly be shirking, undercutting the entire theory of its suit as a matter of law.

DOJ's demand under the CRA fails for other reasons too. Demands for records under that law must state "the basis and the purpose" for which they are issued, and that basis and purpose must be legally valid. 52 U.S.C. § 20703. But the CRA is concerned with protecting the constitutional right to vote—not with enforcing election administration or list maintenance rules—and thus is not a proper tool for investigating supposed HAVA violations, even if New Hampshire had relevant federal duties under that law. And while DOJ also brings a secondary claim under

HAVA itself, that statute does not impose *any* obligation on States to disclose their voter registration materials to DOJ or anyone else.

Moreover, even if DOJ had made a valid demand for New Hampshire's full statewide voter registration list, no federal law preempts New Hampshire law's privacy protections and confidentiality requirements for the statewide voter list and certain sensitive voter data. Even States that are subject to the additional requirements imposed by the NVRA are free to require the "appropriate redaction of uniquely or highly sensitive personal information in" voter files. *Pub. Int. Legal Found., Inc. v. Bellows* ("*PILF*"), 92 F.4th 36, 56 (1st Cir. 2024). That conclusion is even more obvious in New Hampshire, which is exempt from the NVRA's requirements. And DOJ has not, in any event, complied with the requirements that the Privacy Act imposes on federal agencies before allowing them to collect the sort of private personal information DOJ seeks here.

Federal courts reviewing similar demands from DOJ to other States have dismissed them for these reasons. Last month, a federal court dismissed DOJ's suit in California, holding that its CRA and HAVA claims were legally defective. *See United States v. Weber*, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026). The court held that (1) DOJ's proffered basis and purpose do not suffice under Title III of the CRA, *id.* at *8; (2) federal law does not preempt state privacy laws protecting sensitive voter data, *id.* at *13, 17; (3) HAVA does not grant DOJ any power to compel the production of records, *id.* at *15; and (4) DOJ's data request violates the Privacy Act, *id.* at *17–19. Last week, a federal court in Oregon issued a substantially similar decision, dismissing with prejudice DOJ's parallel demand to that State. *See generally United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *1 (D. Or. Feb. 5, 2026).

Ultimately, DOJ's demand to New Hampshire runs directly contrary to the purposefully decentralized structure of our federal electoral system. *See, e.g.*, U.S. Const. art. I, § 4, cl. 1 (giving

the States principal authority over congressional elections). When enacting HAVA after the contested 2000 elections, Congress stressed that the "dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001). Notwithstanding the President's repeated call to "nationalize" our purposefully decentralized election system,[1] the Court should join other courts in dismissing this unprecedented federal overreach, which lacks any valid legal basis in federal law.

## BACKGROUND

**I.    Federal law has long made voter list maintenance a State responsibility, consistent with the constitutional separation of powers.**

The U.S. Constitution "invests the States with responsibility for the mechanics" of elections, subject to any decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* U.S. Const. art. I, § 4, cl. 1. It is therefore *States*, not the federal government, that are primarily responsible for determining voter eligibility and maintaining lists of eligible voters. Congress may preempt state law, but that power extends only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Where Congress has not spoken on an issue, state law controls. *See id.*

Existing federal law sits "atop state voter-registration systems"; it does not displace them. *Id.* at 5. That is particularly true in New Hampshire, which claims an exemption from the primary federal law regulating voter registration—the NVRA—because it has long offered same-day voter registration. 52 U.S.C. § 20503(b)(2). Even where the NVRA applies, it charges *States*—not the federal government—with the "administration of voter registration for elections for Federal

---

[1] *See* Miles Parks, *Trump says he wants Republicans to 'nationalize' elections*, NPR (Feb. 3, 2026), https://perma.cc/F5QY-DXK3.

office," 52 U.S.C. § 20507(a), it preserves the role of *States* for maintaining voter lists (subject to strict procedural safeguards), *id.* § 20507(c)–(g), and it leaves the *States* as custodians of voter registration data, *see Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018).

HAVA, which was enacted "to improve voting systems and voter access" after the 2000 election, does not change this. It, too, puts the responsibility for maintaining voter registration systems on the States, not the federal government. *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Thus, it requires *States* to create a "computerized statewide voter registration list" and "perform list maintenance," 52 U.S.C. § 21083(a)(1)(A), (a)(2)(A), and it is abundantly clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). Many of its provisions command that certain tasks be carried out "in accordance with State law," with no role for federal oversight. *See, e.g.*, *id.* § 21083(a)(2)(A)(iii), (a)(5)(A)(iii). More generally, HAVA commands that "specific choices on the methods of complying with" HAVA "shall be left to the discretion of the State." *Id.* § 21085. HAVA's legislative history stresses the importance of our decentralized electoral system:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, at 31–32. And while HAVA requires States to create their own centralized statewide voter registration lists, it does not obligate them to disclose records in any way.

No federal statute tasks the federal government with compiling a federal voter registration list. Instead, Congress has "left it up to the States to maintain accurate lists of those eligible to vote in federal elections," *Husted*, 584 U.S. at 761, subject only (in New Hampshire's case) to the specific requirements of HAVA, which purposefully operates through the States themselves.

## II.  DOJ has embarked on an unprecedented campaign to amass personal voter registration data held by the States.

In the spring of 2025, DOJ launched an unprecedented campaign to demand broad access to state voter files, which include sensitive and personal information about each registered voter. DOJ has reportedly sent demands to at least 47 States, with plans to make similar demands on all 50.[2] It seeks to use the data to create a national voter database that will be used to attempt to substantiate President Trump's unfounded accusations that millions of non-citizens have voted illegally in recent elections.[3] In recent public statements, moreover, Assistant Attorney General Harmeet Dhillon has made clear that DOJ also intends to use the data it is demanding from the States to attempt to compel the removal of *hundreds of thousands* of voters from the rolls.[4]

According to many of the States subject to these demands, DOJ has sought not simple read-only access, but rather "materials that define or explain how" the voter information is coded into the registration database, "potentially because additional information about database coding would assist in transferring data . . . into other federal databases." Br. of Amici Curiae Maryland et al. in Supp. of Mot. to Dismiss at 6, *United States v. Bd. of Elections of N.Y.*, No. 1:25-CV-01338-MAD (N.D.N.Y. Jan. 6, 2026), ECF No. 79-1. This has caused substantial alarm given public statements from former DOJ officials that the agency intends to use this information for purposes entirely unrelated to voter list maintenance. *See Weber*, 2026 WL 118807, at *11 (noting DOJ may plan to

---

[2] Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Feb. 9, 2026), https://perma.cc/RM4N-WWRZ; Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[3] Barrett & Corasaniti, *supra* note 2.

[4] *See* AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 ET), https://x.com/AAGDhillon/status/2001659823335616795 (stating in video discussing these lawsuits: "You're going to see hundreds of thousands of people in some States being removed from the voter rolls.").

use this information for immigration enforcement and other purposes); *Oregon*, 2026 WL 318402, at \*11–13. Further still, recent reporting has shown that federal agencies under the current administration, including DOGE, have improperly accessed certain social security data and shared it with private, third-party political groups that have previously sought to overturn election results.[5]

Most States have therefore rejected DOJ's demand, declining to turn over sensitive personal information that is typically protected by privacy laws.[6] New Hampshire law, for example, mandates that the "voter database shall be private and confidential," and that it, and any information in it, may *not* be disclosed "pursuant to a subpoena or civil litigation discovery request." RSA § 654:45(VI). Data from the database may be provided only to the state and federal courts for the preparation of jury lists. *Id.* And the New Hampshire Constitution's Bill of Rights guarantees that "[a]n individual's right to live free from governmental intrusion in private or personal information is natural, essential, and inherent." N.H. Const. pt. 1, art. 2-b.

As part of its broader pressure campaign, DOJ sent Secretary Scanlan a letter on June 25, 2025, demanding, among other things, New Hampshire's "statewide voter registration list." Mot. Intervene, Ex. F at 2, ECF No. 6-7 ("June 25 Letter"). Secretary Scanlan responded on July 25 by explaining that New Hampshire law prohibited him from releasing the voter list except "in limited circumstances not applicable here." Mot. Intervene, Ex. G at 8, ECF No. 6-8 ("July 25 Letter"). DOJ then sent another letter on August 18, which claimed the information was necessary to "ascertain New Hampshire's compliance with the list maintenance requirements of HAVA." Mot. Intervene, Ex. H at 1, ECF No. 6-9 ("August 18 Letter"). DOJ made clear it expected New

---

[5] Meryl Kornfield, *Trump Administration Admits DOGE Accessed Personal Social Security Data*, Washington Post (Jan. 20, 2026), https://www.washingtonpost.com/politics/2026/01/20/doge-social-security-data-privacy-act/.

[6] *See* Martinez-Ochoa, O'Connor & Berry, *supra* note 2.

Hampshire to supply information disclosing "all identifiers [of each voter], including the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number." *Id*. at 1. Secretary Scanlan declined again to offer a copy of New Hampshire's voter registration list on August 28.[7]

Around the same time as DOJ was making these demands of New Hampshire, it made similar demands to scores of other States, the majority of which have also refused to turn over highly sensitive personal voter information. Starting in September 2025, DOJ began filing lawsuits against some of these States and the District of Columbia; as of the time of this filing, it has filed 25 such suits. DOJ began this litigation blitz on September 16 by suing Oregon and Maine, alleging in both cases that DOJ was entitled to the voter information it sought under three statutes: the NVRA, HAVA, and the CRA.[8] On September 25, DOJ filed lawsuits against California, Michigan, Minnesota, New York, New Hampshire, and Pennsylvania.[9] DOJ again brought claims under these statutes, excepting the NVRA claim as to exempt States like New Hampshire and Minnesota.

In early December, DOJ sued a third group of States—Delaware, Maryland, New Mexico, Rhode Island, Vermont, and Washington.[10] Notably, at this point in its litigation campaign, DOJ ceased asserting any claims under the NVRA and HAVA, relying instead upon the CRA alone— a tacit acknowledgment of the weakness of its earlier NVRA and HAVA claims. Since that point, DOJ has sued yet another ten States and the District of Columbia in successive waves of

---

[7] *See* Todd Bookman, *Trump Administration and NH officials continue fight over access to state's voter data*, N.H. Pub. Radio (Aug. 28, 2025), https://perma.cc/N7VT-B2CQ.

[8] *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls*, U.S. Dep't of Just. (Sept. 16, 2025), https://perma.cc/9HZQ-CFCG.

[9] *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls*, U.S. Dep't of Just. (Sept. 25, 2025), https://perma.cc/J2Z3-C4NY.

[10] *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls*, U.S. Dep't of Just. (Dec. 2, 2025), https://perma.cc/SCJ6-7GW4.

complaints.[11] These suits also omit any NVRA or HAVA claims, relying upon the CRA alone.

### III.    DOJ sues Secretary Scanlan to obtain New Hampshire's voter registration list.

DOJ filed this suit on September 25, 2025, seeking to compel Secretary Scanlan to provide New Hampshire's unredacted statewide voter registration list. *See* Compl., ECF No. 1. DOJ brings one claim under Title III of the CRA and another under HAVA. *Id.* ¶¶ 55–61. The CRA permits DOJ to review certain voting records to investigate "question[s] concerning infringement or denial of . . . constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962). Congress enacted the law to preserve "the right of all qualified citizens to vote without discrimination on account of race," and specifically to facilitate "investigation[s]" authorized under the Civil Rights Act of 1957. H.R. Rep. No. 86-956, at 7 (1959). HAVA, for its part, was enacted to improve voting systems, but it deliberately works through the States to do so—it does not assign the federal government any of the supervisory authority DOJ claims here. *See supra* Background § I.

DOJ admits that it did not serve the demand for New Hampshire's voter file to investigate any denial of the right to vote in New Hampshire. Rather, DOJ's alleged purpose in making the demand to Secretary Scanlan is "to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA." Compl. ¶ 46 (citation omitted). But, due to its NVRA-exemption, New Hampshire's obligations under HAVA are circumscribed. Moreover, HAVA is a law with its *own* procedures and enforcement mechanisms, none of which include disclosure of the state's voter registration list or the sensitive information it contains.

---

[11] *See Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws*, U.S. Dep't of Just. (Dec. 12, 2025), https://perma.cc/Y8VL-QBDP; *Justice Department Sues Four States for Failure to Produce Voter Rolls*, U.S. Dep't of Just. (Dec. 18, 2025), https://perma.cc/7WMZ-FSQR; *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls*, U.S. Dep't of Just. (Jan. 6, 2026), https://perma.cc/PCE6-DHYA; *Justice Department Sues Virginia for Failure to Produce Voter Rolls*, U.S. Dep't of Just. (Jan. 16, 2026), https://perma.cc/DF7Q-MNQ5.

## LEGAL STANDARD

A complaint must be dismissed where it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court is not required to accept legal conclusions as true when considering a motion to dismiss." *New England Cleaning Servs., Inc. v. Am. Arb. Assoc.*, 199 F.3d 542, 545 (1st Cir. 1999). Instead, "the court must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)); *see also Iqbal*, 556 U.S. at 678 (explaining that courts need not accept "legal conclusions" as true at the motion to dismiss stage). In other words, a complaint should be dismissed "if the facts lend themselves to no viable theories of recovery." *Phoung Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir. 2007).

## ARGUMENT

Both claims in the complaint should be dismissed. DOJ's CRA demand fails from the start because it purports to investigate New Hampshire's HAVA compliance, but without grappling with New Hampshire's modest obligations under that law. DOJ's demand also did not include a valid statement of its "basis and the purpose," as the CRA requires. Even if it had, DOJ's purported purpose—to investigate vague assertions of voter list maintenance issues—does not satisfy the CRA. HAVA itself contains no disclosure requirement whatsoever, which disposes of that claim. Moreover, New Hampshire's own state-law privacy protections are not preempted. Nor has DOJ complied with the federal restrictions in the Privacy Act for compiling the sensitive data it seeks.

## I.    DOJ fails to state a claim under the Civil Rights Act of 1960.

### A.    New Hampshire's exemption from the NVRA's list maintenance rules, and parts of HAVA, render DOJ's demand improper as a matter of law.

DOJ's demand flounders from the get-go because it fundamentally misunderstands New Hampshire's list maintenance obligations under federal law. DOJ concedes that New Hampshire is exempt from the list maintenance requirements of the NVRA. *See* Compl. ¶ 25; *see also* 52 U.S.C. § 20503(b). DOJ insists that New Hampshire still has other federal list maintenance obligations under HAVA, but DOJ seriously overstates what those duties are. In particular, DOJ alleges that it needs records to assess New Hampshire's compliance with 52 U.S.C. § 21083(a)(2), which requires state election officials to "perform list maintenance" subject to specific requirements. 52 U.S.C. § 21083(a)(2)(A); *see also* Compl. ¶¶ 35, 61(b) (citing § 21083(a)(2)(A) as a purpose of DOJ's demand). But New Hampshire is exempt from that portion of HAVA, so there is no compliance to assess. HAVA provides that "if a State is described in section 4(b) of the National Voter Registration Act"—meaning, if it is NVRA-exempt, as New Hampshire is—"that State shall remove the names of ineligible voters from the computerized list in accordance *with State law.*" 52 U.S.C. § 21083(a)(2)(A)(iii) (emphasis added). Thus, under HAVA, New Hampshire has no duty to comply with any substantive federal list-maintenance requirements—its only obligation is to act "in accordance with State law." *Id.* The notion that the federal government may audit New Hampshire's compliance with its own laws violates core federalism principles, and DOJ offers no argument that it may do so. *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (explaining federal courts cannot compel state officials to comply with state law); *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998) ("It is not the proper purview of a federal court to supervise state officials' compliance with state law.").

DOJ also cites a few other provisions of HAVA, but they do not support DOJ's demand either. DOJ points to § 21083(a)(4), which provides that any "State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4); *see also* Compl. ¶¶ 24–25, 61(e) (citing § 21083(a)(4)). But the only duty this subsection imposes on New Hampshire is to "include provisions" to this effect in its statutory law. DOJ can assess New Hampshire's compliance with this requirement by consulting the Revised Statutes. *E.g.*, RSA § 654:44; RSA § 654:45. New Hampshire's statewide voter registration data would do nothing to facilitate that assessment. And while the Court need not reach the issue, this demand that New Hampshire enact particular provisions into state law also raises serious anti-commandeering questions. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 475 (2018) (discussing the "basic principle" that "Congress cannot issue direct orders to state legislatures," including to enact or refrain from enacting specific legislation); *cf.* U.S. Const. art. I, § 4, cl. 1 (authorizing Congress to "make or alter" state regulations of elections, but not to demand that state legislatures themselves enact any particular law).

DOJ also invokes § 21083(a)(5), which commands states not to accept a voter registration form for federal elections unless (subject to certain exceptions) the application includes either a "valid driver's license number," or "the last 4 digits of the applicant's social security number." 52 U.S.C. § 21083(a)(5)(A)(i); *see, e.g.*, Compl. ¶¶ 47, 61(c), (d), (g) (citing § 21083(a)(5)). But the very same section makes clear that "*[t]he State* shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, *in accordance with State law*." 52 U.S.C. § 21083(a)(5)(A)(iii) (emphases added). Once more, DOJ has offered no rationale for federal intrusion with respect to how New Hampshire carries out this *state law* duty.

Finally, the complaint passingly suggests that DOJ wishes to assess New Hampshire's compliance with § 21083(b), which regulates how States conduct voter registration by mail for federal elections. *See* 52 U.S.C. § 21083(b); *see also* Compl. ¶ 61(f). New Hampshire's absentee voter registration rules plainly comply with these procedures. *See* RSA §§ 654:16–19. The complaint does not allege otherwise. Furthermore, only a fraction of New Hampshire residents *register* to vote by mail—that supplies no justification for DOJ's demand for the State's *entire* voter registration list, the vast majority of which consists of voters who registered in person.

At bottom, the alleged purpose for DOJ's CRA demand—"to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA," Compl. ¶ 46 (citation omitted)— simply does not add up. DOJ has failed to identify any federal obligation that could *plausibly* justify its intrusive request for New Hampshire's unredacted statewide voter registration list. The clear absence of any such possible lawful purpose requires dismissal of the CRA claim. *CFPB v. Accrediting Council for Indep. Colleges & Schs.* ("*ACICS*"), 854 F.3d 683, 689 (D.C. Cir. 2017) (explaining "courts will not enforce a" document demand "when the investigation's subject matter is outside the agency's jurisdiction"); *accord FTC v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.) (federal agencies may not engage in "fishing expeditions").

**B.    Even if New Hampshire was subject to relevant federal list maintenance requirements, DOJ has failed to provide a lawful purpose for its demand.**

Even if New Hampshire had relevant federal list maintenance duties, the CRA is simply not an appropriate tool for federal supervision of those duties. It permits DOJ to review voting records for "question[s] concerning infringement or denial of . . . constitutional voting rights." *Lynd*, 306 F.2d at 228. Its "purpose is to enable the Attorney General to determine whether" a suit to enforce the CRA is appropriate, *id.*, not to ascertain compliance with distinct laws like HAVA (or the NVRA), that contain their own enforcement mechanisms selected by Congress. *See Weber*,

2026 WL 118807, at *8–9 (concluding the "purpose of Title III is to detect voting-related racial discrimination" and that "Title III was not passed as a tool for NVRA compliance"); *Oregon*, 2026 WL 318402, at *9–10. Moreover, HAVA's limited regulation of voter registration lists is concerned with things like a "failure[] to purge voters who have moved away or died," which, as one early court applying Title III noted, "do[] not bear any particular importance" to the Title III inquiry. *Kennedy v. Bruce*, 298 F.2d 860, 863 n.2 (5th Cir. 1962) (explaining that "failures to purge voters who have moved away or have died" are beyond the ambit of Title III). Simply put, there is a serious mismatch between DOJ's ostensible purpose (investigating list maintenance) and its chosen tool (a civil rights era statute that authorizes DOJ to investigate denial of voting rights).

DOJ's response appears to be that Title III can be invoked for any purpose whatsoever, including to conduct a fishing expedition into New Hampshire's voter list maintenance practices. *See* Compl. ¶ 46. But as the Oregon court recently observed, the basis and purpose requirement in the CRA would "serve no function" under this boundless reading. *Oregon*, 2026 WL 318402, at *9. Instead, in interpreting the "purpose" requirement, the Court must "account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (alteration in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *see also Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))).

The statutory context here makes clear that Congress enacted Title III to buttress DOJ's enforcement and protection of *civil rights and voting laws*. Specifically, Title III was intended by Congress to strengthen protections of the constitutional right to vote in the Civil Rights Act of

1957. *See* H.R. Rep. No. 86-956, at 3 (finding that while "some progress" had been made since the 1957 Act, there was a "need for additional legislation to implement the enforcement of civil rights"); *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) ("The legislative history leaves no doubt but that [Title III] is designed to secure a more effective protection of the right to vote."), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961) (per curiam). In the Civil Rights Act of 1957, Congress tasked DOJ with protecting the "right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956, at 7. Despite this charge, DOJ's efforts were stymied by "the refusal of some state and local authority to permit" inspection of certain voter records, *id.*, not to mention the intentional destruction of others, *Gallion*, 187 F. Supp. at 856 n.4 ("State action such as taken by the Alabama legislature authorizing registrars to destroy their records is an excellent example."). DOJ had "no existing power in civil proceedings to require the production of [voter registration] records during any investigation" concerning "complaints of a denial to vote because of race." H.R. Rep. No. 86-956, at 7. Congress found that, without granting DOJ a "suitable provision for access to voting records during the course of an investigation," its ability to protect the right to vote was "rendered relatively ineffective." *Id.* Congress thus enacted Title III of the Civil Rights Act of 1960 to assist DOJ in those investigations—not to administer voter registration list requirements in HAVA, a law that would not be enacted until decades later and which contains its own enforcement scheme. *See, e.g.*, 52 U.S.C. § 21111; *see also Oregon*, 2026 WL 318402, at *10.

Prior actions to enforce Title III further confirm that it is meant to be used only for investigating the denial of federal voting rights. Shortly after the law's enactment, courts upheld DOJ demands "based upon information in the possession of the Attorney General tending to show that discriminations on the basis of race and color have been made with respect to registration and

voting within your jurisdiction." *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963); *see also Lynd*, 306 F.2d at 229 n.6 (same). Here, in contrast, DOJ seeks to use the records it is demanding to attempt to compel States to remove hundreds of thousands of voters from the rolls—undermining voting rights, rather than protecting them. *Supra* note 4.

DOJ has yet to cite a single instance in which a court has upheld a Title III demand for records to assess state compliance with HAVA. *See Weber*, 2026 WL 118807, at *8–10.[12] The Court should reject DOJ's efforts to justify its demands with a purpose so divorced from the statutory scheme. *See id.*, at *9 (holding that assessing NVRA compliance was an improper purpose for DOJ's Title III request); *see also Oregon*, 2026 WL 318402, at *9–10 (similar); *In re Subpoena No. 25-1431-014*, No. MC 25-39, 2025 WL 3252648, at *17 (E.D. Pa. Nov. 21, 2025) (rejecting subpoena seeking private health information when DOJ "invoke[d] sweeping needs" for the information "far removed from those claimed purposes granted by Congress"); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 236–39 (D. Mass. 2025) (similar).

Finally, context and public reporting cast doubt that evaluating New Hampshire's list maintenance efforts is the sole purpose of DOJ's request. *See Weber*, 2026 WL 118807, at *10–12 (holding that the court is "not obliged to accept a contrived statement and purpose"); *Oregon*, 2026 WL 318402, at *11 (expressing doubt that the presumption of regularity should apply to DOJ's voter list demands). Neither of DOJ's letters to Secretary Scanlan identified any deficiencies with New Hampshire's list maintenance procedures. *See* June 25 Letter; August 18

---

[12] While some of the 1960s-era cases interpreting Title III offered deference to DOJ's statement of a "basis and . . . purpose," *see Lynd*, 306 F.2d at 226, those cases reflect instances where Title III was unquestionably being used for its intended purpose: investigations into the denial of voting rights due to race. Those cases are thus fundamentally different from this one, where DOJ has not even tried to assert that it seeks to investigate any possible denial of the constitutional right to vote.

Letter. The lack of any meaningful basis for DOJ's investigation into *New Hampshire* is further highlighted by the fact that DOJ has made carbon copy demands to at least 47 States and has sued more than 20 based on nearly identical boilerplate claims and allegations. *See supra* Background § II. This nationwide effort to collect state voter registration lists undermines any notion that DOJ has a particular "basis" for investigating New Hampshire specifically.

In addition, New Hampshire's full and unredacted statewide voter file is simply not helpful or necessary to investigate whether New Hampshire has "include[d] provisions" in its statutory law to "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4). The unredacted voter file cannot tell DOJ anything about the list maintenance procedures that New Hampshire adopted within its discretion under HAVA. Moreover, if DOJ were to obtain the unredacted voter file, the data would be outdated almost immediately,[13] and even if DOJ were able to use the data to identify voters who have moved or died since that single snapshot in time, it would not mean that New Hampshire law does not provide for "reasonable" list maintenance efforts under HAVA.[14]

DOJ's alleged purpose is further undermined by public statements revealing its true motivation for blanketing the States with demands for their full voter lists. Namely, DOJ seeks to use the information it is demanding from States across the country to create an unauthorized, unprecedented national voter database, and—as its own senior official has stated publicly—to compel the removal of countless individuals from the voting rolls. *See* Background § II; *see also*

---

[13] *See* Kris Maher & Eliza Collins, *The Fight Over the Justice Department's Push for State Voter Data*, Wall Street Journal (Dec. 24, 2025), https://www.wsj.com/politics/elections/the-fight-over-the-justice-departments-push-for-state-voter-data-111103f8.

[14] DOJ's own website acknowledges States need only make a "reasonable" effort to identify and remove ineligible persons from the voter rolls. *The National Voter Registration Act of 1993 (NVRA)*, U.S. Dep't of Justice, https://perma.cc/2LYX-68UM (updated Nov. 1, 2024).

*Weber*, 2026 WL 118807, at *11 ("Reports from other agencies also point to the federal government laying the groundwork to amass the personal information of millions of Americans in a centralized database."). And as the *Weber* court further observed, misuse of personal data has been rampant under the current administration, with widespread reporting of personal data being misused for purposes unrelated to its basis for collection. *Id.* It is therefore critical that the Court not merely accept DOJ's purported basis and purpose without scrutiny.

C.    **DOJ failed to provide any basis for requesting records in its demand.**

In addition to providing an improper and pretextual purpose, DOJ's demand fails because it does not offer *any* "basis" for demanding "a complete copy of the state of New Hampshire's statewide VRL." August 18 Letter at 1. Neither the June 25 Letter nor August 18 Letter sent by DOJ contain *any* basis for concern with New Hampshire's list maintenance efforts. *See generally* June 25 Letter; August 18 Letter.[15] In particular, the August 18 letter—DOJ's last communication to New Hampshire before suing, and the only correspondence to invoke the CRA—fails to set out a single fact or allegation that could provide a basis for concern with New Hampshire's list maintenance practices. The complaint confirms the point. While it makes a thin, post-hoc effort to state a *purpose* for the demand—*see, e.g.*, Compl. ¶ 46—it notably omits any *basis*.

The lack of a stated basis is fatal to DOJ's CRA claim. DOJ does not possess "unfettered authority to cast about for potential wrongdoing," *ACICS*, 854 F.3d at 689 (quotation omitted). Its authority to demand documents and information "is a creature of statute," *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458 (5th Cir. 2018), so its demand for information "must comply with statutory requirements," *id.* at 460. Here, Congress expressly required DOJ to state "the basis *and*

---

[15] DOJ's own website acknowledges States "have discretion under the NVRA and HAVA" to design list-maintenance programs, and that "States currently undertake a variety of approaches" to this process. *The National Voter Registration Act of 1993 (NVRA)*, *supra* note 14.

the purpose" of its request before obtaining any records. 52 U.S.C. § 20703 (emphasis added). The two terms are "connected by the conjunctive 'and,' meaning [DOJ] must" satisfy each. *United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021); *see also Carr v. Marietta Corp.*, 211 F.3d 724, 732 (2d Cir. 2000) ("Because the statute speaks of the requirements in the conjunctive, [DOJ] must satisfy both requirements."); *Oregon*, 2026 WL 318402, at *9 (explaining DOJ must satisfy both "basis" *and* "purpose"). Moreover, the terms "basis" and "purpose" have distinct plain meanings. *Compare* Basis, Black's Law Dictionary (4th ed. 1968) (including definitions for "basis" such as the "groundwork," "support," or "foundation" of something), *with* Purpose, Black's Law Dictionary (4th ed. 1968) (defining "purpose" to include "an end, intention, or aim, object, plan, project"). To merge the two into a single requirement, or to omit one entirely—as to DOJ attempts to do here—would impermissibly create surplusage and fail to give meaning to both terms. *See Pejepscot Indus. Park, Inc. v. Maine Cent. R.*, 215 F.3d 195, 202 (1st Cir. 2000) ("A reading that renders a statutory provision surplusage is disfavored.").

DOJ's own past invocations of Title III of the CRA further confirm that "basis" and "purpose" are distinct requirements. For example, in *Kennedy v. Lynd*, the Court recorded DOJ's demand to various Louisiana election officials as follows:

> This demand is *based upon* information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction. *The purpose* of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred.

306 F.2d at 229 n.6 (emphasis added) (internal quotation marks omitted). Other Title III cases from that period likewise reflect an explicit statement of both the "basis" and "purpose" for DOJ's demand. *See Bruce*, 298 F.2d at 861; *In re Coleman*, 208 F. Supp. at 199–200. DOJ in this case has not even done the bare minimum of providing a basis of any kind. "Simply put, [DOJ's demand] does not identify what conduct, it believes, constitute[d] an alleged violation." *Source for*

18

*Pub. Data, L.P.*, 903 F.3d at 458–59 (quashing civil investigative demand that failed to provide basis for investigation). DOJ's failure to include a "basis" in its demand to New Hampshire therefore independently warrants dismissal.[16]

## II.    DOJ fails to state a claim under HAVA.

The only other statute DOJ points to—HAVA—also does not support its demand. It is unclear how DOJ believes it even could—HAVA contains *no* disclosure requirements *at all*. DOJ conceded this point in related challenges. *See, e.g.*, Resp. to Mot. Dismiss at 16, *United States v. Oregon, et al.*, No. 6:25-CV-01666-MTK (D. Or. Dec. 8, 2025), ECF No. 57 (admitting it "is true" that "HAVA has no standalone, public disclosure provision"); *Oregon*, 2026 WL 318402, at *6 (agreeing "HAVA does not contain any disclosure requirements"). And that, presumably, is why DOJ has abandoned any HAVA claims in its most recent lawsuits. *See supra* Background § II.

DOJ's complaint and correspondence fail to cite any authority for the notion that HAVA obliges New Hampshire to produce requested records, relying instead upon a provision permitting the Attorney General to file suit "as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements" of HAVA. 52 U.S.C. § 21111. But none of the substantive legal requirements that the Attorney General can enforce through § 21111 include an obligation for States to turn over their voter rolls to DOJ upon request. Rather, the sole underlying provision that concerns voter registration at all—52 U.S.C. § 21083— confirms that voter registration lists must be "maintained" and "administered at the State level"— *not* by the federal government. *Id.* § 21083(a)(1)(A); *see also* H.R. Rep. No. 107-329, at 32, 36

---

[16] DOJ also cannot attempt to manufacture a basis for its demand *post hoc*. The CRA is clear that "[the] demand" itself "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703; *see also Weber*, 2026 WL 118807, at *9 (finding that DOJ failed to "establish[] the basis for its request" because DOJ failed to explain why it believed that California had violated federal law or why the voter registration list was necessary for DOJ's investigation).

(emphasizing that "local control must be preserved" under HAVA and voter registration databases should be "administered at the state level"). Nothing in HAVA otherwise provides any basis for DOJ to compel disclosure of voter information that the Constitution and HAVA both command to be administered and maintained at the *state* level.

DOJ has tried to argue elsewhere that its pleadings allege a *substantive* violation of HAVA's requirements, such that it can obtain state voter lists through discovery. *See, e.g.,* Resp. to Mot. Dismiss at 15–17, *United States v. Oregon, et al.*, No. 6:25-CV-01666-MTK (D. Or. Dec. 8, 2025), ECF No. 57. But DOJ's complaint fails to allege how New Hampshire is violating HAVA, offering nothing beyond non-specific and conclusory allegations to that effect. *See, e.g.*, Compl. ¶ 61.[17] Such boilerplate allegations do not pass the threshold necessary to allow discovery. *E.g.*, *Ríos-Campbell v. U.S. Dep't of Com.*, 927 F.3d 21, 26 (1st Cir. 2019) (explaining that "[o]ne of the main goals of the [Rule 12(b)(6)] plausibility standard is the avoidance of unnecessary discovery."). Indeed, Rule 12(b)(6) motions are intended to help avoid the burden of discovery "where the pleadings offer no reason to think discovery is worthwhile." *Douglas v. Hirshon*, 63 F.4th 49, 61 (1st Cir. 2023). And DOJ, as much as any litigant, cannot "conduct fishing expeditions in hopes of discovering claims that they do not know they have." *McCloskey v. Mueller*, 446 F.3d 262, 271 (1st Cir. 2006). DOJ is simply not permitted to "sue first, obtain discovery, and finalize its allegations later." *Weber*, 2026 WL 118807, at *15 (describing DOJ's HAVA claim as a "telltale 'fishing expedition'"). Accordingly, DOJ's HAVA claim fails a matter of law and DOJ cannot revive it through improperly treating the claim as a request for discovery.

---

[17] DOJ's complaint in this matter also suggests New Hampshire has violated HAVA by failing to turn over certain data and information to DOJ. *E.g.*, Compl. ¶ 61(a)–(g). But, as explained, HAVA does not require New Hampshire to produce information to DOJ or to respond to specific questions from DOJ. These allegations therefore fail to state a HAVA violation of any kind.

### III.     Title III and HAVA do not preempt New Hampshire confidentiality laws.

Even if DOJ had a viable federal claim, neither reaches so far as to preempt New Hampshire's numerous state-law privacy protections for sensitive voter data. New Hampshire law protects the "voter database" and requires that it, and "the information contained" in it, "shall be private and confidential," with no relevant exception. RSA § 654:45(VI). A different provision of New Hampshire law authorizes the release of a very limited set of information—"name, domicile address, mailing address, town or city, voter history, and party affiliation" only—to political parties, committees, and candidates. *Id.* § 654:31(IV). But no one is entitled to the full database, as DOJ demands. And the New Hampshire Constitution enshrines a right to privacy that Intervenor Neal Kurk—a former state legislator—helped to draft and enact into law. *See* N.H. Const. pt. 1, art. 2-b. This constitutional right reinforces the point that New Hampshire law protects personal information to the greatest practicable extent. *See* Mot. Intervene, Ex. B at 1–2, ECF No. 6-3.

Nothing in HAVA or Title III preempts these state-law protections. Indeed, the First Circuit and other courts have consistently held that *even the NVRA*—which does impose some disclosure obligations in this area, but from which New Hampshire claims exemption—does not preempt state-law privacy protections of sensitive voter information. *PILF*, 92 F.4th at 53–56. The First Circuit held that States subject to the NVRA must make certain voter list information available for public inspection, but that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in" voter files. *Id.* at 56. A litany of other courts have reached the same conclusion.[18] Thus, even where federal law imposes *some* disclosure

---

[18] *E.g.*, *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012); *Pub. Int. Legal Found. v. N.C. State Bd. of Elections*, 996 F.3d 257, 268 (4th Cir. 2021); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010).

obligation on States, that does not mean those States cannot comply in a manner consistent with their own privacy laws and obligations. And for States like New Hampshire that claim exemption from the NVRA, even the limited disclosure obligation discussed in *PILF* does not apply.

HAVA imposes no disclosure obligation of its own. *See generally* 52 U.S.C. §§ 20901–21145. If Congress had thought that it was necessary or desirable for DOJ to have access to a database containing highly sensitive information about every voter in a State to ensure that the State was complying with its list maintenance obligations under HAVA, it would have done so in *HAVA itself*. But Congress did not do so. To the contrary, it omitted any disclosure requirement from HAVA and explicitly specified that voter registration lists must be "maintained" and "administered at the State level"—not by the federal government. 52 U.S.C. § 21083(a)(1)(A).

As to Title III, the Fifth Circuit in *Lynd* enforced DOJ's demand specifically *because* it sought only "public records which ought ordinarily to be open to legitimate reasonable inspection," and *not* "confidential, private papers and effects." 306 F.2d at 231. That holding made sense because, at the time, voter registration applications did not require driver's license numbers or social security numbers. HAVA, enacted in 2002, first required such information on voter registration forms. *See* 52 U.S.C. § 21083(a)(5)(A)(i). The Congress that enacted the CRA therefore could not have intended for Title III to require disclosure of such private information to the federal government, or believed that such information was relevant or necessary for conducting the sort of investigations Title III was supposed to aid. *See Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 47 (1983) (interpreting statute to avoid result that "Congress could not have expected"). Congress's authority to preempt state laws governing elections extends only "so far as it is exercised, and no farther." *Inter Tribal Council*, 570 U.S. at 9 (citation omitted). Nothing in the text of Title III or HAVA reflects an effort by Congress to exercise its authority in a manner that

would displace state-law privacy protections for uniquely sensitive personal information.

In short, Congress did not intend Title III to preempt state privacy laws so that the federal government could assess compliance with voter list maintenance under HAVA—a statute passed decades later and that reflects no congressional intent to preempt such laws. Instead, as with the NVRA, nothing in Title III or HAVA prohibits the "redaction of uniquely or highly sensitive personal information in the Voter File." *PILF*, 92 F.4th at 56; *supra* note 18 (collecting authority).

## IV.    **DOJ fails to comply with the Privacy Act.**

Finally, DOJ's complaint must be dismissed because the relief it seeks fails to comply with the Privacy Act as a matter of law. The Privacy Act, codified at 5 U.S.C. § 552a, *et seq.*, "offers substantial protections regarding governmental use and retention of identifiable personal information." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3501 (SLS), 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). It does so in part by "adopt[ing] procedural safeguards when the records maintained by a federal agency, *i.e.*, a 'system of records,' are changed or used in a new way." *Id.* at *2 (quoting 5 U.S.C. § 552a(a)(5), (e)). In its rushed effort to sweep up the sensitive information of every registered voter in New Hampshire, DOJ overlooked the Privacy Act's basic procedural requirements. As a result, the Privacy Act independently prohibits DOJ from obtaining New Hampshire's statewide voter registration list.

The Privacy Act imposes obligations on any federal agency—like DOJ—that "maintains" a "system of records." 5 U.S.C. § 552a(e). A "system of records" is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5); *see also id.* § 552a(a)(4) (defining "record" to include "any item, collection, or grouping of information about an individual that is maintained by an agency . . . that contains his name, or the identifying number . . . or other identifying particular assigned to the

23

individual"). New Hampshire's statewide voter registration list plainly qualifies as a "system of records" under the Privacy Act. *Cf.* Compl. at 15 (seeking statewide voter registration list including "each registrant's full name, date of birth, residential address, their state driver's license number, and the last four digits of their social security number"). The term "maintain" is defined to include "maintain, collect, use, or disseminate." 5 U.S.C. § 552a(a)(3). Accordingly, if DOJ were to "collect," "use," or "maintain" New Hampshire's statewide voter registration list, the obligations imposed by the Privacy Act are triggered. *See id.* § 552a(e)(4); *see also Weber*, 2026 WL 118807, at *17 (holding that "[t]he Privacy Act applies to the voter records request by the DOJ"). That is precisely the relief DOJ seeks: an order from this Court to permit DOJ to collect, use, and maintain New Hampshire's statewide voter list. *See* Compl. at 16.

As DOJ attempts to amass state voter registration data onto its own servers, the Privacy Act imposes specific obligations on it. Most relevant, "when an agency 'establish[es] or revis[es]' any 'system of records,' it must 'publish in the Federal Register . . . a notice of the existence and character of the system of records,' *i.e.*, a System of Records Notice (SORN)." *League of Women Voters*, 2025 WL 3198970, at *2 (alterations in original) (quoting 5 U.S.C. § 552a(e)(4)). A SORN must include, among other things, the name and location of the system, the categories of individuals on whom records are maintained in the system, the categories of records maintained in the system, and all "routine use[s]" to which the system can be put as well as the "categories of users and the purpose of such use." *Id.* Yet DOJ has not identified *any* SORN that would apply to New Hampshire's statewide voter registration list. *Cf. Weber*, 2026 WL 118807, at *18 (rejecting three pre-existing SORNs DOJ argued could satisfy its Privacy Act obligations).

To allow DOJ to collate sensitive information about every registered voter in New Hampshire (and the country) without a protective SORN would nullify the statute's "procedural

safeguards," which "Congress enacted to . . . permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by federal agencies" and to "ensure adequate safeguards are provided to prevent misuse of such information." *League of Women Voters*, 2025 WL 3198970, at *2 (citation modified); *see also Weber*, 2026 WL 118807, at *18. If DOJ wishes to take such a radical step and compile a federal database of the registered voters in the United States, the Privacy Act requires (at a minimum) that DOJ adhere to strict notice-and-comment requirements, by first providing "adequate advance notice" to two congressional committees and the Office of Management and Budget to evaluate the effects on privacy and other rights and then publishing a SORN in the Federal Register that accurately discloses the system of records it intends to create and the uses to which it will put that information with the opportunity for written data, views, and arguments from interested persons. 5 U.S.C. § 552a(e)(4); *see also id.* § 552a(r); *id.* § 552a(e)(11) (requiring a 30-day notice period "of any new use or intended use of the information in the system," to "provide an opportunity for interested persons to submit written data, views, or arguments to the agency").

In short, because DOJ cannot identify a SORN that covers the records it intends to maintain, the Privacy Act prohibits it from collecting New Hampshire's voter registration list.[19]

### CONCLUSION

For the reasons above, Intervenor-Defendants respectfully request that the Court dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

---

[19] There is no impediment to the Court dismissing the complaint based on DOJ's failure to comply with the Privacy Act. Even if the Court construes failure to comply with the Privacy Act as an affirmative defense, "[i]t is well established that affirmative defenses . . . may be raised in a motion to dismiss an action for failure to state a claim" so long as the defense is clear "on the face of the plaintiff's pleadings." *Blackstone Realty LLC v. FDIC*, 244 F.3d 193, 197 (1st Cir. 2001). Here, the complaint acknowledges the Privacy Act, Compl. ¶ 48, but is completely silent as to DOJ's compliance with the requirements necessary to collect and maintain of New Hampshire's voter registration list. Moreover, DOJ's non-compliance with the Privacy Act is clear as a matter law.

Dated: February 9, 2026

Respectfully submitted,

*/s/ Steven J. Dutton*
Steven J. Dutton, NH Bar No. 17101
**McLANE MIDDLETON, P.A.**
900 Elm Street
Manchester, New Hampshire 03101
Telephone: (603) 625-6464
steven.dutton@mclane.com

Paul Twomey, NH Bar No. 2589
**TWOMEY LAW OFFICE**
44 Ring Road
Chichester, New Hampshire 03258
Telephone: (603) 568-3254
polotuama7@gmail.com

Elisabeth C. Frost*
David R. Fox*
Christopher D. Dodge*
Marcos Mocine-McQueen*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
efrost@elias.law
dfox@elias.law
cdodge@elias.law
mmcqueen@elias.law

Walker McKusick*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(206) 656-0177
wmckusick@elias.law

*Counsel for Intervenor-Defendants*

* *Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2026, the foregoing document was served via e-mail on all counsel of record.

*/s/ Steven J. Dutton*