**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>DAVID M. SCANLAN in his official capacity as Secretary of State for the State of New Hampshire and the STATE OF NEW HAMPSHIRE,<br><br>    Defendants. | Case No. 1:25-cv-00371-AJ |

*AMICI CURIAE* BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF
NEW HAMPSHIRE AND LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE

**TABLE OF CONTENTS**

I.  INTRODUCTION ...............................................................................................1

II. INTEREST OF *AMICI CURIAE* ....................................................................2

III. ARGUMENT ...................................................................................................3

    A.  Plaintiff is not entitled to New Hampshire voters' sensitive data because it articulates no legitimate basis or purpose for its request ........................................3

        1.  The Federal Rules of Civil Procedure apply, and the Court should use a normal, fulsome process in assessing Plaintiff's CRA claim ...........................6

        2.  Plaintiff has not alleged a sufficient basis or purpose under the CRA .............8

    B.  Plaintiff's demand for New Hampshire's voter data is part of a broader effort to amass the sensitive data of millions of Americans ..................................................9

    C.  Plaintiff's data demands erroneously suggest that the federal government is responsible for list maintenance and other election administration activities, authority which is constitutionally reserved for Congress and the States .............16

IV. CONCLUSION.................................................................................................18

i

## I.       INTRODUCTION

The Constitution delegates election administration to the states and Congress. *See* U.S. Const. art. I, § 4. Nonetheless, President Trump recently announced his intention to "take over" and "nationalize" voting in the United States. This case, and the 24 other near-identical cases Plaintiff has brought across the country, is part of that effort. Since January 2025, the executive branch has repeatedly sought to insert itself into voting processes despite lacking constitutional or statutory authority to do so. In this case, Plaintiff claims it is entitled to unfettered access to New Hampshire voters' sensitive data under the Civil Rights Act of 1960 (CRA), for the purported goal of assessing the state's compliance with the list-maintenance procedures prescribed by the Help America Vote Act (HAVA). But Plaintiff provides no basis for believing that New Hampshire is not complying with HAVA and fails to explain why sensitive voter data would be necessary to assess New Hampshire's compliance.

Plaintiff's purported justification for seeking this data makes little sense because it is entirely pretextual. The executive branch's public statements and actions demonstrate that the true purpose of this request is not to assess a suspected violation of HAVA, or otherwise enforce federal law, but to amass the data of tens of millions of voters so it can expand its own role into election administration beyond constitutional limits. *See United States v. Oregon*, No. 6:25-cv-1666-MTK, 2026 WL 318402, at *13 (D. Or. Feb. 5, 2026) ("Plaintiff's claims here represent an overreach and misuse of those limited constitutional exceptions designed to ensure decentralized election regulation" and could be used in "unprecedented ways . . . [and] may very well lead to an erosion of voting rights and voter participation."); *United States v. Weber*, No. 2:25-CV-9149-DOC-ADS, 2026 WL 118807, at *10  (C.D. Cal. Jan. 15, 2026) ("It appears that the DOJ is on a nationwide

1

quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database.").

Plaintiff has requested sensitive voter data from at least 47 states and Washington, D.C. and has so far sued 23 other states and Washington, D.C. for refusing to comply with its unlawful demands. Plaintiff has not attempted to show that it believes all 47 states and Washington, D.C. are violating federal law regarding list maintenance. This remarkable lack of justification demonstrates that Plaintiff improperly seeks to use HAVA and the CRA as an unlimited tool to consolidate voter data and to expand its own power over elections, rather than to protect the right to vote. This Court, like the three other federal district courts to dismiss parallel cases so far, should reject Plaintiff's unprecedented power grab and protect New Hampshire's constitutionally assigned authority over election administration. *See generally Oregon*, 2026 WL 318402; *Weber*, 2026 WL 118807; Order Granting Defendants' and Defendant-Intervenors' Motions to Dismiss, *United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG (W.D. Mich. Feb. 10, 2026).

## II.     INTEREST OF *AMICI CURIAE*

The American Civil Liberties Union is a nationwide, nonprofit organization that, since 1920, has sought to protect the civil liberties of all Americans, with 54 affiliates across the United States. The ACLU of New Hampshire (ACLU-NH) is the New Hampshire affiliate. ACLU-NH engages in litigation by direct representation and as *amicus curiae* in cases raising significant questions about the meaning of the Constitution, its limitations on government power, and the breadth of rights it grants. ACLU-NH is committed to advancing civil liberties and civil rights for a more just, equitable, and caring democracy in New Hampshire. With more than 19,000 members and supporters as of 2026, ACLU-NH seeks to protect New Hampshire voters whose rights would be infringed by the relief sought by the Plaintiff.

2

Founded in 1920 as an outgrowth of the struggle for women's right to vote, the League of Women Voters is a nonpartisan, nonprofit, grassroots organization working to protect and expand voting rights and ensure everyone is represented in our democracy. The League of Women Voters of New Hampshire (LWVNH) is the New Hampshire state League. LWVNH has over 265 members statewide, including four local chapters and members at large. LVWNH's mission is to encourage informed and active participation in government, increase understanding of major public policy issues, and influence public policy through education and advocacy. As part of that mission, LWVNH provides members and other New Hampshire residents with unbiased, nonpartisan voter services and citizen education. It hosts candidate forums, distributes information about voter registration and takes positions on legislation related to election administration and voters' rights. As *amicus*, LWVNH seeks to protect New Hampshire voters' privacy and ensure that Plaintiff's unlawful requests do not chill voter engagement and participation in the political process.

## III.    ARGUMENT

### A. Plaintiff is not entitled to New Hampshire voters' sensitive data because it articulates no legitimate basis or purpose for its request.

The United States' demand for New Hampshire's unredacted electronic voter file exceeds its statutory authority, because nothing in HAVA or the CRA justifies the government's demands for voters' sensitive personal information. Plaintiff's claim under HAVA is a nonstarter, since Plaintiff has not filed an action to enforce a substantive requirement under HAVA, and the statute contains no subpoena authority or records disclosure provision. *See Oregon*, 2026 WL 318402, at *7 ("HAVA contains no record disclosure provisions."); *Weber*, 2026 WL 118807, at *15 ("HAVA simply contains no [disclosure] provision."). This alone ends the inquiry: New Hampshire cannot be required to produce records pursuant to a statute that does not mandate disclosure and where

3

Plaintiff claims no substantive HAVA violation. In prior situations where limited New Hampshire electronic voter file information has been disclosed in discovery—including to the ACLU-NH—the plaintiffs have not received sensitive information such as social security numbers and driver's license numbers, which plaintiff here demands. Moreover, there is no protective order in place; indeed, Plaintiff is trying to skirt the protections of the Federal Rules of Civil Procedure (FRCP). *See* Motion to Compel Br. at 13-14 (ECF No. 31-1) (arguing incorrectly that the CRA "displaces" the FRCP).[1]

Plaintiff's claim under the CRA fares no better. While the CRA mandates disclosure of certain records under certain circumstances, that provision requires that the federal government provide a sufficient statement of the basis and the purpose for any request for records, which Plaintiff has failed to do. *See* 52 U.S.C. § 20703. Congress enacted the public records provisions in Title III of the CRA to facilitate investigations of civil rights violations that were preventing eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956, at 1944 (1959) ("[T]he purpose of Title III is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race[.]"). Throughout the Jim Crow Era, "States were utilizing literacy tests, arbitrary registration tactics, voter ID laws, and poll taxes to keep minorities away from the ballot. Black Americans risked intimidation and violence every time they tried to

---

[1] For example, in *Coal. for Open Democracy v. Scanlan,* No. 24-cv-312-SE, 2025 U.S. Dist. LEXIS 99520 (D.N.H. May 27, 2025), the voter file that was produced in discovery did not include sensitive information like social security numbers or driver's license numbers, and was produced subject to numerous, severe restrictions, including a scrupulous protective order which designates the voter file as "highly confidential," restricts its use to the present litigation, restricts viewing to only a tight circle of designated personnel using "air-gapped computers," and mandates destruction of the data after the case is closed. *See* Protective Order at 4, 13–17*, Coal. for Open Democracy v. Scanlan,* No. 24-CV-312-SE (D.N.H. June 18, 2025), Dkt. No. 87; Sched. A to Protective Order at 2–3*, Coal. for Open Democracy v. Scanlan,* No. 24-CV-312-SE (D.N.H. June 18, 2025), Dkt. No. 87-1.

access the polls." *Weber*, 2026 WL 118807, at *1. During this time "[t]o hide their complicity in voter suppression, state officials destroyed the records of Black Americans who had registered to vote, as well as those denied the opportunity to register." *Id.*; *see also* Daniel M. Berman, A Bill Becomes a Law: Congress Enacts Civil Rights Legislation 9 (2d ed. 1966); Report of U.S. Comm'n on Civil Rights 1963, at 16 (1963). Even where they had not destroyed them, states refused to turn these records over to federal investigators. *Weber*, 2026 WL 118807, at *1. "Title III was enacted directly in response to these concerns, requiring states to retain and preserve all records pertaining to voter registration, voting applications, and payments of poll taxes." *Id.* It also provides that a state must make these records available for inspection by the Attorney General under certain circumstances. *See* 52 U.S.C. § 20703.

The Attorney General's access to these records is not unbounded. Rather, when making a demand for records, she must provide "a statement of the basis and the purpose therefor." *Id.* "Basis" and "purpose" under Title III have consistently been treated as distinct concepts. *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962). "The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law," and "purpose" is "the rationale for the request[.]" *Weber*, 2026 WL 118807, at *9; *see also Oregon*, 2026 WL 318402, at *9 ("If the purpose is to investigate violations of a statute, the basis must be something else."); *Basis*, Black's Law Dictionary (8th ed. 2004) ("an underlying condition"); *Purpose*, Black's Law Dictionary (8th ed. 2004) ("An objective, goal, or end"). At a minimum, the "basis" requirement compels the Attorney General to describe information in her possession that tends to show the law has been violated. *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962). And to have any meaning, "purpose" must mean more than a conclusory reference to federal statutes. *Oregon*, 2026 WL 318402, at *9-10. The statutory

5

basis and purpose requirements are not perfunctory but require a specific statement as to (1) reason for requesting the information and (2) how that information will aid in the investigatory analysis. *Weber*, 2026 WL 118807, at \*9 (describing the basis and purpose requirement as a "critical safeguard that ensures the request is legitimately related to the purpose of the statute").

### 1. The Federal Rules of Civil Procedure apply, and the Court should use a normal, fulsome process in assessing Plaintiff's CRA claim.

The CRA does not authorize a rushed process with lack of meaningful judicial review. *Cf.* Motion to Compel Br. at 13-14 (ECF No. 31-1). To the contrary, the statute provides a district court "shall have jurisdiction by *appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). Nothing in the statute suggests that a Motion to Compel— based exclusively on Plaintiff's representations and without the opportunity to inquire into the nature of its request—is the appropriate process, especially given that Plaintiff's argument would make this Court's review a mere rubber stamp. *See Weber*, 2026 WL 118807, at \*8 at 13 (finding that "[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures"); *United States v. Markwood*, 48 F.3d 969, 979 (6th Cir. 1995) ("[A] district court is not a 'rubber stamp' for agency demands for the production of information."). Appropriate process requires meaningful judicial review, including through compliance with the FRCP. *See Weber*, 2026 WL 118807, at \*8 ("appropriate process" requires application of the FRCP, which allows the Court to determine whether Plaintiff has met the CRA's statutory requirements); Fed. R. Civ. P. 1 ("These rules govern the procedure *in all civil actions and proceedings* in the United States district courts . . . .") (emphasis added).

Plaintiff's argument to the contrary relies extensively on Fifth Circuit cases from the early 1960s, particularly *Kennedy v. Lynd*. *See* Motion to Compel Br. at 13-14 (ECF No. 31-1). *Lynd* contains a single line suggesting that the CRA authorizes a special statutory proceeding

6

"*comparable to* the form of a traditional order to show cause, or to produce in aid of an order of an administrative agency." 306 F.2d at 225 (emphasis added). Plaintiff's heavy citations to this line of cases are misleading. Only four years after Congress enacted the CRA, including its reference to "appropriate process," but after many of the decisions on which Plaintiff relies, the Supreme Court held that a different statute using materially identical language required application of the procedures mandated in the FRCP. *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964) ("Because § 7604(a) contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply."). As the district court in *Oregon* recently held, "[t]he Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*." *Oregon*, 2026 WL 318402, at *8.

Since *Powell*, courts have continued to exercise meaningful judicial review in analyzing federal agency demands for investigation. For example, such investigations cannot be "unduly burdensome or unreasonably broad" and courts should "inquire into allegations that an agency is using an administrative subpoena for an improper purpose." *CFPB v. Accrediting Council for Indep. Colls. and Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017). Judicial enforcement of such federal demands includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 345 (1st Cir. 2009) (citing *United States v. Powell*, 379 U.S. 48, 57 (1964)), and that such subpoenas "are not licenses for extended fishing expeditions." *Coro, Inc. v. F.T.C.*, 338 F.2d 149, 153 (1st Cir. 1964).

The Supreme Court has emphasized that judicial review requires a court to look beyond an agency's proffered explanation for its actions. According to the Court, "[a]ccepting contrived reasons would defeat the purpose of the enterprise. If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this

case." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). At a minimum, Plaintiff's demand must satisfy the basic administrative requirements outlined in the statute to obtain records. *See, e.g.*, *Markwood*, 48 F.3d at 975-76, 978 (analyzing enforceability of "civil investigative demand" under federal False Claims Act). Plaintiff has not met the statutory prerequisites under the CRA, because it has not provided a statement of the basis and the purpose for its demand, *see infra* Section 2, and should not be allowed to abuse this procedural device to circumvent judicial analysis of that failure.

2. *Plaintiff has not alleged a sufficient basis or purpose under the CRA.*

Plaintiff has fallen far short of meeting the CRA's basis and purpose requirements. It asserts only that its "purpose" is to "enforce HAVA," Compl. ¶ 57, ECF No. 1, and provides no basis for its apparent belief that New Hampshire has violated the law, nor any link between the CRA records requirements and HAVA's list-maintenance standards. *See Oregon*, 2026 WL 318402, at *8-10. Even assuming that enforcing HAVA is a proper purpose for the demand, nowhere in the Complaint does Plaintiff explain why unredacted voter files would be necessary, likely because they are not. A single snapshot of a state's unredacted voter file does not provide enough information to evaluate the state's compliance with HAVA. Rather, HAVA leaves list maintenance up to the state, subject to limited federal oversight. *See* 52 U.S.C. § 21083(a)(2)(A). The *procedures* carried out by a state or locality establish its compliance; the unredacted voter file does not. Plaintiff's barebones invocation of Title III of the CRA and HAVA do not constitute a "statement of the basis and purpose." The CRA therefore does not entitle the Attorney General to an unredacted version of New Hampshire's voter registration list.

8

**B. Plaintiff's demand for New Hampshire's voter data is part of a broader effort to amass the sensitive data of millions of Americans.**

Far from the conclusory and insufficient descriptions of its purpose in the Complaint, Plaintiff's efforts to compel New Hampshire to produce its unredacted voter registration list, including the data of hundreds of thousands of New Hampshire voters, is part of the executive branch's broad effort to gather this type of information about millions of Americans and its related efforts to assert unprecedented and unlawful control over elections in this country. Alongside its information-gathering efforts, the administration has also eliminated or degraded long-standing protections regarding how such data can be used by various federal agencies. And although Plaintiff has not described its efforts here, this Court "is not obliged to accept a contrived statement and purpose" from the United States Department of Justice (USDOJ) for its demand. *Weber*, 2026 WL 118807, at *10. As the court explained in *Weber*, "[t]his Court and the American people deserve to know what exactly the sensitive information of millions of Americans is going to be used for. The Court is not required to accept pretextual, formalistic explanations untethered to the reality of what the government has said outside of the courtroom." *Id.*

This case presents the same disconnect as *Weber*. Far from the complete lack of stated "basis" and the insufficient "purpose" in the Complaint, the public record—including repeated statements by USDOJ, President Trump, and others—make clear that part of Plaintiff's true purpose is a massive data-gathering endeavor that reaches far beyond this lawsuit. Upon entering office in January 2025, President Trump issued Executive Order No. 14,158 (the DOGE EO), which claimed to "establish" a "Department of Government Efficiency" (USDS or DOGE) and required that, "Agency Heads shall take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." 90 Fed. Reg. 8441,

9

§ 1, 4(b) (Jan. 20, 2025). In March, President Trump issued Executive Order No. 14,243 (the Information EO), which purported to require federal agencies to, among other things, "rescind or modify all agency guidance that serves as a barrier to the inter- or intra-agency sharing of unclassified information" specified in that order, as well as "to ensure the Federal Government has unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases." 90 Fed. Reg. 13681, § 3(b), (c) (Mar. 20, 2025).

A few days after the Information EO, President Trump issued Executive Order No. 14,248 (the Elections EO), which directed the Department of Homeland Security (DHS) to provide state and local officials access to government systems for verifying citizenship and directed DHS to coordinate with DOGE to review various data sources "for consistency with Federal requirements" and to "identify unqualified voters registered in the States." 90 Fed. Reg. 14005, § 2(b)(iii) (Mar. 25, 2025); *see also LULAC v. Exec. Off. of the President*, No. 25-cv-0946, 2025 WL 3042704, at *7 (D.D.C. Oct. 31, 2025). The DOGE EO, Information EO, and Elections EO all contemplated that federal agencies and DOGE would have extraordinarily broad access to data—held both within the federal government and separately by the states—about ordinary Americans.

Just as quickly, Plaintiff established it would not use this information lawfully or appropriately. Instead, the administration is engaged in the unauthorized "secondary use" of the data in its possession, "where information that an individual has given to one agency for a specific purpose is later reused by that agency or by another agency or entity for an entirely different purpose without the individual's consent."[2] This included directing the Internal Revenue Service

---

[2] Nicole Alvarez, *The Trump Administration Is Using Americans' Sensitive Data to Build a Digital Watchtower*, Center for American Progress (Aug. 25, 2025),

(IRS) to provide confidential tax information to Immigration and Customs Enforcement (ICE), over the objections of the IRS's acting general counsel, who was subsequently "forced out of his job."[3] *See Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, No. 1:25-cv-00457-CKK, 2025 WL 3251044, at *2 (D.D.C. Nov. 21, 2025) (IRS's data-sharing was unlawful); *see also Cmty.Econ. Dev. Ctr. of Southeastern Mass. v. Bessent*, No. 1:25-cv-12822-IT, 2026 WL 309281 (D. Mass. Feb. 5, 2026) (enjoining IRS policy of sharing taxpayer addresses with ICE). The Transportation Security Administration, likewise, is reported to be providing names and birthdates of travelers to ICE for use in immigration enforcement.[4] And the Centers for Medicare & Medicaid Services agreed to provide extraordinary levels of detail about Medicaid recipients to ICE, including "social security number (SSN), date of birth, sex, phone number, locality, ethnicity and race,"[5] only to have that policy narrowed following litigation. *See California v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-05536-VC, 2025 WL 3751931, at *3 (N.D. Cal. Dec. 29, 2025).

More recently, public information has made clear that Plaintiff's efforts to accumulate and distribute sensitive information extend even beyond the government. In ongoing litigation over Social Security Administration (SSA) data—which includes deeply private information about the health, income, and assets of millions of Americans—USDOJ disclosed that DOGE team members

---

https://www.americanprogress.org/article/the-trump-administration-is-using-americans-sensitive-data-to-build-a-digital-watchtower.

[3] William Turton, Christopher Bing, and Avi Asher-Shapiro, *The IRS Is Building a Vast System to Share Millions of Taxpayers' Data With ICE*, ProPublica (July 15, 2025), https://www.propublica.org/article/trump-irs-share-tax-records-ice-dhs-deportations.

[4] Hamed Aleaziz, *Immigration Agents Are Using Air Passenger Data for Deportation Effort*, N.Y. Times (Dec. 12, 2025), https://www.nytimes.com/2025/12/12/us/politics/immigration-tsa-passenger-data.html.

[5] Joseph Cox, *Here's the document giving ICE 80 million Medicaid patients' data*, Freedom of the Press Foundation (Jan. 5, 2026), https://freedom.press/the-classifieds/heres-the-document-giving-ice-80-million-medicaid-patients-data/.

"were potentially outside of SSA policy and/or noncompliant with the District Court's March 20, 2025, temporary restraining order." Notice of Corrections to the Record, *American Fed. of State, Cnty., and Mun. Emps., AFL-CIO v. SSA*, No. 1:25-cv-00596-ELH (D. Md. Jan. 16, 2026), ECF No. 197 at 1. This included transferring personally identifiable information to DOGE employees or leadership, *id.* at 3, and executing a "Voter Data Agreement" with a non-governmental group looking to "find evidence of voter fraud and to overturn election results in certain States." *Id.* at 5. It also included sharing unknown amounts of social security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." *Id.* at 6. SSA's admissions confirmed previous whistleblower reports that DOGE employees had mishandled SSA data.[6] Nor is this conduct an aberration. Public reporting indicates that the IRS inadvertently shared taxpayer information with DHS, beyond even what DHS requested, and contrary to law.[7] Notwithstanding its demonstrated inability to handle this information properly, the administration has sought to gather driver's license data,[8] Supplemental Nutrition Assistance Program (SNAP) data,[9] and Department of Housing and Urban Development (HUD)[10] data from states, including sensitive data like social security numbers.

---

[6] Stephen Fowler and Jude Joffe-Block, *The Trump administration admits even more ways DOGE accessed sensitive personal data*, NPR (Jan. 30, 2026), https://www.npr.org/2026/01/23/nx-s1-5684185/doge-data-social-security-privacy.

[7] Jacob Bogage, Jeff Stein, and Perry Stein, *IRS improperly disclosed confidential immigrant tax data to DHS*, Washington Post (Feb. 11, 2026), https://www.washingtonpost.com/business/2026/02/11/immigrants-irs-dhs-tax-data/.

[8] Jonathan Shorman, *Homeland Security wants state driver's license data for sweeping citizenship program*, Stateline (Nov. 25, 2025), https://stateline.org/2025/11/25/homeland-security-wants-state-drivers-license-data-for-sweeping-citizenship-program/.

[9] Jude Joffe-Block, *The USDA wants states to hand over food stamp data by the end of July*, NPR (July 19, 2025), https://www.npr.org/2025/07/19/nx-s1-5471553/usda-snap-privacy-lawsuit.

[10] Rachel Siegel, Hannah Natanson, and Laura Meckler, *DOGE is collecting federal data to remove immigrants from housing, jobs*, Washington Post (Apr. 15, 2025), https://www.washingtonpost.com/business/2025/04/15/doge-ssa-immigration-trump-housing/.

At the same time Plaintiff has engaged in an unprecedented effort to gather Americans' data, it has sought to centralize data across the federal government. This effort dates back to the earliest days of the administration, when DHS and DOGE announced plans to transform the Systematic Alien Verification for Entitlements (SAVE) system from a relatively limited system to one which directly searches multiple databases, including SSA data—a notoriously unreliable source of citizenship information.[11] Plaintiff apparently intends for this expanded version of SAVE to be used to scrutinize state voter rolls, including New Hampshire's. *League of Women Voters v. DHS*, No. 25-cv-3501-SLS, 2025 WL 3198970, at \*\*2-4 (D.D.C. Nov. 17, 2025); *but see* Pub. L. 100-503, § 9, 102 Stat. 2507 (1988) (prohibiting "national data bank[s] that combine[], merge[], or link[] information on individuals."). The rushed effort to adapt SAVE to a completely new system created a number of unjustified risks to the right to vote.[12] And both the federal government and nonprofit civic engagement organizations have warned against using SAVE, and the underlying USCIS data, for voter verification because of the real risk of false negatives and wrongful voter purges.[13] SSA data similarly does not—and cannot—provide "definitive

---

[11] Press Release, DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database, Dep't of Homeland Sec. (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M; *see also* Jen Fifield, *Details of DHS Agreement Reveal Risks of Administration's Use of Social Security Data for Voter Citizenship Check*s, ProPublica (Oct. 30, 2025), https://www.propublica.org/article/dhs-social-security-data-voter-citizenship-trump.

[12] *See* Jen Fifield and Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica and Tex. Tribune (Feb. 13, 2026), https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion; Jasleen Singh and Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. for Justice (July 21, 2025), https://www.brennancenter.org/our-work/research-reports/homeland-securitys-save-program-exacerbates-risks-voters.

[13] An Assessment of Minority Voting Rights Access in the United States, U.S. Comm'n on Civil Rights (2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf?inline=1; *See* Abby Vesoulis and Ari Berman, *New Docs Show DHS Gathering Driver's License Data in Voter Fraud Crusade*, Mother Jones (Nov. 14, 2025), https://www.motherjones.com/politics/2025/11/dhs-

information about an individual's citizenship status."[14] Nor has DHS established it is engaged in proper data matching.[15] Such a system creates an unnecessary risk of false matches, which not only jeopardize voters (especially naturalized citizens whose stale pre-naturalization data may lead to erroneous flags) but also can be used by the administration to support debunked claims of noncitizen voting.

Plaintiff is not engaged in an analysis of states' list-maintenance procedures but, rather, is accumulating massive troves of data, including through compulsion and threats—and centralizing that data, including by making it accessible through SAVE. USDOJ is also reported to be trying "to build the largest set of national voter roll data it has ever collected, raising concerns that the data could be used to cast doubt on future election results."[16] The instant lawsuit, and the dozens of similar lawsuits playing out across the country, are not a good faith attempt to enforce HAVA or the CRA—or any other aspect of federal election law—but rather a profound threat to the right to vote and long-standing democratic and separation of powers principles. The Attorney General made this explicit in her letter to Governor Walz after federal agents killed Alex Pretti in Minnesota on January 23, 2026.[17] Like New Hampshire, Minnesota has been sued by the federal government

---

gathering-drivers-license-save-voter-fraud-crusade/; Jen Fifield, *Details of DHS Agreement Reveal Risks of Trump Administration's Use of Social Security Data for Voter Citizenship Checks*, ProPublica (Oct. 30, 2025), https://www.propublica.org/article/dhs-social-security-data-voter-citizenship-trump.

[14] Letter from SSA Off. of Gen. Counsel to Fair Elections Ctr. 2 (July 13, 2023), https://fairelectionscenter.org/wp-content/uploads/2025/07/SSA-Touhy-Decision-letter.July-13-2023-signed.pdf.

[15] *DOGE and state voter rolls*, Protect Democracy (July 15, 2025), https://protectdemocracy.org/work/doge-and-state-voter-rolls/.

[16] Nick Corasaniti, *Why Is the Trump Administration Demanding Minnesota's Voter Rolls?*, N.Y. Times (Jan. 26, 2026), https://www.nytimes.com/2026/01/26/us/politics/minnesota-trump-voter-rolls.html.

[17] *See* Letter from U.S. Att'y Gen. Pamela Bondi to Minn. Gov. Tim Walz (Jan. 24, 2026), https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html.

14

seeking access to its unredacted voter rolls.[18] While eliding an explicit quid pro quo, Attorney General Bondi's letter linked USDOJ's demand to "access voter rolls" not with any sort of enforcement of federal statutes (or other reasoned explanation of why such access was appropriate) but, instead, with the massive presence of federal immigration agents in Minneapolis. The Attorney General's attempt to compel Minnesota to hand over its unredacted voter rolls out of court belies Plaintiff's claim that this case, and those like it, are routine or good faith efforts to enforce federal law and raises a serious concern that Plaintiff is attempting to further its data-collection agenda through extrajudicial means.[19] As the district court said in *Oregon*, "[t]he context of this demand within a letter about immigration enforcement casts serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases, and what it intends to do with that data." *Oregon*, 2026 WL 318402, at *11.

Far from a good-faith effort to investigate potential violations of federal law, Plaintiff's claims in this case, and in cases like it, are a transparent effort to gather unprecedented amounts of voter data for political purposes, and by any means at the executive's disposal, including through unlawful coercion. "The presumption of regularity that has been previously extended to [the United States] that it could be taken at its word—with little doubt about its intentions and stated

---

[18] Plaintiff filed suit against Minnesota and its Secretary of State on September 25, 2025. Compl., *United States v. Simon*, No. 0:25-cv-03761 (D. Minn. Sep. 25, 2025), ECF No. 1.

[19] As Judge Menendez, who is hearing both a challenge to ICE's operations in Minneapolis and Plaintiff's suit against Minnesota asked: "Is the executive trying to achieve a goal through force that it can't achieve through the courts?" Josh Gerstein and Kyle Cheney, *Trump, Bondi statements fuel legal case against Minnesota surge*, Politico (Jan. 26, 2026), https://www.politico.com/news/2026/01/26/minnesota-operation-metro-surge-case-00746755. Only two days after Judge Menendez's warning, the Federal Bureau of Investigation executed a search warrant on the Fulton County Election Hub and Operation Center for records related to the 2020 election, even as Plaintiff pursues CRA claims seeking a subset of the same records. Compl., *United States v. Alexander*, No. 1:25-cv-07084-TWT (N.D. Ga. Dec. 11, 2025), ECF No. 1.

purposes—no longer holds." *Oregon*, 2026 WL 318402, at *11. As explained in Section C, *infra*, the executive is weaponizing state data to act outside of its constitutional remit. This Court need not be part of the executive's scheme, nor accept its transparently false explanations for its demands.

**C. Plaintiff's data demands erroneously suggest that the federal government is responsible for list maintenance and other election administration activities, authority which is constitutionally reserved for Congress and the States.**

One of the ways in which the administration has weaponized data is in the executive branch's overall effort to exert authority over election administration. Under our constitutional order, the states and Congress share responsibilities for regulating election administration. *See* U.S. Const. art. I, § 2, cl. 1; U.S. Const. art. I, § 4, cl. 1. Crucially, the Constitution "assigned no role at all to the President" in election administration. *LULAC v. Exec. Off. of the President*, No. 25-cv-0946, 2026 WL 252420, at *1 (D.D.C. Jan. 30, 2026) (granting partial summary judgment and permanently enjoining parts of the Elections EO).

The notion that the executive would have power to regulate federal elections "does not appear to have crossed the Framers' minds." *LULAC*, 2025 WL 3042704, at *4 (citing The Federalist No. 59 (Alexander Hamilton); Federal Farmer No. 3); *see also* Debate in Massachusetts Ratifying Convention, 2 The Founders' Constitution 255 (P. Kurland & R. Lerner eds., 1987) ("I know of but two bodies wherein [the power to regulate federal elections] can be lodged—the legislatures of the several states, and the general Congress." (statement of Caleb Strong)). "Congress, not the President, has the ultimate constitutional authority over elections." *California v. Trump*, 786 F. Supp. 3d 359, 381 (D. Mass. 2025).

Although the President has no constitutional role in elections, Plaintiff's complaint seeking unredacted voter rolls here starts by identifying President Trump's Election EO as catalyst in filing this suit, which indicates its faulty premise. *See* Compl. at 1, ECF No. 1. Not only does that

16

executive order lack the power to displace the constitution's separation of powers, but several parts of it have already been enjoined. *See LULAC*, 2026 WL 252420, at *1 ("[T]wo provisions of the Executive Order—both purporting to impose new requirements for verifying the U.S. citizenship of people registering to vote or applying to receive absentee ballots—are inconsistent with the constitutional separation of powers and cannot lawfully be implemented."). Nonetheless, President Trump has recently called for an unconstitutional "take over" of voting procedures in many states.[20] This is an escalation, but not a change in position for this President, who in August of 2025 declared that states must do "what the Federal Government, as represented by the President of the United States, tells them" as related to elections.[21] By its own public accounts, the executive's real purpose for collecting sensitive voter data from New Hampshire and other states is to disrupt and take over election processes, just as it has weaponized data in other contexts to pursue policy goals regardless of legal limitations.

Specifically, Plaintiff seeks to supplant New Hampshire's role in list maintenance by substituting its own judgment and process, *see* Motion to Compel Br. at 10-11 (ECF No. 31-1), which violates the Constitutional and statutory assignments of election administration duties. *Weber*, 2026 WL 118807, at *2 ("The DOJ cannot go beyond the boundaries provided by Congress and use these legislative tools in a manner that wholly disregards the separation of powers provided for in the Constitution."); *see also id*. at *10-11. Plaintiff's limited role in enforcing federal statutes does not require or permit it to engage in list maintenance, but rather to ensure that states comply

---

[20] *See* Erica L. Green, Michael Gold, and Robert Jimison, *Trump Repeats Call to 'Nationalize' Elections, as White House Walks It Back*, N.Y. Times (Feb. 3, 2026), https://www.nytimes.com/2026/02/03/us/politics/trump-save-act-elections.html.
[21] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025), https://truthsocial.com/@realDonaldTrump/posts/115049485680941254.

17

with federal laws. Congress has not delegated list-maintenance duties to USDOJ or any other facet of the federal government. But, as made clear by the Memorandums of Understanding that USDOJ has asked states to sign, USDOJ plans to use state data to independently identify voters it deems should be removed from the rolls, and require states to do so within forty-five days of "receiving that notice from the Justice Department."[22] As with its other unlawful uses of information, Plaintiff's goal in obtaining and consolidating massive amounts of voter data is to encroach on the constitutionally mandated role of states in election administration.

## IV.     CONCLUSION

In exercising its legislative authority to enact election laws, Congress respected the constitutional structure which places authority over elections in the hands of states in the first instance, while balancing transparency interests with the need to protect individual citizens' right to vote. Plaintiff's unprecedented demands flout this careful scheme to consolidate data and power in the hands of the federal government. This Court should reject Plaintiff's pretextual and statutorily deficient demand for New Hampshire's unredacted voter data, deny Plaintiff's Motion to Compel, and dismiss the Complaint.

---

[22]     Alaska Memorandum of Understanding at 5, https://www.brennancenter.org/media/15064/download/alaska_12.22.2025_executed-mou.pdf?inline=1.

Respectfully submitted on March 16, 2026,

AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE

By and through their attorneys,

Brent Ferguson[†]
Daniel S. Lenz[†]
Sejal Jhaveri[†]
Renata O'Donnell[†]
Kate Hamilton*
Alexis Grady[†]
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
bferguson@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
agrady@campaignlegalcenter.org

Patrick Berry*
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
berryp@brennan.law.nyu.edu

Maura Eileen O'Connor[†]
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
777 6th St., NW, Ste. 1100
Washington, DC 20002
(202) 249-7190
oconnore@brennan.law.nyu.edu

*/s/ Gilles R. Bissonnette*
Henry R. Klementowicz (N.H. Bar No. 21177)
Gilles R. Bissonnette (N.H. Bar No. 265393)
AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE FOUNDATION
18 Low Avenue
Concord, NH 03301
(603) 333-2201
henry@aclu-nh.org
gilles@aclu-nh.org

Theresa J. Lee[†]
William Hughes[†]
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
tlee@aclu.org
whughes@aclu.org
slakin@aclu.org

* *admitted pro hac vice*
[†] *contributed to the brief but not appearing*

19