UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

United States of America

    v.

                                            Case No. 25-cv-371-JL
                                            Opinion No. 2026 DNH 085

David M. Scanlan, et al.

## **MEMORANDUM ORDER**

In one of more than two dozen lawsuits across the country in which the United States seeks production of a state voter registration list, the United States seeks to compel the New Hampshire Secretary of State to produce, among other information, the state's unredacted state voter registration list.  New Hampshire declined to provide the list to the U.S. Attorney General in response to a series of written requests, after which the Attorney General filed suit.  New Hampshire moves to dismiss the complaint, while the United States moves to compel production of the list, along with other information.[1]

This court has jurisdiction under 28 U.S.C. § 1331 (federal question).  After reviewing the parties' submissions and hearing oral argument, because the Attorney General's demand did not comply with Title III of the Civil Rights Act of 1960 (CRA), and because he failed to allege a violation under the Help America Vote Act (HAVA), the court grants New Hampshire's motion to dismiss and denies as moot the United States' motion to compel.

---

[1] The defendant-intervenors made a separate motion to dismiss the complaint with overlapping arguments to New Hampshire's, which the court considers here.  *See* doc. nos. 32, 37.

## I.    Applicable legal standard

To state a claim for relief, a complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Martinez v. Petrenko*, 792 F.3d 173, 179 (1st Cir. 2015).  This standard "demands that a party do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013).  In ruling on a motion brought under Rule 12(b)(6), the court accepts as true all well-pleaded facts set forth in the complaint and draws all reasonable inferences in the plaintiff's favor.  *See, e.g., Martino v. Forward Air, Inc.*, 609 F.3d 1, 2 (1st Cir. 2010).[2]

Factual background

*June 2025 letter.*  On June 25, 2025, a Deputy Assistant Attorney General from the Civil Rights Division of the U.S. Department of Justice sent a letter to New Hampshire's Secretary of State noting that HAVA "establishes minimum standards" governing certain aspects of federal election administration and requesting information

---

[2] The United States contends that its CRA claim should be evaluated under the summary enforcement standard applicable to administrative subpoenas rather than the Rule 12(b)(6) standard because a CRA records demand is analogous to an administrative subpoena and courts have historically resolved such demands through summary proceedings.  But the United States brought its CRA claim alongside its claim under the HAVA, which does not confer administrative subpoena authority.  Because the complaint therefore takes the form of a traditional civil complaint rather than a petition for summary enforcement, the standard applicable to motions to dismiss for failure to state a claim governs the court's review.  *See United States v. Benson*, 819 F. Supp. 3d 753, 765-66 (W.D. Mich. 2026).  The court further notes that, as of the time of this order's issuance, "no district court has adopted the United States' view" that resolving its CRA claim requires a "special statutory proceeding."  *United States v. Bellows*, 2026 WL 1430481, at *5 n.8 (D. Me. May 21, 2026).

"regarding the State's compliance with HAVA."[3]  In it, DOJ posed a series of questions concerning the State's voter-registration procedures, statewide voter registration database, list-maintenance practices, and related processes, and requested production of, inter alia, "New Hampshire's current statewide voter registration list" including "both active and inactive voters."[4]  The letter concludes by requesting a response within 30 days and thanking the Secretary for his "cooperation in [DOJ's] nationwide efforts to monitor HAVA compliance."[5]

*Initial response.*  The Secretary of State timely responded with a letter answering DOJ's questions concerning New Hampshire's voter-registration procedures, statewide voter registration database, and list-maintenance practices, with the caveat that he had "limited" certain responses to the extent they implicated cybersecurity concerns.[6]  The letter also addressed DOJ's request for the statewide voter registration list, explaining that "New Hampshire law authorizes the Secretary of State to release the statewide voter registration list in limited circumstances not appliable here."[7]  The letter added that "each municipality's public checklist [could] be obtained from their respective supervisors or clerks."[8]

*August 2025 demand.*  On August 18, 2025, DOJ sent another letter renewing its "request for a copy of New Hampshire's statewide voter registration list" with "all fields,

---

[3] June 25, 2025 Letter (doc. no. 32-2) at 2-3.
[4] *Id.*
[5] *Id.* at 3.
[6] July 25, 2025 letter (doc. no. 32-3) at 2.
[7] *Id.* at 9.
[8] *Id.*

including all identifiers, including the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number, as required by HAVA at 52 U.S.C. § 21083(a)(5)(A)(i)."[9] The letter explains that DOJ's request is made pursuant to the "Attorney General's authority to enforce HAVA" and "the Civil Rights Act of 1960, codified at 52 U.S.C. § 2070" for the "purpose" of "ascertain[ing] New Hampshire's compliance with the list maintenance requirements of HAVA."[10]

*August 28, 2025 response.*  The Secretary responded ten days later, reiterating that "New Hampshire law prohibits the sharing of [the statewide voter registration list] with the [DOJ] in the manner [DOJ] request[s]."[11]  He noted that his refusal was informed by consultation with legal counsel, who concluded that DOJ's August 18 letter did not cite "any provision under federal law" that supersedes New Hampshire law to "compel[] the production of voter registration data" to the federal government.[12]

*Litigation.*  About a month later, the United States filed this lawsuit, alleging violations of Title III of the Civil Rights Act, 52 U.S.C. § 20703 (Count 1); and the Help America Vote Act, *id.* § 21083 (Count 2).[13]  The United States seeks an injunction ordering the Secretary and the State of New Hampshire "to provide to the United States New Hampshire's current statewide voter registration list, including active and inactive

---

[9] Aug. 18, 2025 letter (doc. no. 32-4) at 2.
[10] *Id.* at 2-3.
[11] Aug. 28, 2025 letter (doc. no. 32-5) at 2.
[12] *Id.*
[13] Compl. (doc. no. 1).

voters and containing all fields, including the registrant's full name, date of birth, residential address, and either their state driver's license number or the last four digits of their social security number" under the CRA and HAVA.[14]

Judge Johnstone permitted four individual New Hampshire voters to intervene as defendants.[15]  The Secretary and the intervenor-defendants moved to dismiss the complaint and opposed the motion to compel.[16]  The United States filed a consolidated opposition to the motions to dismiss.[17]

## II.    Legal landscape

The United States brings claims under HAVA and Title III of the Civil Rights Act of 1960.

*Title III*. Title III requires state election officials to "retain and preserve all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. It also requires state election officials to produce those records for inspection and copying "upon demand in writing by the Attorney General." *Id*. § 20703. The Attorney General

---

[14] *Id*. at 16.  Courts have dismissed nine similar lawsuits to date, and no court has granted the United States' requested injunction.  *See United States v. Demarinis*, 2026 WL 1780586, at *2 (D. Md. June 18, 2026); *United States v. Wis. Elections Comm'n*, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *Bellows*, 2026 WL 1430481; *United States v. Fontes*, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Amore*, 2026 WL 1040637 (D.R.I. Apr. 17, 2026)*; United States v. Galvin*, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *Benson*, 819 F. Supp. 3d 753, *aff'd*, 2026 WL 1815425 (6th Cir. June 24, 2026); *United States v. Oregon*, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026).
[15] Dec. 16, 2025 Endorsed Order.  United States Magistrate Judge Andrea Johnstone initially presided over this case.
[16] Doc. nos. 32, 37, 60, 61.
[17] Doc. no. 51.

must provide "a statement of the basis and the purpose" for the written demand. *Id.* The federal district court for the district in which the demand is made or records are located "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705.

**Help America Vote Act.** "Through HAVA, Congress established standards for states' voting systems and voter registration lists." *Id.* (citing 52 U.S.C. § 21081, 21083). The law requires each state to develop a single, computerized official statewide voter registration list ("SVRL") that includes a unique identifier for each registered voter. 52 U.S.C. § 21083(a)(1)(A). The SVRL must be an interactive computerized list designed, maintained, and administered at a statewide level. *Id.* HAVA requires state officials to engage in various list-maintenance activities and to "provide adequate technological security measures to prevent that unauthorized access" to the SVRL, although the federal statute does not provide any further directions or requirements as to the security measures a state is allowed to choose. 52 U.S.C. § 21083(a)(2)-(4).

States must also adopt a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* at § 21083(a)(4)(A); *see also Colón-Marrero v. Vélez*, 813 F.3d 1, 13-14 (1st Cir. 2016). Congress expressly left the "specific choices on the methods of complying with [its] requirements ... to the discretion of the State." 52 U.S.C. § 21085. In response to these directives, New Hampshire passed N.H. RSA 654:45, which directs the Secretary of State to "plan, develop, equip, establish, site, and maintain a statewide centralized voter registration database and communications system[.]" RSA 654:45,I(a).

6

## III.    Analysis

### a.  Title III

The Secretary argues that New Hampshire is not compelled by the Title III of the CRA to provide the United States with an unredacted copy of its statewide voter registration list (SVRL) for two reasons.  First, he contends that the SVRL is not a record subject to production under 52 U.S.C. § 20703.  Second, he contends that DOJ's demand letter did not contain a sufficiently stated basis and purpose as required by § 20703.  The court addresses these arguments in turn.

### i.  Record subject to production

Whether the SVRA is a document subject to production under of 52 U.S.C. § 20703 is a question of statutory interpretation.  To determine the meaning of a statute, the court's "starting point is the text of the statute itself." *United States v. Gordon*, 875 F.3d 26, 33 (1st Cir. 2017).  "To the extent that Congress chose words that it did not define, [the court] assume[s] those words 'carry their plain and ordinary meaning.'" *Id.* (citing *Stornawaye Fin. Corp. v. Hill*, 562 F.3d 29, 32 (1st Cir. 2009).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Duckworth v. Pratt & Whitney, Inc.*, 152 F.3d 1 (1st Cir. 1998) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).  "Other tools of statutory interpretation, such as legislative history, customarily carry significant weight only when the text is ambiguous or its plain meaning leads to an absurd result." *City of Providence v. Barr*, 954 F.3d 23, 31-32 (1st Cir. 2020).  As a general matter, "there is no reason to

look past the statutory text itself if that text is unambiguous and consistent with a coherent statutory scheme." *United States v. Freeman*, 147 F.4th 1, 13 (1st Cir. 2025), *cert. denied*, 224 L. Ed. 2d 13 (Feb. 23, 2026).

Here, 52 U.S.C. § 20703 authorizes the Attorney General to demand the production of "[a]ny record or paper required by [52 U.S.C § 20701] to be retained and preserved." Section 20701, in turn, requires election officers to preserve and retain "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. The operative question is thus whether the SVRL is a paper or record subject to the retention and preservation requirements of § 20701.

On this point, New Hampshire argues that the SVRL is "far outside" the scope of papers and records covered by § 20701 because it is "a relational database … into which users are consistently adding, changing, and correcting data,"[18] and therefore "not a static record or paper."[19] Moreover, New Hampshire emphasizes that the SVRL is materially different from the election records historically subject to inspection and preservation requirements: namely, voter registration forms, applications for absentee ballots, and other "voting-related paperwork."[20] *See Liebert v. Millis*, 733 F.Supp.3d 698, 711-12 (W.D. Wis. 2024) (collecting authorities interpreting the meaning of "any record or paper relating to any application, registration, or other act requisite to voting" as that phrase is

---

[18] Reply to Obj. to Mot. to Dismiss (doc. no. 63) at 3.
[19] State Mot. to Dismiss (doc. no. 32-1) at 8-9.
[20] *Id.*

used in 52 U.S.C. § 10101(a)(2)(B)).  The United States, by contrast, contends that the SVRL falls comfortably within § 20701's "broad" text, which it says covers electronic records, non-public records, or records generated by state officials themselves.[21]  For authority, the United States relies principally on the Fifth Circuit Court of Appeals' characterization of the retention and preservation obligations under § 20701 as "sweeping" in *Kennedy v. Lynd*, arguing that the Secretary is effectively attempting to limit the scope of the statute by creating an exception for electronic records or non-public records.[22]  306 F.2d 222, 226 (5th Cir. 1962).

   While the parties largely focus their arguments on the scope of documents covered by the phrase "all records and papers," an examination of the statutory text reveals a threshold question that proves dispositive: namely, what it means for a record or paper to "come into [an officer's] possession."  "Come into possession" is most naturally read to "refer[] to a process by which someone *acquires* an item from an external source." *Benson*, 819 F. Supp. 3d at 768 (citing *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting *Random House Dictionary of the English Language* 995 (1966)); RECEIVE, *Black's Law Dictionary* (11th ed. 2019) (defining "receive" as "to come into possession of or get from some outside source")).  The language does not describe a static state of possession; rather, "come into" is a prepositional verb phrase that implies there was a prior state when election officials did not have the record or paper, and a transition that changed that.

---

[21] Consolidated Opp. to Mot. to Dismiss (doc. no. 51) at 22.
[22] *Id.* at 23-24

Because the court must "give effect to the phrase 'come into [their] possession' and prevent it from being surplusage," it interprets § 20701 as referring only to records that election officials obtain from outside sources—i.e., prospective voters—and not to records that they themselves have created and thus have always possessed. *Benson*, 819 F. Supp. 3d at 768; *see also Feliciano v. Dep't of Transp.*, 605 U.S. 38, 51-52 (2025) (the surplusage canon reflects an assumption that "[w]henever a reading arbitrarily ignores linguistic components or inadequately accounts for them, the reading may be presumed improbable" (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) (Scalia & Garner)).

This interpretation is "bolstered" by the types of items described by the rest of the sentence—records "relating to any application, registration, payment of poll tax, or other act requisite to voting"—all of which "refer[ ] to something that the voter submits or does as part of the registration process" and are thus "records that election officials *receive*, rather than *create.*" *Benson*, 819 F. Supp. 3d at 769. It is also "consistent with a coherent statutory scheme." *Freeman*, 147 F.4th at 14; *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014) ("A statutory 'provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.'" (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371 (1988)). Section 20701 is, after all, a document retention and preservation statute. The obligation to preserve implies an obligation not to alter or destroy the covered material. That framework makes sense when applied to discrete records and

10

papers submitted by voters and other outside sources but could produce absurd results when applied to a state's own evolving work product, like a database that is constantly being revised as election officials add, change, and correct voter data.  *See United States v. Demarinis*, 2026 WL 1780586, at \*5 (D. Md. June 18, 2026) ("An SVRL, unlike a voter registration application that an applicant submits once, is a dynamic list that is constantly updated and, thus, altered.").  Reading § 20701 to encompass such a system would effectively require election officials to simultaneously preserve and modify the same record by creating a new, static version of the database with every single edit, which, per the state, would be "impractical to the point of impossible."[23]

The United States argues that the court's interpretation of § 20701 provides  "an unwritten carve-out for records or documents that are self-generated."[24]  It contends that statutes use similar phrases to "regulate acquiring information or property *through improper means* or trigger duties to act based on acquiring information or property *at a particular time*," and thus that the distinction "between possessing something and having something come into one's possession" is strictly temporal in nature.[25]  The court is not persuaded.  Congress has consistently employed the phrase "comes into possession" to describe the process by which a person receives something from an external source, including in the statutes cited by the United States.  *See K.L. v. Rhode Island Bd. of Educ.*, 907 F.3d 639, 646 (1st Cir. 2018) (describing the "whole code" canon of statutory

---

[23] State Mot. to Dismiss (doc. no. 63) at 3.
[24] Consolidated Opp. to Mot. to Dismiss (doc. no. 51) at 25.
[25] *Id.*

interpretation, "under which courts construe terms across different statutes consistently" (quoting A. Gluck & L. Schultz Bressman, Statutory Interpretation from the Inside -- an Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 936 (2013))).  For example, the census statute, 13 U.S.C. § 214, prohibits the disclosure of information that "comes into [the] possession" of a "census liaison" and is deemed confidential by 13 U.S.C. § 9, under which "data for particular individuals and establishments" is confidential while the census report itself is not.  In other words, the information that "comes into [the] possession" of the census liaison as that phrase is used in 13 U.S.C. § 214 is that which is gathered from respondents, not the data compiled by the agency itself.  *See also* 44 U.S.C. § 3572(b), (f) (prohibiting agency employees from disclosing "information acquired by an agency under a pledge of confidentiality and for exclusively statistical purposes" that they "come[] into possession of by reason of his or her being an officer, employee, or agent [of that agency]"); 18 U.S.C. § 654 (prohibiting the conversion of property entrusted by another that "comes into one's possession"); 50 U.S.C. § 217 (requiring soldiers to report property found or surrendered in the field that "comes into their possession").

This holds true when examining the United States' lead statutory exemplar for this theory, 8 U.S.C. § 1445(a), which provides that "the applicant or any other person who shall have, or may come into possession" of a lost certificate of naturalization must surrender that document to the Attorney General.  The United States argues that the distinction between "shall have" and "may come into possession of" in this provision is purely temporal because "shall have" refers to current possession while "come into

12

possession" refers to future acquisition, and that the phrase "come into possession" therefore says nothing about the item's source.[26]  But the certificate of naturalization is a document issued by the federal government to the applicant; neither the applicant nor any third party who subsequently acquires it has created it.  The provision contemplates only persons who receive the certificate from a source other than themselves.  So while "come into possession" does connote a temporal difference (i.e., *when* the certificate is received or found), it does nothing to displace the external-acquisition aspect of the phrase (i.e., that the certificate is received rather than self-generated).  Indeed, the provision would have no occasion to speak of a person who "comes into possession" of a self-generated certificate because, as the United States correctly observes, no private person generates naturalization certificates.  Section 1445(a) therefore confirms that even where "come into possession" carries a temporal meaning, it presupposes receipt from an external source.

Lastly, the court notes that if "come into possession" were purely temporal, as the United States contends, it would cover every record that an election official touches at any point in time.  Again, if that were the case, the provision "could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier, which is the language used in the NVRA, *see* 52 U.S.C. § 20507(i)(1)." *Benson*, 819 F.Supp.3d at 768.  Congress chose not to use this broader formulation in § 20701 and, having done so, the court must give meaning to the words "come into."  *See*

---

[26] Consolidated Opp. to Mot. to Dismiss (doc. no. 51) at 26.

*Nielsen v. Preap*, 586 U.S. 392, 414 (2019) (statutes should be construed such that every word is given effect).[27]  For the reasons explained above, the court gives meaning to the phrase "come into possession" by construing it to refer only to records that election officials obtain from prospective voters.

Applying that interpretation here, the court concludes that New Hampshire's SVRL falls outside the scope of documents or records covered by § 20701.  The SVRL is not a document that arrived at the Secretary's office from prospective voters or any other external source at an identifiable moment in time.   Instead, it is a continuously maintained, state-generated compilation of data housed in a "relational database"[28] that New Hampshire has built, updated, and controlled since its creation.  As such, it does not constitute a record or paper that "comes into [an election officer's] possession" as this phrase is used in § 20701, and § 20703 does not compel its production.[29]

### ii.  Purpose and basis

New Hampshire argues in the alternative that the United States' claim under Title III of the CRA should be dismissed because DOJ's demand did not contain a sufficiently stated basis and purpose as required to constitute a valid request under 52 U.S.C. § 20703.  That statute provides that paper and records subject to the preservation requirements of § 20701 "shall, upon demand in writing by the Attorney General or his

---

[27] For this same reason, the court finds the United States' reliance on cases finding voter lists to be a "record" as that term is used in the NVRA unpersuasive.  *See Fontes*, 2026 WL 1177244, at *6 (observing that "the NVRA's statutory language is too dissimilar to be of any real value in interpreting the text of § 20701").

[28] Reply to Obj. to Mot. to Dismiss (doc. no. 63) at 3.

[29] The court notes that the Sixth Circuit Court of Appeals reached the same conclusion in *United States v. Benson*, 2026 WL 1815425, at *6-7 (6th Cir. June 24, 2026).

representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection," and that such "demand shall contain a statement of the basis and the purpose thereof." 52 U.S.C. § 20703.  New Hampshire contends that while DOJ's August demand letter purported to articulate a purpose, it contained no statement whatsoever as to the basis of its request, and is therefore facially invalid under § 20703.

As with any question of statutory interpretation, the court's "starting point is the text of the statute itself." *Gordon*, 875 F.3d at 33.  Here, the textual structure of § 20703 is instructive.  The statute requires that a demand "contain a statement of the basis and the purpose thereof," employing the definite article "the" before each noun and joining the two with the conjunctive "and."  On its plain terms, this construction signals that "basis" and "purpose" are separate, non-overlapping requirements, each of which must independently be satisfied.  *See Galvin*, 2026 WL 972129, at *4 ("[T]he statutory text [of § 20703] clearly conveys that 'the basis' and 'the purpose' are conceptually distinct.").  To read the statute as satisfied by a statement of either basis or purpose alone would run afoul of the ordinary rules of statutory construction by rendering one half of the phrase superfluous.  *See* Scalia & Garner 174 (explaining that, under the surplusage canon, no word or provision "should needlessly be given an interpretation that it causes it to… have no consequence"); W. Eskridge, Jr. Interpreting Law: A Primer on How to Read Statutes and the Constitution 113 (2016) ("[E]very provision, indeed every word, of a statute adds something to the statutory scheme if plausible.").

15

The question then becomes how to construe the independent requirements of "purpose" and "basis" in this context.  The parties appear to agree that "the purpose" refers to the objective or goal of the demand.[30]  *See* PURPOSE, *Black's Law Dictionary* (12th ed. 2024) (defining "purpose" to mean "[a]n objective, goal, or end"); *see also, e.g.*, *Lynd*, 306 F.2d at 229 n.6 (reviewing CRA demand with a stated "purpose" of "examin[ing] the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred").  If "the purpose" denotes the investigative objective of the demand, it follows that "the basis" in this context is the evidentiary or factual predicate giving rise to the demand in the first place. *See* BASIS, *Black's Law Dictionary* (12th ed. 2024) (defining basis to mean "an underlying fact or condition; a foundation or starting point"); *Oregon*, 2026 WL 318402, at *9 (construing "basis" to mean "a factual basis for investigating a violation of a federal statute").  A statute that requires the Attorney General to identify the legal authority under which he acts would not naturally be phrased as one requiring a "statement of the basis and the purpose."  *Cf. Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 669 (2007) (cautioning "against reading a text in a way that makes part of it redundant"); *see also* Scalia & Garner 174 ("Whenever a reading arbitrarily ignores linguistic components or inadequately accounts for them, the reading may be deemed improbable." (citation omitted)); W. Eskridge, Jr. 112 ("[I]t is a cardinal rule of statutory

---

[30] *See* Mot. to Dismiss (doc. no. 32-1) at 9-10 (proffering definition of "purpose"); Obj. to Mot. to Dismiss (doc. no. 51) at 20 (arguing that August demand letter articulated a valid "purpose" to "ascertain New Hampshire's compliance with the list maintenance requirements of HAVA").

interpretation that no provision should be construed to be entirely redundant or meaningless." (citation omitted)).

There is no indication that construing "the basis" to refer to the factual basis for the demand produces an absurd result or is logically inconsistent with the statutory scheme as a whole. *See Freeman*, 147 F.4th at 13. To the contrary, requiring the Attorney General to articulate both a factual predicate and an investigative objective before compelling production of state records is entirely consistent with Title III's overall structure, which conditions the government's inspection power on compliance with these threshold requirements. *See King v. Burwell*, 576 U.S. 473, 475 (2015) (examining "the broader structure of the Act to determine whether" proffered construction of statutory provision "produces a substantive effect that is compatible with the rest of the law" (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988)).

This reading also accords with the Attorney General's own historical practice under Title III, which has been to include a statement of factual basis in § 20703 demand letters. *See, e.g., Lynd*, 306 F.2d at 229 n.6 (§ 20703 demand letter's statement that it was "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction" complied with Title III's requirements); *see also id.* at 226 (referring to the "factual foundation for, or the sufficiency of, the Attorney General's

17

'statement of the basis and the purpose' contained in the written demand" made under §
20703).[31]

Applying this textual framework to DOJ's August letter, the court finds that the
demand fails to satisfy § 20703's basis requirement.  The demand does not identify any
factual anomalies in New Hampshire's voter registration data, nor does it point to any
complaint or pattern suggesting noncompliance with HAVA or the CRA.  *Contrast with
Benson*, 819 F. Supp. 3d at 766 (noting that DOJ's letter to Michigan cited the state's
"high percentage of registered voters, [] low confirmation notice rate, [] low voter
removal rate, and [] high duplicate registration rate," as well as a complaint regarding
Michigan's compliance with HAVA's unique-identifier requirements).  Instead, the letter
states only that the demand represents an exercise of the Attorney General's "authority to
enforce" HAVA and Title III of the CRA, i.e., provides a statement of legal authority, not
a factual basis.

The United States contends that this reference to its statutory authority is sufficient
under § 20703, particularly when read together with the letter's stated purpose of
"ascertain[ing] New Hampshire's compliance with the list maintenance requirements of
HAVA."  But this argument conflates the legal authority under which the Attorney
General acts with the statute's independent requirement that the demand state "the basis."
As *Galvin* observed, "[i]f Congress sought to direct the Attorney General to include a

---

[31] Other district courts in this circuit construing § 20703 have reached the same conclusion
through similar textual analysis.  *See, e.g.*, *Amore*, 2026 WL 1040637, at *5; *Galvin*, 2026 WL
972129, at *4.

citation to Title III in demand letters, requiring the letter to contain a 'statement of the basis and the purpose therefor' would not be the obvious way to do so." 2026 WL 972129, at *5 (citing 5 U.S.C. § 553(b)(2) (requiring notice of proposed rulemaking to include "reference to the legal authority under which the rule is proposed"); 8 U.S.C. § 1229(a)(1)(B) (requiring notice to appear for removal proceedings to "specify[ ] ... [t]he legal authority under which the proceedings are conducted")); *see also* W. Eskridge, Jr. 415 ("Presume against reading a specific concept into general words when precise language in other statutes reveals that Congress knew how to identify that concept."). Accepting the government's reading would collapse "the basis" into "the purpose" and read the word "basis" out of the statute altogether, which is a result the plain text forecloses. *See Breest v. Cunningham*, 752 F.2d 8, 10 (1st Cir. 1985) (courts should not interpret a statute to cause redundancy because "every word is presumed to have a purpose and meaning").

The cases on which the United States relies do not countenance a different result. In both *Lynd* and *Bruce*, the demand letters at issue stated expressly that they were "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within [the] jurisdiction." *Lynd*, 306 F.2d at 229 n.6; *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962). Those letters thus satisfied the "basis" requirement that this court identifies today.

Finally, the United States argues that requiring a statement of factual basis would undermine the investigatory character of Title III. This argument does not alter the plain

meaning of the text Congress enacted. "Congress did not require the Attorney General to prove a violation before compelling production of records, it *did* require the Attorney General to make a demand 'contain[ing] the basis for the demand." *Galvin*, 2026 WL 972129, at *6. The investigatory nature of a Title III demand does not permit the Attorney General to dispense with the statutory prerequisites Congress imposed as conditions on that investigatory authority.

Because the plain text of § 20703 requires a statement of factual basis distinct from a statement of purpose, and because the August 18 letter contains no statement of factual basis whatsoever, the letter is facially invalid under § 20703. The court need not reach the question whether the letter adequately stated a "purpose" within the meaning of the statute. The absence of any basis is independently fatal to the United States' claim and provides an independent ground for dismissal of the CRA claim.

### b. Help America Vote Act

The United States brings a second claim under HAVA, alleging that the defendants have failed to comply with HAVA Section 303 by failing, in response to its demand letters, to provide the federal government with several types of information, including New Hampshire's SVRL. The United States also alleges that New Hampshire failed to conduct list maintenance as required by 52 U.S.C. § 21083(a) or to follow governing requirements for voters who register by mail. New Hampshire and the intervenor-defendants seek to dismiss the HAVA claim. They argue that the United States failed to state a claim under HAVA, first because HAVA contains no provision requiring states to disclose this kind of voter information to the federal government, so a failure to disclose

does not constitute a violation of the statute,[32] and second because the federal government failed to allege facts sufficient to show that New Hampshire had committed a substantive violation of the statute.[33]

The United States failed to object in its briefs to the defendants' and intervenors' motions to dismiss the HAVA claims.  In fact, in its briefing, the federal government made no attempt to address arguments that it had failed to state a claim under HAVA, or to argue that any alleged facts could show that New Hampshire had committed a substantive HAVA violation.  The Attorney General all but abandoned any allegation that a HAVA violation had taken place, stating that "United States seeks these documents for one purpose only: to evaluate New Hampshire's compliance with the list maintenance provisions of HAVA, and *if appropriate*, to bring an enforcement action,"[34] and, in a section addressing the purpose of its demand under Title III, characterizing "enforcement of the list maintenance requirements of HAVA" as being "for the purpose of investigating *possible* violations of a Federal statute."[35]  The United States has accordingly waived the claim.  *See, e.g., Dahua Tech. USA, Inc. v. Zhang,* 138 F.4th 1, 11 (1st Cir. 2025) (stating that a party is generally responsible for "the consequences of its decision to press one theory to the exclusion of another."); *see also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Pickering v. Citizens Bank,*

---

[32] Mot. to Dismiss (doc. no. 32-1) at 15-16.
[33] Intervenor-Defs.' Mot. Dismiss (doc. no. 37) at 20.
[34] *See* Consolidated Opp. to Mot. Dismiss (doc. no. 51) at 9.
[35] *Id.* at 30 (emphasis added) (internal citations removed).

21

*N.A.*, 2019 WL 3457602, at *4 (D.N.H. July 31, 2019) (DiClerico, J.) ("[A] court is not obligated to make arguments on behalf of a party, particularly a party represented by counsel, and may disregard arguments that are not developed.").

Even if the United States had objected, the court would dismiss the HAVA claim. HAVA provides for civil actions against a state by the Attorney General for declaratory or injunctive relief "as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements" of the law.  52 U.S.C. § 21111.  On a 12(b)(6) motion, a court takes a plaintiff's factual allegations in the complaint as true, and draws all reasonable inferences from those facts in the plaintiffs' favor.  *Martino v. Forward Air, Inc.*, 609 F.3d 1, 2 (1st Cir. 2010).  But "[i]f the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal."  *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013) (quoting *SEC v. Tambone,* 597 F.3d 436, 442 (1st Cir.2010)).

Here, the complaint contains two kinds of factual allegations: first, that the defendants failed to provide the United States with certain information to allow the Attorney General to "evaluate New Hampshire's compliance" with various provisions of HAVA; and second, that its response to the Election Administration and Voting Survey 2024 Comprehensive Report showed that the number of potential duplicate names that New Hampshire identified or removed from its voter list was lower than the national

average.[36]  This second type of factual allegation about discrepancies between New

Hampshire's duplicate removal rates relative to other states' was notably absent from the

Attorney General's letters to Secretary of State Scanlan.

As to the claims regarding New Hampshire's alleged failure to provide various

types of information, several courts facing nearly identical suits have found that failure to

disclose information to the Attorney General does not constitute a substantive violation of

HAVA because HAVA has no disclosure provision.  *See, e.g., Benson*, 819 F. Supp. 3d at

759b ("HAVA lacks any provision related to disclosure"); *Weber*, 816 F. Supp. 3d at 1190

("HAVA simply contains no such [disclosure] provision. This ends the inquiry. And the

fact that the NVRA and CRA do include such provisions signals that the omission in

HAVA was intentional." (citing *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392

(2015))); *Oregon*, 2026 WL 318402, at *6 ("Congress knows how to include disclosure

provisions, as it did so in both the NVRA and Title III. It did not do so here, and the

Court will not play the role of Congress by adding one where it does not exist." (citing

*Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988))).  This court therefore joins

others in finding that a state's failure to disclose information, including the SVRA, does

not on its own constitute a substantive violation giving rise to a claim for relief under

HAVA.  *See, e.g. Benson*, 819 F. Supp. 3d at 759 (the United States cannot "file a HAVA

claim, allege no violations of HAVA, and obtain information to support its (as-yet-

nonexistent) claim via discovery.").

---

[36] Compl. (doc. no. 1) at ¶¶ 28-53.

As to potential substantive violations of HAVA, the federal government makes three allegations: that New Hampshire failed to (i) "conduct list maintenance of [its] SVRL in a manner that ensures that… duplicate names are eliminated from the computerized list;"[37] (ii) incorporate "provisions to ensure that voter registration records in the State are accurate and are updated regularly… particularly in regard to removing [*inter alia*]…duplicate names from the SVRL;" and (iii) follow requirements for voters who register by mail.  The only factual allegation in the complaint that could conceivably pertain to any of these claims is that the number of potential duplicates that New Hampshire identified or removed from its voter list was lower, in 2024, than the national average.  This allegation is pertinent, at most, to the claim that New Hampshire failed to conduct list maintenance in a manner that ensures that duplicate names are eliminated from the computerized list, but no others.

The *Weber* court found in response to similar allegations that "the fact that California *reported* duplicate registrations…does not indicate that its list maintenance system is deficient."  816 F. Supp. 3d at 1191.  The court noted that "a lag in removals is not indicative of any wrongdoing" and that, as here, DOJ had not alleged any specific breakdown in the state's removal program.  *Id*. at 1192 (citing *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019) and *Republican Nat'l Comm. v. Benson*, 754 F. Supp. 3d 773, 792 (W.D. Mich. 2024)).

---

[37] *Id*. at ¶ 61.

The allegation that New Hampshire's rate of identifying and removing duplicates from its SVRL is lower than the national average, without any other factual allegation or level of specificity, is not a sufficient factual basis to make out a claim that New Hampshire has substantively violated HAVA, particularly not one that would not allow the far-reaching discovery that the Attorney General seeks. *See Ríos-Campbell v. U.S. Dep't of Com.*, 927 F.3d 21, 26 (1st Cir. 2019) (explaining that "[o]ne of the main goals of [Rule 12(b)(6)] is the avoidance of unnecessary discovery.").

The mere contention that New Hampshire's duplicate identification rates are lower than the national average, without more, cannot support a lawsuit allowing the Attorney General unrestricted access to New Hampshire's SVRL to conduct a line-by-line audit to assess a "possible" violation of a federal statute.[38]  Moreover, the United States's silence in the face of pleading deficiency arguments in both motions to dismiss operates as a waiver of its HAVA claim.  This court therefore joins others in finding that the United States has failed to state a claim under HAVA.[39]

## IV.    Conclusion

For the reasons above, the defendants' and intervenors' motions to dismiss[40] are **GRANTED**.  The United States' motion to compel[41] is **DENIED** as moot.

---

[38] The *Bellows* court found that, though HAVA gives the Attorney General the power to bring a civil suit against a state that has violated the list maintenance provisions, "it does not contemplate the line-by-line audit of each state's computerized SVRL by the federal government to assess compliance with those provisions."  2026 WL 1430579, at *8.

[39] Because the court dismisses the claims based on Title III and HAVA, it does not address the defendants' and intervenors' arguments on privacy and preemption.

[40] Doc. nos. 32, 37.

[41] Doc. no. 31.

SO ORDERED.

_____
Joseph N. Laplante
United States District Judge

Dated: June 29, 2026

Cc: Counsel of record